# WITNESS' AFFIDAVIT

I, ~~DANNY YOUNG~~, DANNIE YOUNG

am an __X__ employee of ___ applicant to ___ former employee of the U.S. Government Printing Office:

(Agency)

(Office)  Production Department

(Division)  Electronic Photocomposition Division

(Branch)  Digital Prepress Section

Located in (CITY AND STATE) Washington, DC

In the capacity of (show both your organization title and the classification of your job, if different):  Superintendent of Electronic Printing Division

Grade __ between __1989__ and __Present__.
Telephone number during working hours is: 202-512-0625.

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Government Printing Office policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Government Printing Office.  I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint.  My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Government Printing Office policy.  This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record.  In addition, the complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file.  I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

_(Initials)_

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

I am an African American male and I am currently employed at the U.S. Government Printing Office (GPO) in the Electronic Photocomposition Division (EPD) as the Superintendent of EPD in Washington, D.C. I have held this position for five years. I have been employed with GPO for thirty two years and have held a supervisory position for fifteen of those years.

During my tenure, I have served as a selecting official approximately ten times and I have served as the reviewing official five times. I also served on a selection and interview panel at least three times.

For the positions of Head Deskperson, KA-4413-00, advertised under vacancy announcement # 04-161 and 04-162; Group Chief, KA-4416-00, advertised under vacancy announcement # 04-163, I served as the selecting official. The selectees for all three positions were African Americans: one female and two males.

As I recall, someone in Human Resources sent me a Certification List of the Best Qualified Candidates for each of those positions. I believe Mr. Hairsine appeared on these lists. I did not interview anyone from the certification list for any of the positions advertised. I asked Fred Hall who worked for the Production Manager where all of the applicants worked to provide recommendations for each of the positions. Mr. Hall reviewed the applications and recommended the three African American applicants: Fletcher Ruffin, Charlie Brown, and Sara Pitt. I asked for his input because he was the foreperson for the Copy Preparation Unit. After the recommendations were made, I reviewed each application from the Certification List of Best Qualified Candidates and agreed with Mr. Hall's recommendations. I did not use race as a factor in the selection process for any of these positions.

I believe Mr. Hairsine was qualified for the positions and he was performing his duties satisfactorily.

During the past two years, I have promoted and hired numerous employees with varying backgrounds. I have attached a list of names to this affidavit.

*D. E.*

(Initials)

2

To the best of my knowledge, Mr. Hairsine did not approach me concerning the selection process or why he was not selected.

I do not recall if Mr. Hairsine applied for other positions in which I served as the Selecting Official.

I have very little interaction with Mr. Hairsine. I am only familiar with him due to the number of years both of us have been with the agency.

I have reviewed this statement, which consists of these __3__ pages, and hereby solemnly __✓__ swear or __✓__ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____          _____
          Signature of Affiant)                            12/10/04 /(Date)

_____
(Initials)

Signed before me at (City and State) _Washington, DC_____

On this _13th_ day of _December_____ , 2004.

_____
          (Signature of Investigator/Witness)

_____
(Initials)

# WITNESS' SUPPLEMENTAL AFFIDAVIT

**Dannie Young**, Superintendent of Electronic Printing Division, U.S. Government Printing Office, hereby declares:

1.      This statement responds to a request that I supplement my earlier statement, dated December 10, 2004, which I provided to the EEO investigator in connection with the equal opportunity complaint filed by Jack Hairsine.  As I understand it, Mr. Hairsine contends that, because of his race (Caucasian) and color (White), he was not selected for three positions we filled in my division in 2004.  I address each of these selections individually.

2.      Head Deskperson, KA-4413-00, Shift 2, Copy Prep Unit, Merit Promotion Announcement No. 04-161, dated June 4, 2004.

The applicant selected for this vacancy was Fletcher Ruffin.  When I viewed Mr. Hairsine's Form 612 application, I noted that he stated that he served as the Acting Head Deskperson.  The records available to me at the time indicated instead that Mr. Ruffin received back pay as the Acting Head Deskperson for the section, not Mr. Hairsine.  I took the fact that Mr. Ruffin had been acting for a substantial time period in the Head Desk position and was eligible for back pay, together with the recommendation of Mr. Frederick Hall, as the principal bases for my selection of Mr. Ruffin.

I should point out that Mr. Hall had been the Foreperson of the Copy Preparation Section for a long period of time.  (He has since retired.)  Mr. Hall worked on a daily basis with the persons in that Section, and his name appears on most of the Employee Performance Ratings.  That, plus the fact that I trusted Mr. Hall's judgment, are the reasons that I asked for his input in connection with my selection decisions.

3.      Head Deskperson, KA-4413-00, Shift 1, Copy Prep Unit, Merit Promotion Announcement No. 04-162, dated June 4, 2004.

The selectee for this position was Ms. Sarah L Pitt.  With respect to this selection, I know that the duties and work are different on each shift.  The following jobs are worked only on shift 1 (days):

    a.  Code of Federal Regulations

    b.  Presidential Documents

*p. 4/*

000073D



    c.   Official Gazette Trade Marks

    d.   Official Gazette Notices

    e.   Scanning of Camera Copy

    f.   Red jackets (outside agency work) inquiries

    g.   Color unit work (storage)

Ms. Pitt worked on shift 1. I knew that Mr. Hairsine had little knowledge of the work and duties as it was being done on shift 1. Again, I relied in part on the recommendation of Mr. Hall, and selected Ms. Pitt because I viewed her to be better able to understand and direct the work on the first shift.

4.     Group Chief, KA-4416-00, Shift 3, Copy Preparation Unit, Merit Promotion Announcement No. 04-163, dated June 4, 2004

I selected Mr. Charles Brown for this vacancy. In my review of Mr. Hairsine's application, I concluded that he had not put any extra effort into his application for this job. The Group Chief is a supervisory position and is higher in rank than Head Deskperson, which is not a supervisory position. However, I noticed that the only thing that Mr. Hairsine's had done to his Group Chief application, from the application that he had submitted for the Head Deskperson position, was that he changed the name of the position and the announcement number. Otherwise, it was the same application. Mr. Brown worked on the third shift, and had performed most of the duties of the Group Chief job on an informal basis before the job had been posted. This, along with input from Mr. Frederick Hall, convinced me that he was the best person for the job.

In addition, my personal experience is that on several occasions I would go to the unit where Mr. Hairsine worked and he was not at his workstation, and no one knew where he was. In my view, this was an indicator that he would not be the best choice for a supervisory or leadership position.

I hereby declare under penalty of perjury that the above statement is true and correct to the best of my information, knowledge, and belief.

                                      *Dannie E. Young* - April 5, 2005

                    DANNIE YOUNG                DATE

COPY

1

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF COLUMBIA

3

4   - - - - - - - - - - - - - - - - -x

5   JACK R. HAIRSINE                    :

6              Plaintiff               :

7       vs.                            :   Case No: 05-1884

8   BRUCE R. JAMES, PUBLIC PRINTER      :

9   OF THE UNITED STATES GOVERNMENT     :

10  PRINTING OFFICE                     :

11             Defendant                :

12  - - - - - - - - - - - - - - - - -x

13

14                          Washington, D.C.

15                          Tuesday, November 7, 2006

16

17  Deposition of:

18            JACK R. HAIRSINE

19  the Deponent, called for examination by counsel for the

20  Defendants, pursuant to notice and agreement as to time and

21  place, at 501 3rd Street, N.W., Washington, D.C., before

22  Jack L. Becker, a Notary Public in and for the District of

23  Columbia.

24

25



**FREE STATE REPORTING, INC.**
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

1     A.   Roughly, right.

2     Q.   Okay.  And during the time you were on first shift,

3 during those six years, were you always on first shift or did

4 you at any point work second or third shift?

5     A.   Always on first shift.

6     Q.   Okay.  So for six years you were on the first shift,

7 from 1984 to 1990, and then you went to a different shift?

8     A.   Yes.

9     Q.   And what shift was that?

10    A.   I went to the third shift.

11    Q.   What time period was that?

12    A.   That was 12 to 8.

13    Q.   12 p.m. to 8 a.m.?

14    A.   Um-hum.

15    Q.   Did you go from the first shift to the third shift

16 by choice or were you involuntarily transferred to the third

17 shift?

18    A.   No, by choice.

19    Q.   And who was your immediate supervisor?

20    A.   Fred Hall.

21    Q.   Had Mr. Hall been your supervisor prior to the time

22 you began working the third shift?

23    A.   Can you repeat that please?

24    Q.   Had Mr. Hall ever been your immediate supervisor

25 prior to 1990 when you started --

1    A.    No.

2    Q.    -- working the third shift?

3    A.    No.

4    Q.    And how long did you work the third shift?

5    A.    I'd say roughly three-and-a-half to four years.

6    Q.    So to 1993 or 1994?

7    A.    I would say '94.

8    Q.    And did you make a change in terms of the shift you
9 worked in 1994?

10    A.    Yes, but not by choice.

11    Q.    What shift did you go to?

12    A.    Second shift.

13    Q.    And you say not by choice.  How did that happen?

14    A.    They always sent us back when Congress was out for
15 the recess, and they sent people back to day side.  And when
16 Congress came back, then they opened the jobs back up for us
17 to claim to go back to where we were.

18    Q.    So what you're saying is when Congress is not in
19 session there is no third shift?

20    A.    No.  There is a third shift, but what they do is
21 they take the bulk of the people to save money and put them on
22 day shift because there's no work.  The work is not there like
23 it used to be.  So what they do is send you back for two
24 months until Congress comes back and then they repost the jobs
25 for second and third shift and they bring people back when the

1   work starts flowing from Congress again.

2       Q.   Okay.

3       A.   And what happened, we was -- my seniority wasn't

4   quite that high and somebody bumped me off of third shift, so

5   I made the second shift.

6       Q.   Okay.  So prior to that time when you were working

7   on the third shift, you would go back to the daytime and then

8   back to third shift, but in 1994 you no longer could go back

9   to the third shift?

10      A.   Right.  When I was on the third shift and then I

11  went back to first, and then when Congress came back in and

12  they had to draft people back to second and third shift I

13  applied for the third shift, but I didn't have enough

14  seniority and another person bumped me from the third shift,

15  so I applied for the second shift and I made the second shift.

16      Q.   Okay.  Who was your supervisor when you were working

17  the second shift in 1994?

18      A.   Willis Mitchell.

19      Q.   What were the hours for the second shift?

20      A.   3:30 to 12, I believe.

21      Q.   Okay.  I want to make sure that I understand this

22  because you talk about being sent back to daytime when

23  Congress was not in session.  You started working the third

24  shift in 1990.  Between 1990 and 1994 you continually worked

25  the third shift, is that correct?

1       A.    Correct, yes.

2       Q.    All right.  And in 1994 you went back to -- when you

3  were transferred off of the third shift you were transferred

4  to the second shift or the first shift?

5       A.    First shift.

6       Q.    How long were you on the first shift?

7       A.    About two months.

8       Q.    Okay.  And then you applied to go back to the third

9  shift, didn't get it, but got second shift?

10      A.    Right.

11      Q.    Okay.  So your time working on the first shift --

12 let's see, you said you worked the first shift in -- you

13 started in 1984.  You said you worked the first shift all the

14 way to 1990 when you went to the third shift.  Between 1990

15 and 1994 how many times did you go back and work the first

16 shift?

17      A.    One time.

18      Q.    Just one time, and that was for two months?

19      A.    I'm sorry, twice.

20      Q.    When were those times?

21      A.    I can't really tell because two of those years

22 Congress didn't go out.  They were extended, so we stayed on

23 the third shift.  So I'm not sure of that four year period the

24 two years I went back, but I know I went back twice.

25      Q.    You know you went back twice to the first shift

34

1   between 1990 and 1994, correct?  Between 1990 --

2        A.    '90.

3        Q.    -- and 1994 --

4        A.    '94.

5        Q.    -- you went back to work on the first shift two

6   times?

7        A.    Right.

8        Q.    And you're saying you don't remember when.

9        A.    I don't remember what year out of those --

10       Q.    Okay.

11       A.    -- what two years out of those four that I went

12  back.

13       Q.    And during both of those two time periods when you

14  went back to work on the first shift, how long were you

15  working on the first shift?

16       A.    Two months.

17       Q.    Okay.  Both times -- each time was two months?

18       A.    Two or three months depending if they went out in

19  October or November.

20       Q.    Okay.  Then you went to the second shift in 1994,

21  and how long did you work the second shift?

22       A.    From '94 to present.

23       Q.    Okay.  So since 1994 to the present you have been

24  continually on the second shift?

25       A.    Yes.

42

1     A.   Yes.

2     Q.   When you came to -- when you started working the

3  second shift in 1994, was Fletcher Ruffin already working the

4  second shift?

5     A.   Yes.

6     Q.   Do you know how long he had been working on the

7  second shift when you started in 1994?

8     A.   I believe he told me he was on there for 32 years or

9  something.

10     Q.   Thirty-two years before 1994 or that he's been on

11  there?

12     A.   That he's been on the second shift for most of his

13  career --

14     Q.   Okay.

15     A.   -- 32 years.

16     Q.   Okay.  Do you know when Mr. Ruffin started at GPO?

17     A.   No.

18     Q.   Did Mr. Ruffin do any training of you when you came

19  to the second shift?

20     A.   Yes.

21     Q.   What did he train you on?

22     A.   He trained me on the incoming desk, and also he

23  trained me on the head desk person job and also in the

24  computer scanning area.

25     Q.   In any other areas?

1      A.    No.

2      Q.    Okay.  When did he train you on the incoming desk

3  duties?

4      A.    That job was a volunteer job for anybody who wanted

5  to train, and as soon as we found out that they might make a

6  group chief job is when I volunteered to go up and train on

7  the desk.

8      Q.    Okay.  So then you told me that the group chief job

9  was just recently posted.  I'm not sure I'm understanding you.

10 Why don't you tell me the dates that you began training on the

11 incoming --

12     A.    Well, the group chief job was --

13     Q.    Wait.  You need to let me finish my question,

14 please.

15     A.    Okay.

16     Q.    Can you please tell me that date on which you

17 trained -- began training on the incoming desk job?

18     A.    Let's see -- I can't remember the date.

19     Q.    Do you remember the year?

20     A.    I'm trying to think.  Probably in 2001.

21     Q.    All right.  So you think sometime in 2001 Mr. Ruffin

22 trained you on the incoming desk job?

23     A.    He trained me on all the --

24     Q.    I'm going to get to the others in a minute.

25     A.    Okay.

44

1     Q.    I'm just talking about the incoming desk job.

2     A.    2001, incoming desk job.

3     Q.    So in -- sometime in 2001 you were trained on that

4  job?

5     A.    Yes.

6     Q.    Did you ask Mr. Ruffin to train you on that job?

7     A.    Yes.

8     Q.    And why did you ask him to train you on that job in

9  2001 given that you had been in the section since 1994, on

10  that shift since 1994?

11     A.    Well, Mr. Ruffin was probably the most experienced

12  person in the section of all three shifts.  He was very

13  supportive to everyone.  He knew his job and at the time, in

14  my opinion, he was the best teacher around.

15     Q.    Okay.  I guess what I'm trying to ask you is what

16  prompted you to seek this training in 2001?

17     A.    What prompted me was I knew that they was going to

18  post a position of supervisor on that shift, not the date, but

19  I knew they would have to sooner or later, and they were

20  asking for volunteers to come up and train to get the

21  experience for when they did post the job I could put that on

22  my application as having experience.

23     Q.    Okay.  When did you train for the head desk person

24  position?

25     A.    2001.

1    Q.    Okay.  He had his arms up in the air?

2    A.    Yes, and he got between us.

3    Q.    He came down and got between you and Mr. Hall?

4    A.    Right.

5    Q.    He physically touched Mr. Hall?

6    A.    He grabbed him by the arm and took him back to Mr.

7  Hall's office.

8    Q.    That would involve physical touching, correct?

9    A.    Yes.

10    Q.    Okay.  Is there anything else Mr. Hall said to you

11  during that conversation?

12    A.    No.

13    Q.    Now you said that you told him that Ms. Pitt didn't

14  do any scanning.  How do you know that?

15    A.    Whenever I was on the first shift and the

16  opportunity to volunteer to scan was offered, we all had a

17  chance to go over there and she started and stayed for about a

18  week, said she didn't like it, she didn't want to do it, and

19  she went back to the incoming desk where she worked.

20    Q.    So you and Ms. Pitt worked together when you were on

21  the first shift, is that right?

22    A.    Yeah, yes.

23    Q.    And you hadn't worked on the first shift since 1994,

24  correct?

25    A.    Correct.

85

1     A.    Yes.

2     Q.    And what about Eli Rice?

3     A.    Yes.

4     Q.    And Mr. Clagett?

5     A.    Yes.

6     Q.    And Mr. Ruffin until he got the head desk person

7  position was a journeyman, correct?

8     A.    Correct.

9     Q.    And Dexter Hood, he's a journeyman, right?

10     A.    Correct.

11     Q.    And a journeyman's not a management position, right?

12     A.    Right.

13     Q.    Now Mr. Ruffin on your shift worked periodically as

14  the acting head desk person, is that right?

15     A.    Correct.

16     Q.    And to your knowledge did he ever receive back pay

17  for working that position?

18     A.    Yes.

19     Q.    And do you have any understanding as to how long you

20  have to work as the acting head desk person before you can get

21  that pay?

22     A.    Thirty-one days.

23     Q.    Okay.  Did you ever work as acting head desk person?

24     A.    Yes.

25     Q.    Did you ever receive back pay for it?

1    A.   No.

2    Q.   Okay.  When did you first start work as an acting

3 head desk person, when was the first time?

4    A.   Probably -- date-wise I couldn't tell you.  It was

5 when I was in my training and Mr. Ruffin was on vacation.

6 That's why we were being trained, so people could take off,

7 because we didn't have enough people to cover the desk, and I

8 would fill in the days he would take off, and also at other

9 times where he had to go to other areas to question work or to

10 find out how certain jobs had to be done I would be in charge,

11 so-called, non-supervisory, but I'd be in charge until he came

12 back.

13    Q.   When was -- do you have any idea when the first time

14 occurred that you assumed that position?

15    A.   Immediately, on the job training, immediately.

16    Q.   Well, but I'm asking you if you have any idea when

17 was the first time that you acted as the acting head desk

18 person?

19    A.   Oh, I can't remember the date.  That was probably --

20    Q.   Do you remember the year?

21    A.   Probably around 2002, I would say.

22    Q.   How often did you do this?

23    A.   Every night.

24    Q.   Every night for some part of the night you were

25 acting head desk person?

1     A.    Yes.  It was like for a month and then I'd go back

2  to the other side for a week and then come back for a month.

3  It was off and on.

4     Q.    Okay.  So it wasn't every night, it was off and on?

5     A.    Yeah, but I would say every night for the simple

6  fact even when I wasn't there that one week, I had to still

7  fill in when he left the room, so I would say every night.

8     Q.    Nobody else ever filled in?  It was only you if Mr.

9  Ruffin left?

10     A.    Um-hum.

11     Q.    You need to answer yes or no.

12     A.    Yes.

13     Q.    Okay.  But some of those times might have been five

14  minutes when he left the room, correct?

15     A.    I would say on the average every night from at least

16  a half-hour to eight hours.

17     Q.    So every single night for a half-an-hour to eight

18  hours you served as acting head desk person from 2002 on,

19  that's your testimony?

20     A.    No.  What I meant to say was when he wasn't in the

21  room I was acting head desk person.  When he was in the room I

22  wasn't, but I was being trained.  He was showing me what to do

23  when he was in the room as head desk person.

24     Q.    I understand that, but I'm asking you about when you

25  actually were serving as acting head desk person.

88

1    A.    I would say on a -- maybe two-and-a-half, three

2  hours a night.

3    Q.    Every night for at least two to three-and-a-half

4  hours your testimony is that you served as the acting head

5  desk person on the second shift, is that your testimony?

6    A.    I wouldn't say every night, no.  I would say

7  periodically -- it's hard to say that every night because

8  Ruffin was there sometimes all night and I was there with him

9  and he was teaching me, but when he left the room or he had a

10  phone call he had to go see at a meeting or something like

11  that I filled in.  I couldn't tell you exactly on an average

12  when I filled in as desk person, but I did -- I was up there

13  every night for at least two or three hours either supporting

14  him or taking over when he was gone.

15    Q.    Well, I'm not asking about when you were supporting

16  him or he was training you.  I'm asking about when you were

17  acting --

18    A.    I couldn't --

19    Q.    Let me finish my question, please.  I'm asking you

20  when you were acting head desk person how often did that

21  happen?  Do you have any estimate or not?  If you don't, just

22  say I don't know, it happened periodically.

23    A.    Periodically.

24    Q.    Okay.  With respect to the head desk person position

25  for the second shift that Mr. Ruffin was selected for, is it

1  your position that you were better qualified than Mr. Ruffin

2  for that job?

3      A.   No.

4      Q.   Then why is it you feel you were discriminated

5  against by Mr. Ruffin's selection for that job?

6      A.   I don't think I filed against Mr. Ruffin.

7      Q.   I'm sorry, what?  So are you saying that you do not

8  have a claim in this case for the head desk person position

9  that Mr. Ruffin was selected for?

10          MR. ALLISON:  Objection, calls for a legal

11  conclusion.

12          BY MS. BRASWELL:

13     Q.   Are you claiming any kind of discrimination with

14  respect to the head desk person position --

15     A.   Yes, I am.

16     Q.   -- that Mr. Ruffin was selected for?

17     A.   Yes.

18     Q.   And you're claiming discrimination based on race?

19     A.   Yes.

20     Q.   Okay.  And why do you think you were discriminated

21  against by not being selected for the position that Mr. Ruffin

22  was selected for?

23          MR. ALLISON:  Same objection.

24          BY MS. BRASWELL:

25     Q.   You can answer.

# COPY

1

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4    JACK R. HAIRSINE,              )

 5    an individual,                 )

 6              Plaintiff,           )

 7         vs.                       )    Civil Action No.

 8    BRUCE JAMES, Public Printer    )    05-1884 (RMC)

 9    of the United States,          )

10              Defendant.           )

11                   -    -    -    -    -

12         The deposition of FREDERICK GEORGE HALL,

13    SR., was taken on Thursday, November 9, 2006,

14    commencing at 10:25 a.m., at the U.S. Government

15    Printing Office, 732 North Capitol Street, N.W.,

16    Washington, D.C., before Karen Hinnenkamp,

17    Registered Merit Report Notary Public.

18                   -    -    -    -    -

19

20

21

22
```

For The Record, Inc.

(301) 870-8025 -  - (800) 921-5555

DEFENDANT'S EXHIBIT
4
1:05-1884 RMC

Hall

23

1      A     I don't recall.

2      Q     Did the idea to fill those three

3  positions, either as group chief or as head

4  deskperson, come from you?

5      A     Oh, no.

6      Q     Did it come from someone in Digital Copy

7  Prep?

8      A     I don't know.

9      Q     Who did you first learn about it from?

10     A     Dannie.

11     Q     Dannie Young?

12     A     Yes.

13     Q     Okay.  Did Dannie Young ask you to do

14  anything with respect to the creation or filling of

15  those three positions?

16     A     Yes.

17     Q     What was the first task or first thing

18  that he asked you to do?

19     A     He asked me to look over the applications

20  and give him a recommendation.

21         MR. ALLISON:  Can we mark this as Hall

22  Exhibit 1, please.

Hall

28

1    Q    Do you recall telling Mr. Hairsine and/or

2    Mr. Ruffin that you had been involved in deciding

3    whether there would be so many group chief positions

4    or so many head desk positions?

5    A    No, I don't recall that.

6    Q    Do you recall anything in particular

7    about that conversation?

8    A    Not really.

9    Q    Okay.  At the time that work was being

10   done that you were involved in leading up to the

11   posting of three jobs, a group chief and two head

12   desk jobs in 2004, did you have any idea about who

13   possible candidates would be within the Digital Copy

14   Prep Section?

15   A    No, I really wasn't concerned with it as

16   I was not in the section any more.

17   Q    Now at that time you were personally

18   acquainted with Charles Brown?

19   A    Yes.

20   Q    And personally acquainted with Sarah

21   Pitt?

22   A    Yes.

Hall

29

1      Q      Personally acquainted with Jack Hairsine?

2      A      Yes.

3      Q      And personally acquainted with Fletcher

4  Ruffin?

5      A      Yes.

6      Q      Apart from those four people, were there

7  any other people that you were acquainted with who

8  would have been good candidates for either a group

9  chief or head desk job in 2004?

10     A      I would hesitate to say because I can't

11  even remember who was in the section at the time any

12  more.

13     Q      Okay.  So if I asked you to tell me

14  anyone you recall in the first half of 2004 who you

15  would have thought would be applying for one of

16  these positions, you can't recall any other people?

17     A      No.  If you gave some names, I might, it

18  might help me.  But like I said, I don't even

19  remember, I can't recall all the people who were in

20  the section at the time.

21     Q      Okay.  I would like to ask you about a

22  couple of people.  I think this is a little bit of a

Hall

44

1   was any controversy about whether he should get back

2   pay?

3       A    Yes.

4       Q    Tell me what you know about Sarah Pitt's

5   training on the computer and scanning functions in

6   the Copy Prep Unit.

7       A    She had a limited amount of training.

8   But she had other duties.  She wasn't trained as

9   extensively as some, but she had training.

10      Q    Do you know who trained her?

11      A    Bill Milans, and there was another guy,

12  Bill Knecht I think on day side, and there was a

13  couple other fellows in the back.  I don't recall

14  their names.  They have since retired.

15      Q    Was there a man named Dexter Hood who was

16  a trainer on computers?

17      A    Dexter was there, but Dexter came later.

18      Q    Okay.  When you say Sarah Pitt had other

19  duties, tell me what you mean by that.

20      A    Sarah would be on the incoming desk so

21  she took care of all the jobs that were coming into

22  the section.  She made out the control cards.  She

Hall

1   had the PPW make the xeroxes of the jackets.  She

2   scheduled them.  She placed them up on the counter

3   to be worked.

4          Q      During what period of time was she doing

5   these jobs?

6          A      Period of time?

7          Q      Yeah.  Like what year to what year, do

8   you know?

9          A      She took over that position after Mo was

10  promoted to the group chief in the Color Unit.

11         Q      After Mo Ford was --

12         A      So it was probably sometime in '96 or

13  '97, up until she was promoted into the head

14  deskperson job.

15         Q      Okay.

16         A      Which in fact was the same duties.

17         Q      Head desk was the same duties as incoming

18  desk?

19         A      Yes.

20         Q      The Mo that you're talking about is Mo

21  Ford?

22         A      That's correct.

**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

Hall

46

1     Q     So is it your belief that from the time

2     that Mo Ford got his promotion to group chief until

3     sometime in 2004 that Sarah Pitt was the acting head

4     deskperson during all that time?

5     A     Well, she wasn't acting because there

6     were two supervisors there so there was no position

7     there.  When we lost, when the group chief retired,

8     she assumed the responsibilities of the person that

9     was performing those duties.  And she was working

10    the incoming desk, she was handling queries, she was

11    okaying press sheets, she was doing all the things

12    that the group chief did.

13    Q     You say she wasn't acting in that

14    position because there were two supervisors there?

15    A     Yeah, it was myself and Milans on the

16    other side, so....

17    Q     Then after you left there was still

18    Milans?

19    A     Yes.

20    Q     So was she in charge of the section after

21    you left?

22    A     In charge?

. Hall

47

1    Q    Yeah, did you leave Sarah in charge of

2  the section?

3    A    No, I didn't leave her in charge.

4    Q    Okay.

5    A    Sarah was promoted before I left.

6    Q    Before you left the GPO.

7    A    No, before I left the section.

8    Q    I understood you to say that you left the

9  section in 2002.  You left your Foreman position in

10  2002.

11    A    Yeah.

12    Q    And that was the last time that you were

13  a supervisor of Copy Prep, right?

14    A    That's correct.

15    Q    Okay.  Sarah was not promoted by that

16  time, was she.

17    A    I thought she was promoted already before

18  -- I don't absolutely recall, but I thought she was

19  already the head deskperson in the day shift before

20  I left there.

21    Q    Okay.

22    A    Maybe I'm confused about the time frame.

Hall

48

1     Q     Okay.  You were promoted to Assistant to

2  the Production Manager in about 2002 do you recall?

3     A     I think.  I'm not sure about the dates.

4     Q     Okay.  You recall that the promotion when

5  Sarah Pitt became a head deskperson was in the

6  middle of 2004.

7     A     Is that correct?

8     Q     That is correct.

9     A     Okay.  Then my recollection of it is

10  wrong then.

11     Q     Okay.

12     A     So she was acting.

13     Q     She was acting.

14     A     Yes.

15     Q     Okay.  Was she the supervisor in charge?

16     A     No, Milans was in charge.

17     Q     All right.  Do you belong to any

18  organizations whose membership is predominantly

19  black or African American?

20     A     Prince Hall Masons.

21     Q     Do you hold an office in the Masons?  Do

22  you have a title?

Hall

56

1  kind of testimony with respect to a proceeding at

2  the MSPB?

3      A    Yes, I did.

4      Q    Who was that?

5      A    Some years ago, Mr. Leon Rutland.

6      Q    And did you actually testify at the

7  proceeding?

8      A    Yes, I did.

9      Q    Now if you can turn back to Exhibit 3,

10  page 2, please.

11          MR. ALLISON:  Page 2 of the whole

12  exhibit?

13          MS. BRASWELL:  I'm sorry, at the very

14  end.  Page 2 of your affidavit.

15          MR. ALLISON:  Right.  Last page of the

16  exhibit.

17          THE WITNESS:  Hm-mm.

18          BY MS. BRASWELL:

19      Q    You talk about the selection of

20  Mr. Ruffin for the head deskperson position?

21      A    Yes.

22      Q    Had you had an opportunity to observe

Hall

1    Mr. Ruffin's skills?

2        A    Yes.

3        Q    In what capacity?

4        A    As Foreman of the section.

5        Q    Do you know how often he -- I believe in

6    this affidavit here you say he ran the whole ship,

7    stepped up and took charge.  Do you know if that

8    happened with any regularity?

9        A    Yes.  Quite often.

10       Q    Why was it that you recommended

11   Mr. Ruffin for the position of head deskperson

12   instead of Mr. Hairsine?

13       A    I felt he was the best qualified.

14       Q    Did you have any knowledge as to whether

15   or not Mr. Ruffin had ever given any training to

16   Mr. Hairsine?

17       A    Not directly, no.

18       Q    Okay.  What was your understanding about

19   Mr. Hairsine's willingness to engage in scanning?

20       A    It was my understanding that when that

21   operation first came into our section that he had

22   told the supervisor then that he was not, he didn't

Hall

58

1   really want to train on the scanning since it wasn't

2   a part of our responsibilities at that point.

3       Q    Okay.  The next paragraph in your

4   declaration, in paragraph 2, you say you recommended

5   an African American female to Mr. Young for the day

6   shift.  Who would that be?

7       A    That would be Ms. Pitt.

8       Q    Can you please explain why you

9   recommended Ms. Pitt for that position instead of

10  Mr. Hairsine?

11      A    Well, first off, she was there.  She had

12  all the qualifications.  She had been a journey

13  person for a period of time.  She was actively

14  working in the position.

15      Q    Which position?

16      A    The head deskperson position.  And had

17  been for a period of time.

18      Q    As an individual acting in that position

19  did she have any responsibility for contacts with

20  other offices?

21      A    Oh yes.  She had responsibility not only

22  for the other offices here in the building but for

Hall

59

1  the agencies outside of the building that would call

2  in and question where their job was or call in some

3  corrections and various other sundry queries that

4  she had to handle.

5      Q    Are the duties on the first shift -- was

6  she on the first shift?

7      A    She was on the first shift.

8      Q    Are the duties on the first shift the

9  same as the duties on the second shift?

10     A    No, they are vastly different.

11     Q    In what way?

12     A    Well, first off, there are more people

13 they have to supervise.  There are different

14 operations that go on on day side that don't go on

15 on the night shift.  There is the Color Unit.  There

16 is -- there are jobs that were strictly done on day

17 side that weren't done on nights.

18          Most of the time the patents were done on

19 day side.  The contact with the other agencies was

20 all done on the shift one.  There was more agency

21 work that came into the section on day side.  We

22 dealt with outside purchase jobs.  We dealt with

Hall

60

1    print orders.  We dealt with jackets that, black

2    jackets, which were plant operation jobs.

3            So she handled various and sundry

4    responsibilities that more often than not were not

5    done on the second and/or third shift.

6        Q    Okay.  Your next paragraph says that you

7    recommended an African American male to Mr. Young

8    for the midnight shift.  Is that the third shift?

9        A    That's the third shift.

10       Q    For the group chief position.  Who was

11   that individual?

12       A    It was Mr. Ruffin, I believe.

13       Q    Was that Mr. Ruffin or Mr. Brown?

14       A    I'm sorry.  Mr. Brown.  Charlie Brown.

15       Q    Okay.  Why did you recommend Mr. Brown

16   for that position as opposed to Mr. Hairsine?

17       A    Well, I felt he was the best qualified.

18   He had shown the initiative and the drive to handle

19   the position.  He was very personable.  He was

20   knowledgeable about all the operations of Prep.  And

21   he had also been trained extensively and was

22   training people on the new process of scanning.

Hall

61

1      Q      Did you ever have an opportunity to
2  personally view Mr. Brown's work?

3      A      Yes.

4      Q      And how was that?

5      A      It was, on a whole it was very good.

6      Q      I'm sorry.  I was unclear in my question.
7  When I asked you if you had an opportunity to view
8  his work and you said yes, I meant to ask how did
9  that work that you had an opportunity to view his
10  work?  Did you work with him?  How was it that you
11  saw his work?

12      A      No.  Well, on occasion what myself and
13  Mr. Milans used to do, we would pull a job that a
14  person had scanned and we would go over to see how
15  accurate it was.  And this is how I was able to
16  determine that Charlie was very good at what he did.

17      Q      Okay.  Did you ever work during the same
18  time period as Mr. Brown?

19      A      He worked for a period of time on day
20  side when I first came over in '95.  Then he went to
21  the night shift.

22      Q      Okay.  When he worked the night shift,

Hall

62

1    what shift were you working?

2        A        I was on days, shift one.

3        Q        What time did you come in in the morning?

4        A        I usually got in about 7:15, 7:30.

5        Q        Was Mr. Brown working at that time?

6        A        He was on until 8:00.

7        Q        Did you have an opportunity to view his

8    work when you came in for your shift?

9        A        On occasion, yes.  Well, not only that.

10   In the absence of the supervisors, while he was

11   acting, he would give me an update on what they had

12   accomplished, what was left to be accomplished,

13   because a lot of times there was the Congressional

14   Record was left over.  We had to pick up on that.

15   There was some hot reports of bills or committee

16   bills or whatever that we had to look at.  So he

17   gave me an update on what was coming and what was

18   probably going to be on the hot list that we had to

19   look out for.

20       Q        How did you find the quality of the

21   updates he gave you?

22       A        Very good.

## WITNESS' SUPPLEMENTAL AFFIDAVIT

I, **FREDERICK G. HALL,**

am an ____ employee of ___ applicant to _x_ former employee of the U.S. Government Printing Office:

(Agency)

(Office)  Production Department

(Division)  Electronic Photocomposition Division

(Branch)  Digital Press Section

Located in (CITY AND STATE)  Washington, DC

In the capacity of (show both your organization title and the classification of your job, if different):  Supervisor of Printing

Grade  14  between  2003  and  November 10, 2004.
Telephone number during working hours is:  Retired.

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Government Printing Office policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Government Printing Office. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Government Printing Office policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

_____
(Initials)



000067E

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

I recommended Fletcher Ruffin to Mr. Young for the Head Deskperson position because he had more experience in the overall operation of the office. In addition, he ran the whole ship, stepped up and took charge when the supervisor was absent. Mr. Ruffin demonstrated that he knew everything he needed to know pertaining to the skills necessary for the position. I felt confident that he would be able to perform the tasks required of the position.

I recommended an African American female to Mr. Young for the day shift, Head Deskperson position because she was familiar with the overall operation of the office. In addition, she operated the section since I left. I had confidence in her ability to perform the duties of the position.

I recommended an African American male to Mr. Young for the midnight shift, Group Chief position because he stepped up and took charge and showed more initiative than Mr. Hairsine. I also had confidence in his ability to successfully perform the duties of the position.

I believe that all the selectees names above were better qualified than Mr. Hairsine because he did not show as much initiative as the others.

Since I have been employed with GPO for thirty eight years, I cannot specifically recall the total number of employees I promoted. If I provide a number, I would probably be incorrect. I do recall that I promoted five White employees during my tenure and I can only recall the names of three: Tom Gilles, Harold Needleman, and Karen Kuntz.

I have reviewed this statement, which consists of these _____ pages, and hereby solemnly ___ swear or ___ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____
*Initials*

2

TAB F-2
Page 10 of 10 Pages

# In The Matter Of:

*JACK R. HAIRSINE    v.*
*BRUCE JAMES*

---

*FREDERICK G. HALL, SR*
*November 9, 2006*

---

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*10760 Demarr Road*
*White Plains, MD  USA  20695*
*(301) 870-8025    FAX: (301) 870-8333*

*Original File 61109HAL.ASC, 72 Pages*
*Min-U-Script® File ID: 3326625807*

# Word Index included with this Min-U-Script®

Page 53

[1] **Q:** I'm asking that because Ms. Rice in her

[2] covering memorandum suggests that she never got a

[3] signed supplemental affidavit from you. I'm just

[4] wondering if you recall ever sending it.

[5] **A:** I sent it to her. I think it was

[6] probably after this date.

[7] **Q:** Okay. Do you recall, if you look through

[8] this document down to the last two pages where it

[9] says witness supplemental affidavit.

[10] **A:** Okay.

[11] **Q:** Do you recall being involved in the

[12] preparation of this supplemental affidavit? In

[13] other words, providing information to Ms. Rice.

[14] **A:** Yes.

[15] **Q:** Okay. Do you recall her sending you this

[16] supplemental affidavit?

[17] **A:** This particular one?

[18] **Q:** Yeah. You had mentioned, and I realize

[19] that this one that we're looking at has some things

[20] stamped on it and it has a fax machine ID across the

[21] top.

[22] **A:** Hm-mm.

Page 54

[1] **Q:** But otherwise you had testified earlier

[2] that you recalled her sending you something, I

[3] believe you said by e-mail, and I'm just asking if

[4] you recall receiving this particular one.

[5] **A:** To be honest, I don't recall this

[6] particular one.

[7] **Q:** Okay. If you look, page 1 of the

[8] affidavit has identifying information about you and

[9] then a sort of paragraph advising you of certain

[10] things, and page 2 appears to have the actual facts

[11] that you were being asked to provide.

[12] **A:** Page 2, is that the one that starts up

[13] with "Having been advised"?

[14] **Q:** Exactly. If you could read through that

[15] and just tell me whether that is information that

[16] you provided to Ms. Rice when she spoke to you about

[17] Mr. Hairsine's case.

[18]    (Brief pause.)

[19] **A:** Yes, I believe this is information that I

[20] did provide her. Yes.

[21] **Q:** So your recollection is you either did

[22] sign an affidavit with this information in it or you

Page 55

[1] were willing to?

[2] **A:** Yes.

[3] **MR. ALLISON:** Okay. I don't have any

[4] further questions.

[5] **MS. BRASWELL:** I have a few follow-up

[6] questions.

[7]    **EXAMINATION BY COUNSEL FOR DEFENDANT**

[8]    **BY MS. BRASWELL:**

[9] **Q:** Mr. Hall, I think at the beginning of

[10] this deposition you were asked whether or not you

[11] had ever given sworn testimony in an administrative

[12] proceeding and you said no. Do you remember your

[13] selection of Karen Kuntz?

[14] **A:** Yes.

[15] **Q:** Was there any complaint filed in

[16] connection with that selection?

[17] **A:** Yes, there was.

[18] **Q:** Do you remember whether or not you gave

[19] any kind of statement in connection with that

[20] selection?

[21] **A:** Yes, I did.

[22] **Q:** All right. Have you ever provided any

Page 56

[1] kind of testimony with respect to a proceeding at

[2] the MSPB?

[3] **A:** Yes, I did.

[4] **Q:** Who was that?

[5] **A:** Some years ago, Mr. Leon Rutland.

[6] **Q:** And did you actually testify at the

[7] proceeding?

[8] **A:** Yes, I did.

[9] **Q:** Now if you can turn back to Exhibit 3,

[10] page 2, please.

[11] **MR. ALLISON:** Page 2 of the whole

[12] exhibit?

[13] **MS. BRASWELL:** I'm sorry, at the very

[14] end. Page 2 of your affidavit.

[15] **MR. ALLISON:** Right. Last page of the

[16] exhibit.

[17] **THE WITNESS:** Hm-mm.

[18]    **BY MS. BRASWELL:**

[19] **Q:** You talk about the selection of

[20] Mr. Ruffin for the head deskperson position?

[21] **A:** Yes.

[22] **Q:** Had you had an opportunity to observe

# COPY

1

```
1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4    JACK R. HAIRSINE,              )

5    an individual,                 )

6              Plaintiff,           )

7              vs.                   )   Civil Action No.

8    BRUCE JAMES, Public Printer     )   05-1884 (RMC)

9    of the United States,           )

10             Defendant.           )

11              -    -    -    -    -

12        The deposition of DANNIE E. YOUNG was

13   taken on Tuesday, October 24, 2006, commencing at

14   10:05 a.m., at the offices of Karr & Allison, P.C.,

15   1920 N Street, N.W., Suite 300, Washington, D.C.,

16   before Karen Hinnenkamp, Registered Merit Report

17   Notary Public.

18              -    -    -    -    -

19

20

21

22
```



DEFENDANT'S
EXHIBIT
6
05-1884 RMC

Young

107

1       Q      I'm sorry.  Go back to 13.  This must be

2   13.  Let's find 13.

3       A      I've got 13.

4       Q      Can you look at page 2 of 13?

5       A      Hm-mm.

6       Q      Okay, that's the one I wanted, thank

7   you.  The very last sentence says "During the past

8   two years, I have promoted and hired numerous

9   employees with varying backgrounds.  I have

10  attached a list of names to this affidavit."  Is

11  Exhibit 16 the list you attached only minus the

12  handwriting?  Is that what you're referring to?

13      A      I believe so, yes.

14      Q      Okay.  So Exhibit 16 would have been

15  attached to Exhibit 13 except Exhibit 16 would not

16  have had any handwritten notations on it at the

17  time?

18      A      Yes.

19      Q      Okay.  If you could please look at

20  Exhibit 14 again.  Go to the first page, number 3.

21  You were asked about a list of duties here as to

22  when they were performed.  The affidavit says the

Young

108

1    following jobs are worked only on shift one days.

2    What did you mean when you said only on shift one

3    days?

4        A    The majority of the time.

5        Q    Okay.  So some of these duties were

6    worked on other shifts?

7        A    Sometimes.

8        Q    Not on a daily basis?

9        A    Not on a daily basis.

10            MR. ALLISON:  Objection.  Leading.

11            BY MS. BRASWELL:

12        Q    That's fine.  You can answer.  Were they

13    worked on a daily basis on the other shifts, shift

14    two and shift three?

15            MR. ALLISON:  Same objection.

16            THE WITNESS:  No.

17            BY MS. BRASWELL:

18        Q    If you will look at Exhibit 11 and

19    Exhibit 10, please.  Okay, there is 10, and Exhibit

20    11 should look like this, the same type of thing.

21    It is a Form 52.

22            All right.  You were asked some