**United States District Court for the District of Columbia**

| | | |
|---|---|---|
| Jack R. Hairsine, an individual, | ) | |
| | ) | Civil Action No. 05-1884  RMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Bruce James, Public Printer of | ) | |
| the United States | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OPPOSING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jack R. Hairsine, by counsel, opposes defendant's motion for summary judgment.  This memorandum will respond to defendant's Statement of Material Facts, and present additional material facts which require trial on all elements of plaintiff's claim (at p. 10), followed by a discussion of the facts and governing principles of law (at p. 16).

Plaintiff, a highly qualified and experienced printer with the U.S. Government Printing Office, is Caucasian, and has repeatedly been passed over by his African American supervisors for promotions for which he possessed superior qualifications.  The three selections in issue in this action were highly irregular, and the reasons given for the selection of at least two of the successful applicants over Mr. Hairsine were irrational and, in certain details, patently false.  Therefore, genuine issues of material fact exist which constitute sufficient "background circumstances" to require a trial applying the *McDonnell Douglas/Burdine* framework to this "reverse discrimination" action under the principles articulated in *Harding v. Gray*, 9 F.3d 150 (D.C. 1993) and *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012 (D.C. Cir. 1981).

<u>Response to Defendant's Statement of Facts</u>

1. Plaintiff is a Caucasian male who at all times relevant to this case was employed as an

offset stripper in the Copy Prep Unit of the Pre-Press Section of the Electronic Printing Division [EPD] of the Government Printing Office. Complaint, ¶7.

    <u>Undisputed</u>

    2.  In April 2004, three vacancy announcements were issued for the Copy Prep Unit: (1) Vacancy Announcement 04-162 for a "Head Deskperson" for Shift 1; (2) Vacancy Announcement 04-161 for a "Head Deskperson" for Shift 2, and (3) Vacancy Announcement 04-163, for a "Group Chief" position for Shift 3. Exh 1 at 2; Exh. 2 at 1-2.

    <u>Undisputed</u>

    3.  Plaintiff applied for all three positions but was not selected. Complaint, 13-16.

    <u>Undisputed</u>

    4.  At the time plaintiff applied for the positions, plaintiff was working on Shift 2. Exh. 3 at 34.  Plaintiff has been working continuously on Shift 2 since 1994. Id.

    <u>Disputed</u>.  Mr. Hairsine has worked on all three shifts periodically during the entire period of his employment as an offset stripper.  (P.Ex. 14 Young Dep. 68:11-19; P.Ex. 19 Hairsine Aff. ¶ 3.)  While the implication of this statement of fact is that Mr. Hairsine was less experienced or qualified for the shift 1 and shift 3 positions, Mr. Hairsine was qualified for all three positions, having been trained to perform them on all three shifts, and having experience in all aspects of the work of all three shifts.  (P.Ex. 9 Hairsine App. At 3.)  According to Fletcher Ruffin, one of the successful applicants and now a Group Chief, he and Mr. Hairsine trained for the head deskperson job together, before 2004, and Mr. Hairsine demonstrated that he knew how to do the job.  (P.Ex. 15 Ruffin Dep. 34:9-12.)  Mr. Young had very little knowledge of whether Mr. Hairsine was familiar with the work of shift 1.  (P.Ex. 14 Young Dep. 51:13-17.)

5. Mr. Dannie Young was involved in making the selection decisions, and he relied upon the recommendations made by Frederick Hall, who worked for the Production Manager in the section where all of the applicants worked. Exh. 1 at 2; Exh. 4 at 28-29.

Disputed. Defendant avers that Dannie Young "selected the three candidates for the three positions at issue in this lawsuit" (Answer, ¶11), as Mr. Young confirmed (P.Ex. 14 Young Dep. 21:12-22:11, 35-38). He did not "place a lot of reliance" on Mr. Hall's recommendations, but rather, "took in what he had to tell me." (P.Ex. 14 Young Dep. 22:6-11.) Mr. Hall was not the head of the Digital Pre-Press unit, and indeed, had not even worked in that unit for over a year prior to the announcements and selections for the three positions. (P.Ex. 16 Hall Dep. 10-13.) Dannie Young, in his initial affidavit in Mr. Hairsine's administrative case at the agency level (hereinafter "administrative case") only a few months after the selections, testified that he "asked Fred Hall . . . to provide recommendations for each of the positions" (P.Ex. 1 Young Aff. at 2) because "he was the foreperson for the Copy Preparation Unit." (*Id.*) In reality, as Mr. Young well knew, William Milans, a Caucasian man, was the foreperson of the Copy Preparation Unit; Mr. Young testified, however, that he did not consult Mr. Milans because the latter was out of the office, on vacation, at the time of the selections. (P.Ex. 14 Young Dep. 30:5-16.) This was untrue. (P.Ex. 19 Hairsine Aff. ¶ 2.) Mr. Young claims to have made independent selections based on a thorough review of all the applications for all three positions. (P.Ex. 14 Young Dep. 37:12-38:17.) Mr. Young did not interview any of the candidates for the positions (P.Ex. 1 Young Aff. 2), but relied on the statements in the candidates' applications, which he accepted as true. (P.Ex. 14 Young Dep. 37:12-40:11.) Mr. Young found nothing in the applications he considered to be untrue, and made no inquiries to determine whether any of the applications contained any false statements. (P.Ex. 14 Young Dep. 34:1-11.)

7.  Mr. Hall reviewed all the applications for the positions listed in paragraph two above and made recommendations for selection to Mr. Young. Id.; Exh. 4 at 23.

<u>Disputed</u>.  This statement of fact is disputed to the extent that Mr. Hall did not brief Mr. Young concerning any of the successful applicants (P.Ex. 16 Hall Dep. 34-35) and did not interview the applicants or talk to anyone about them.  (P.Ex. 16 Hall Dep. 38:21-40:16.)  Mr. Hall had not worked in the Digital Pre-Press section for over a year (P.Ex. 16 Hall Dep. 10-13), and had not worked on the same shift as Mr. Hairsine for approximately ten years.  (P.Ex. 16 Hall Dep. 12-13.)  Thus, at a minimum, Mr. Hall did not give fair consideration to the application of Mr. Hairsine.

8.  Plaintiff considers Mr. Hall to be his friend. Exh. 3 at 105-06.

<u>Undisputed</u>  (N.B.  The fact that plaintiff and Mr. Hall were friends and fellow ex-Marines, in addition to plaintiff's superior qualifications, adds to the likelihood that racial bias, as opposed to merit, cronyism, or caprice, was a motivating factor in the selections.)

9.  Mr. Hall recommended to Mr. Young that he select Sarah Pitt, an African-American, for the Head Deskperson position for Shift 1.  Exh. 1 at 2; Exh. 2 at 1-2.

<u>Undisputed</u>

10.  At the time of this recommendation, Ms. Pitt was working on the incoming desk on Shift 1 in the Copy Prep Unit, which required her to take care of jobs that were coming into the Unit by, among other things, making out control cards, scheduling the work, handling queries and approving press sheets. Exh. 4 at 44-46.

<u>Disputed</u>.  This statement of fact is inaccurate because it is incomplete and incorrectly suggests that Ms. Pitt was qualified for the position.  Ms. Pitt's application was plainly false (P.Ex. 10 Pitt App. 5-6; P.Ex. 4 Hall Supp. Aff. 2, Deft. Exh. at 37-40; P.Ex. 16 Hall Dep. 46:1-47:3; P.Ex. 14 Young Dep. 49:4-13, 81:18-82:12) and contained obvious plagiarism (P.Ex. 7 Pitt

App. 6; P.Ex. 6 Ruffin App. 6; P.Ex. 14 Young Dep. 47:19-48:15; and P.Ex. 15 Ruffin Dep. 63:3-18.)  Ms. Pitt had limited training in the automated aspects of the job, which were significant (P.Ex. 16 Hall Dep. 44:4-17), and she was not competent in those areas (P.Ex. 13 Hood Aff. ¶ 3) ("Ms. Pitt did not have that competency in the area of computers and scanning, and was not qualified for that position"); and, her application revealed that she did not comprehend one of the critical aspects of the job–timely completion of work.  (P.Ex. 14 Young Dep. 50:2-16.)

11.  Mr. Hall recommended Ms. Pitt to Mr. Young because he believed that she was familiar with the overall operation of the office and her shift duties and that she had acted as the Head Deskperson for Shift 2.  Exh. 4 at 46-48, 58-60; Exh. 5 at 2.

Disputed.  Mr. Hall's recommendation was the product of pre-selection.  (*See* ¶¶ 7, 8, at 12, below.)  Mr. Hall had selected or recommended only African American candidates consistently since 1997.  (P.Ex. 16 Hall Dep. 29:21-34:2; P.Ex. 5 Ruffin Aff. 2-3; P.Ex. 19 Hairsine Aff. ¶ 6.)  Mr. Hall conceded that Ms. Pitt had "a limited amount of training" in the use of computers and scanners in the department (P.Ex. 16 Hall Dep. 44:4-9), and Ms. Pitt was not competent in those areas.  (P.Ex. 13 Hood Aff. ¶ 3.)  Mr. Hall had little knowledge of Mr. Hairsine's experience or capabilities, but knew that he had been trained as a Group Chief and head deskperson (P.Ex. 16 Hall Dep. 15-16); however, Mr. Hall made no effort to learn anything else about Mr. Hairsine in connection with his applications for the three positions.  (P.Ex. 16 Hall Dep. 38:21-40:16; 17:1-17.)  Mr. Hall was well aware that Mr. Hairsine had served a tour of duty in the U.S. Marine Corps.  (P.Ex. 16 Hall Dep. 17:18-19:2), and of Mr. Hairsine's leadership experience.  (P.Ex. 19 Hairsine Aff. ¶ 4.)

12.  Mr. Young selected Ms. Pitt for the position of Head Deskperson for Shift 1 based in part on Mr. Hall's recommendation.  Exh. 2 at 2. Mr. Young understood that certain duties

performed during Shift 1, such as dealing with the Code of Federal Regulations and Presidential Documents, were primarily performed only during Shift 1. Exh. 2 at 1-2; Exh. 4 at 58-60, Exh. 6 at 107-08.

　　　　Disputed.  Mr. Young could not have selected Ms. Pitt based on his own assessment of her application, but he has testified that he did so.  The head deskperson should be knowledgeable about the different types of work being done in the section.  (P.Ex. 14 Young Dep. 66:20-67:2.)  Mr. Young changed his testimony about the work done on shift 1 between the time of his affidavit in the administrative case, prepared shortly after the selections, and his deposition in this action (P.Ex. 2 Young Supp. Aff. ¶ 3; P.Ex. 14 Young Dep. 98:11-22).   In his affidavit, he asserted that certain types of work were performed *only* on shift 1 (and by implication, that Ms. Pitt would be familiar with such work) as a justification for the selection of Ms. Pitt.  Mr. Young accepted the assertion in Ms. Pitt's application that she had been "serving as acting head deskperson for approximately 5 years," but did not consider whether she had received back-pay for that work, or otherwise check to determine whether her assertion was true. (P.Ex. 14 Young Dep. 49:4-13.)  Ms. Pitt was not, in fact, acting head deskperson for five years as stated in her application; according to Mr. Hall, "she wasn't acting because there were two supervisors there so there was no position there."  (P.Ex. 16 Hall Dep. 46:1-47:3.)  Mr. Hall did not "leave Sarah in charge of the section" when he was promoted (*id.*), yet in his affidavit, he said exactly the contrary (P.Ex. 4 Hall Supp. Aff. 2.)  Mr. Young also agreed that Ms. Pitt, in describing how she performed the job of acting head deskperson, conceded that she would allow jobs to be delayed, but just not for long periods of time," (P.Ex. 14 Young Dep. 50:2-16), although making sure jobs are not delayed is an essential function of the head deskperson. (P.Ex. 14 Young Dep. 49:14-18.)  Mr. Hairsine, in contrast, demonstrated the importance of processing work on time.  (P.Ex. 9 Hairsine App. 4.)  Neither Mr. Young nor Mr. Hall had a

reasonable understanding of Mr. Hairsine's qualifications, except to know that he was experienced and trained on the head desk, and was an officer in the U.S. Marine Corps. (*E.g.*, P.Ex. 3, at 3, Mr. Hall "supervised Mr. Hairsine "while he and I were on the midnight or third shift," prior to 1994.)  Mr. Young testified, "I have very little interaction with Mr. Hairsine.  I am only familiar with him due to the number of years both of us have been with the agency."  (P.Ex. 1 Young Aff. 3.)   Thus, he could not have testified truthfully that he "knew that Mr. Hairsine had little knowledge of the work and duties as it was being done on shift 1."  (P.Ex. 14 Young Dep. 51:2-17.)

13.  Mr. Young concluded that Ms. Pitt was the best candidate to understand and direct the work on Shift 1. Exh. 2 at 2.

Disputed.  Mr. Young could not have honestly reached this conclusion, and neither he nor Mr. Hall did anything to determine whether Mr. Hairsine would be better qualified.  (*See* response to ¶¶ 11 and 12, above.)

14.  At the time of the selections, plaintiff had not worked on Shift 1 for ten years. Exh. 3 at 34, 70.

Disputed.  Mr. Hairsine had done shift 1 and shift 3 work, on his shift, and during Congressional recesses.  (P.Ex. 19 Hairsine Aff. ¶ 2.)

15.  Mr. Hall recommended to Mr. Young that he select Fletcher Ruffin, an African-American, for the Head Deskperson position for Shift 2. Exh. 1 at 2; Exh. 2 at 1-2.

Undisputed

16.  Mr. Hall based this recommendation on the fact that Mr. Ruffin had more experience in the overall operation of the Copy Prep Unit than any of the other applicants and had been placed in charge when the supervisor was absent. Exh. 4 at 56-57; Exh. 5 at 2.

Undisputed

17.  Mr. Ruffin had trained plaintiff to perform various duties in the Copy Prep Unit. Exh. 3 at 42.

    <u>Undisputed</u>

18.  Mr. Ruffin worked periodically as acting Head Deskperson on Shift 2, and for a period received back pay for performing this job because he worked in the position thirty one consecutive days.  Exh. 3 at 85.

    <u>Undisputed</u>

19.  Mr. Young selected Mr. Ruffin for the position of Head Deskperson for Shift 2 based in part on Mr. Hall's recommendation.  Exh. 2 at 1. Mr. Young also selected Mr. Ruffin because Mr. Ruffin had been serving as the acting Head Deskperson on Shift 2 for a substantial period of time, including a continuous period that was long enough to qualify Mr. Ruffin for back pay. Id.

    <u>Disputed</u>.  While Mr. Hairsine does not dispute that Mr. Ruffin was qualified for the position, Mr. Young was plainly untruthful when he averred that he selected Mr. Ruffin in part because he had served as acting head deskperson long enough to merit an award of back-pay. (P.Ex. 2 Young Supp. Aff. ¶ 2.)  Mr. Hairsine's application demonstrated that he had "trained on the incoming desk on all three shifts," (P.Ex. 8, p. 5, page numbered "2") and "occasionally volunteer[ed] as the Head Deskperson," and "serv[ed] as the Acting Head Deskperson."  (*Id.* p. 7, page numbered "4;" *see also* P.Ex. 5 Ruffin Aff. at 2.)  But Mr. Young, after being asked by GPO in the course of Mr. Hairsine's administrative case for "further clarification on the specific reasons why [he] recommended the three African American applications," made a supplemental affidavit, in which he averred that, because "the records available to me at the time indicated instead that Mr. Ruffin received back pay as the Acting Head Deskperson for the section, not Mr. Hairsine," Mr. Ruffin should be selected for the position.  (P.Ex. 2 Young Supp. Aff. ¶ 2.) However, Mr. Ruffin's application contained nothing about having received back-pay as acting

head deskperson (P.Ex. 14 Young Dep. 42:4-11), and neither Mr. Young nor Mr. Hall consulted

with anyone about facts outside the applications to support their selections.  (P.Ex. 14 Young

Dep. 21:12-14; P.Ex. 16 Hall Dep. 34-35, 38:21-40:16.)  Most significantly, Mr. Ruffin himself

testified that he did not receive back-pay for serving as acting head deskperson until sometime

after the selection and that he did not even apply for the back-pay until "a couple of weeks *after*

obtaining the position" (P.Ex. 15 Ruffin Dep. 25:2-26:1).  Moreover, Mr. Young turned down

Mr. Ruffin's first application for back-pay.  (P.Ex. 15 Ruffin Dep. 26:21-28:20.)

20.  Plaintiff does not believe that he was better qualified than Mr. Ruffin for the Head

Deskperson position for Shift 2. Exh. 3 at 88-89.

Undisputed  (as to Mr. Ruffin only).

21.  Mr. Hall recommended to Mr. Young that he select Charles Brown, an African-

American, for the Group Chief position for Shift 3.  Exh. 5 at 2. Mr. Hall believed that Mr.

Brown had demonstrated leadership capabilities while working on Shift 3 and that Mr. Brown

had shown more initiative than plaintiff. Id.; Exh. 4 at 60.  Mr. Hall found Mr. Brown to be

knowledgeable about all the operations done in the Copy Prep Unit and very personable, and

believed that Mr. Brown performed good work. Exh. 4 at 60-62.

Disputed

This fact is disputed in that Mr. Hall had not worked on the same shift as Mr. Brown or

Mr. Hairsine (P.Ex. 16 Hall Dep. 12-13), and made no effort to determine whether Mr. Hairsine's

skills were equivalent or superior to Mr. Brown's.  (Hall Dep. 38:21-40:16.)  Mr. Hall was not

the selecting official, and Mr. Young gave irrational and false reasons for his selection of Mr.

Brown.  According to Mr. Young, "Mr. Brown worked on the third shift, and had performed

most of the duties of the Group Chief job on an informal basis before the job had been posted."

(P.Ex. 14 Young Dep. 53:10-54:4.)  But Mr. Young admitted that Mr. Brown did not say

anywhere in his applications that he had served as acting group chief, or acting head deskperson. (P.Ex. 14 Young Dep. 53:10-54:4.)  Nor did Mr. Brown explain why he is qualified for a higher level job.  (P.Ex. 14 Young Dep. 58:4-7.)  Mr. Young had no direct experience working with Mr. Brown.  (P.Ex. 14 Young Dep. 17:9-12.)  To justify his selection, Mr. Young averred, "the Group Chief is a supervisory position and is higher in rank than Head Deskperson . . . [but] the only thing that Mr. Hairsine had done to his Group Chief application, from the application that he had submitted for the Head Deskperson position, was that he changed the name of the position and the announcement number.  Otherwise, it was the same application."  (P.Ex. 2 Young Supp. Aff. ¶ 4; P.Ex. 14 Young Dep. 42:12-43:5.)  However, Mr. Brown's applications for group chief and head deskperson were, themselves, identical, as Mr. Young was forced to concede.  (P.Ex. 14 Young Dep. 57:6-58:16.)  Nor had Mr. Hall worked on the same shift as Mr. Brown for many years, if ever.  (P.Ex. 16 Hall Dep. 12-13.)

22.  Mr. Young selected Mr. Brown for the position of Group Chief for Shift 3 based in part on Mr. Hall's recommendation. Exh. 2 at 1.  Mr. Young also selected Mr. Brown because he believed that Mr. Brown had been performing most of the duties of the Group Chief position on an informal basis before the vacancy announcement for the position had been posted. Exh. 2 at 2.

Disputed.  The reasons given for the selection of Mr. Brown were arbitrary, if not demonstrably false.  See response to paragraph 21, above.

23.  Plaintiff had not worked on Shift 3 since 1994. Exh. 3 at 30-32.

Disputed.  Mr. Hairsine performed the work of shift 3 periodically throughout the time period, and the work was similar to, if not the same as, his work on shift 2, with the exception of a greater proportion of scanning at which he was experienced.  (P.Ex. 19 Hairsine Aff. ¶ 2.)

<u>Plaintiff's Statement of Facts Presenting a Genuine Issue for Trial</u>

1.  In this action for race discrimination in violation of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5, plaintiff claims that he was denied two promotions on the basis of race, that his qualifications for the positions were superior to those of the successful applicants, and that the reasons given by the agency for the selections were pretextual.  Plaintiff exhausted his administrative remedies pursuant to Title VII, in that plaintiff submitted to and cooperated fully with the Equal Employment Opportunity counseling procedure, filed a formal complaint with the agency EEO office in or about September 3, 2004, and received an adverse decision from the agency within the past 90 days. (Complaint, ¶6; Answer.)

2.  The racial make-up of the personnel of the Production Department, Copy Prep Unit is roughly evenly divided between African American and Caucasian, the former being the majority. (P.Ex.17, EEOC Report.)

3.  Mr. Hairsine is a Caucasian man, who is been employed by the United States Government Printing Office ("GPO") in Washington, D.C. (Complaint, ¶4; Answer) and who for 21 years has held the position of offset stripper in the Copy Prep Unit, Pre-Press Section ("PPS") of the Electronic Printing Division ("EPD") (collectively referred to as "PPS EPD"), within the Production Department ("PD") of the GPO.  (Complaint, ¶7; Answer.)

4.  Fred Hall was formerly the foreperson of Copy Prep Unit, but did not hold a position in that section at the time of the selections.  (Complaint, ¶9; Answer.)  Both Mr. Young and Mr. Hall are African American.  (Complaint, ¶9; Answer.)

5.  Defendant avers that Dannie Young "selected the three candidates for the three positions at issue in this lawsuit." (Answer, ¶11.)  Dannie Young was the Assistant Production Manager in the Production Department.  (Complaint, ¶10; Answer.)  He was the immediate superior of Frederick Hall.  (*Id.*)  For over a year before the selections, Mr. Hall worked in an

area separate from the Digital Pre-Press unit, and had no supervisory authority in that unit.  Both Mr. Young and Mr. Hall worked the day shift, 7:30 a.m. to 4:00 p.m., from 1993 through the time the selections were made.  (P.Ex. 14 Young Dep. 14:14-15:19; P.Ex. 16 Hall Dep. 12-13.)

6.  It was generally known in Mr. Hairsine's unit that Mr. Hairsine was an ex-Marine.  (P.Ex. 15 Ruffin Dep. 45:6-46:6), and Mr. Hall was well aware of this fact.  (P.Ex. 16 Hall Dep. 17:18-19:2.)  Mr. Hairsine indicated in his applications that he was a military veteran, entitled to veteran's preference (P.Ex. 9 Hairsine App. 3), but Mr. Young paid this no heed.  (P.Ex. 14 Young Dep. 14:1-7.)  Mr. Hairsine had been a sergeant in the Marine Corps., in charge of a platoon of up to 48 men in combat and training operations.  (P.Ex. 19 Hairsine Aff. 4.)

7.  In or about May, 2004, Plaintiff learned that the position vacancies were going to be announced, and had conversations with the Superintendent of Production and one of his subordinates, Mike Emery, about fairness in the selection process.  Specifically, Plaintiff warned that Mr. Hall had not been fair in prior selections, and informed the officials of rumors of the identities of the persons who would be selected for the positions: Charles Brown (African American man), Sara Pitt (African American woman), and Fletcher Ruffin (African American man).  (P.Ex. 18 Hairsine EEO Aff. at 2.)

8.  According to widespread rumor and reputation, Mr. Hall planned to select Mr. Brown, Mr. Ruffin and Ms. Pitt for the jobs even before they were announced.  (P.Ex. 18 Hairsine EEO Aff. at 2.)  Mr. Ruffin confirmed that there had been rumors prior to the selections being made that he, Ms. Pitt and Mr. Brown would be selected, and that Mr. Hall was involved in establishing the three positions.  (P.Ex. 15 Ruffin Dep. 55:4-59:15)

9.  Mr. Hairsine was qualified for the positions, having been trained to perform them on all three shifts, and having experience in all aspects of the work of all three shifts.  (P.Ex. 9 Hairsine App.)  According to Fletcher Ruffin, he and Mr. Hairsine trained for the head

deskperson job together, before 2004, and Mr. Hairsine demonstrated that he knew how to do the job.  (P.Ex. 15 Ruffin Dep. 34:9-12.)

10.  Mr. Brown was not well-qualified for the Group Chief position.  In addition to the lack of supervisory or leadership qualifications in his application (*see* response to paragraph 21, above), Mr. Ruffin testified that Mr. Brown would periodically call him when he was not at work to ask him questions about the work (P.Ex. 15 Ruffin Dep. 60:17-61:8), although Mr. Ruffin worked on a different shift.

11.  Mr. Young collaborated with Mr. Hall on the selections even though William Milans, a Caucasion man, was the foreperson in charge of the section at the time of the vacancy announcements, and selections.  In addition, Mr. Milans had extensive experience in the section, having served as the assistant foreperson under Mr. Hall for several years before the selections were made.[1]  Mr. Young asserted in deposition testimony that he did not consult with Mr. Milans because Mr. Milans was on vacation or out of the office at the time the selections were made. (P.Ex. 14 Young Dep. 30:5-15.)  This, however, is demonstrably false.  (P.Ex. 19 Hairsine Aff. ¶ 2.)

12.  Plaintiff presented substantially better qualifications for the positions than did the Group Chief selectee, Charles Brown.  Mr. Young identified nine different aspects of Mr. Hairsine's applications for the positions that demonstrated supervisory ability.  (P.Ex. 14 Young Dep. 75-77.)  Mr. Brown's application does not appear to demonstrate any.  (P.Ex. 12; *see also* response to paragraph 21, at 9, above.)

---

[1]  Mr. Milans has given a sworn statement stating his agreement with the selections; plaintiff need not allege or prove that Mr. Milans would have made different recommendations, as he was not the selecting official; what is relevant is the peculiar circumstance of Mr. Young having excluded Mr. Milans, the Caucasian head of the section, from the selection process altogether.

13.  Ms. Pitt's application similarly demonstrated far less supervisory ability than did Mr. Hairsine's, and in addition, on the qualification of having served as acting head deskperson, the material facts in her application were blatantly at odds with Mr. Hall's sworn testimony about her experience.  (P.Ex. 10 Pitt App. 1, P.Ex. 4 Hall Supp. Aff. at 10, page numbered "2;" P.Ex. 16 Hall Dep. 46:1-47:3.)

14.  Mr. Young testified, concerning the selection of Ms. Pitt, that the duties and work are different on each shift, that Ms. Pitt worked on shift 1, and "I knew that Mr. Hairsine had little knowledge of the work and duties as it was being done on shift 1."  (P.Ex. 2 Young Supp. Aff. ¶ 3.)  Mr. Young accepted that Ms. Pitt had been "serving as acting head deskperson for approximately 5 years," but did not consider whether she had received back-pay for that work, or otherwise check to determine whether her assertion was true.  (P.Ex. 14 Young Dep. 49:4-13.) Mr. Young also agreed that Ms. Pitt, in describing how she performed the job of acting head deskperson, conceded that she would allow jobs to be delayed, but just not for long periods of time," (P.Ex. 14 Young Dep. 50:2-16), although making sure jobs are not delayed is an essential function of the head deskperson.  (P.Ex. 14 Young Dep. 49:14-18.)  Mr. Ruffin testified that it was a "possibility" that in the process of completing applications for the three positions, that Ms. Pitt had asked him to explain the basics of scanning to her.  (P.Ex. 15 Ruffin Dep. 64:19-65:1.) Ms. Pitt's application blatantly copied Mr. Ruffin's in several respects, although Mr. Ruffin did not know how this had happened.  (P.Ex. 7 Pitt App. 6, P.Ex. 6 Ruffin App. 6; P.Ex. 14 Young Dep. 47:19-48:15; P.Ex. 15 Ruffin Dep. 63:3-18.)

15.  With respect to the Group Chief position, Mr. Young testified, "the Group Chief is a supervisory position and is higher in rank than Head Deskperson . . . [but] the only thing that Mr. Hairsine had done to his Group Chief application, from the application that he had submitted for the Head Deskperson position, was that he changed the name of the position and the

announcement number.  Otherwise, it was the same application." (P.Ex. 1 Young Aff. 4; P.Ex. 14 Young Dep. 42:12-43:5.)  The applications submitted by the successful candidate for the Group Chief position, Charles Brown, was identical to his application for head deskperson as well.  (P.Ex. 14 Young Dep. 57:6-58:16.)

16.  According to Mr. Young, "Mr. Brown worked on the third shift, and had performed most of the duties of the Group Chief job on an informal basis before the job had been posted." (*Id.*)  Mr. Brown's application showed little or no supervisory experience or ability.  (P.Ex. 12 Brown App. 3-5; *cf.* P.Ex. 11 Hairsine App.)  Mr. Young admitted that Mr. Brown did not say anywhere in his applications that he had served as acting group chief, or acting head deskperson. (P.Ex. 14 Young Dep. 53:10-54:4.)  Mr. Young had no direct experience working with Mr. Brown.  (P.Ex. 14 Young Dep. 14:14-15:19, 17:9-12.)

17.  In his supplemental affidavit, Mr. Young added by way of justification, "my personal experience is that on several occasions I would go to the unit where Mr. Hairsine worked and he was not at his workstation, and no one knew where he was.  In my view, this was an indicator that he would not be the best choice for a supervisory or leadership position." (P.Ex. 2 Young Supp. Aff.)   Mr. Ruffin testified that to his recollection, Mr. Young had never come into the unit looking for Mr. Hairsine, and that he never observed any problems with Mr. Hairsine's attendance or presence on the job.  (P.Ex. 15 Ruffin Dep. 40:16-41:21.)  Mr. Young certainly had no reason to have looked for Mr. Hairsine before the selections were made, having had little knowledge of or contact with him over the preceding 13 or more years.  (P.Ex. 14 Young Dep. 65:18-66:2; P.Ex. 1 Young Aff. 3.)

18.  The job selections described above were the latest in a pattern of discriminatory job selections in which Mr. Hall was involved.   Plaintiff had previously applied for promotion to a number of positions in which Mr. Hall was the recommending official, and in each of the last

15

seven selections, the successful applicant, recommended by Mr. Hall, was African American. (*See* P.Ex. 16 Hall Dep. 30-33; P.Ex. 19 Hairsine Aff. ¶ 6; P.Ex. 5 Ruffin Aff. p. 3.)  Mr. Hall averred (in his affidavit in the administrative case) that he had promoted several Caucasian applicants while a supervisor at GPO (P.Ex. 4 Hall Supp. Aff. at 6, page numbered "2"); two were in the early 1980s, and one, in 1995, was for a low-level delivery job.  (P.Ex. 16 Hall Dep. 50-51.)

19.  According to Mr. Ruffin, David Boddie, another management official, confided in him that he (Mr. Boddie) was disappointed that Mr. Hairsine had not been selected for one of the positions.  (P.Ex. 15 Ruffin Dep. 72:1-73:6.)

20.  Plaintiff has therefore sustained a loss of compensation in the full amount of the salary and benefits offered and paid to the successful candidate for the position, in the amount of at least ten percent of his salary annually.  (P.Ex. 19 Hairsine Aff. ¶ 7.)

### Discussion

The *prima facie* case of employment discrimination may be established according to the familiar framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d. 668 (1973).  "In the ordinary race discrimination case, in which a minority plaintiff accuses his employer of discriminating in favor of non-minority applicants, the Supreme Court has held that the plaintiff may make a prima facie case by showing:  (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."  *Harding v. Gray*, 9 F.3d 150 (D.C. 1993), citing *McDonnell Douglas,* 411 U.S. 792, 802.   "These criteria are 'flexible,' and must be adjusted to the facts of the case at hand."  *Id.*   The standard is "not onerous"; it serves only to "eliminate[]

the most common nondiscriminatory reasons for the plaintiff's rejection," thus justifying a

requirement that the employer come forward with an explanation.  *Texas Dep't. of Cmty. Affairs*

*v. Burdine,* 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

      In *Harding*, the Court elaborated on its earlier ruling in *Parker v. Baltimore & Ohio R.R.*

*Co.*, 652 F.2d 1012, 209 U.S. App. D.C. 215 (D.C. Cir. 1981) establishing the "background

circumstances" principle in cases of "reverse discrimination" under Title VII.  The Court in

*Harding* explained:

> "This Court requires a white plaintiff to show additional "background circumstances
> [that] support the suspicion that the defendant is that unusual employer who
> discriminates against the majority."  *Parker v. Baltimore & Ohio R.R.,* 209 U.S. App.
> D.C. 215, 652 F.2d 1012, 1017 (D.C. Cir. 1981).  This requirement is not designed to
> disadvantage the white plaintiff, who is entitled to the same Title VII protection as a
> minority plaintiff.  *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 278-
> 80, 49 L. Ed. 2d 493, 96 S. Ct. 2574 (1976). Instead, the background circumstances
> requirement merely substitutes for the minority plaintiff's burden to show that he is a
> member of a racial minority; both are criteria for determining when the employer's
> conduct raises an "inference of discrimination." (Citations omitted.)

      The Court in *Harding* held that "an allegation of superior qualifications, if supported by

the facts, can constitute sufficient background circumstances to establish a prima facie case. A

contrary ruling would defeat the purpose of Title VII—to shield the ideal of merit-based

employment from the distortions of invidious discrimination."

      The Court explained that evidence of such "background circumstances" generally fell

into one of two categories, the first being evidence of more systematic discrimination against the

majority, and the second, "evidence indicating that there is something "fishy" about the facts of

the case at hand that raises an inference of discrimination," citing *Daye v. Harris*, 210 U.S. App.

D.C. 145, 655 F.2d 258, 260-61 (D.C. Cir. 1981) (plaintiff alleged "scheme" to fix performance

ratings); *Lanphear v. Prokop*, 703 F.2d 1311, 1315 (D.C. Cir. 1983) (plaintiff was given "little or

no consideration" for the promotion, and supervisor never fully reviewed qualifications of

minority promotee); *Bishopp v. District of Columbia*, 788 F.2d 781, 786-87 (D.C. Cir. 1986) (promotee was less qualified than four white plaintiffs and was promoted "over their heads . . . in an unprecedented fashion").  The Court concluded, "we will take this opportunity to hold [that] 'background circumstances' need not mean 'some circumstance in the employer's background' " but, "on the contrary, other evidence about the 'background' of the case at hand—including an allegation of superior qualifications—can be equally valuable."

"Under [the *McDonnell Douglas/Burdine*] test, if a more qualified white applicant is denied promotion in favor of a minority applicant with lesser qualifications, we think that in itself raises an inference that the defendant is 'that unusual employer who discriminates against the majority.' "  *Harding*, citing *Parker*, 652 F.2d at 1017.  "And when an employer acts contrary to his apparent best interest in promoting a less-qualified minority applicant, it is more likely than not that the employer acted out of a discriminatory motive. The *McDonnell Douglas/Burdine* allocation of the burden of proof relies on this very presumption. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576-77, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978) (court should ask whether discriminatory motivation is "more likely than not," and employer who acts irrationally is presumed to have such motivation)."  *Harding*, 9 F.3d at 154.

Mr. Hairsine is entitled to prove that he was subject to discrimination in the selections in this case by circumstantial evidence, including evidence that the defendant's stated reason for adverse action was pretextual, combined with evidence of the prima facie case:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if the disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, no additional proof of discrimination is required.' "

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 512, 113 S. Ct. 2742, 125 L. Ed. 2d 407

(1993).  *See also Lathram v. Snow*, 336 F.3d 1085, 1090 (D.C. Cir. 2003) (evidence which cast

doubt on or refuted the defendant's proffered justification for a failure to promote was held to

"provide grounds upon which a reasonable jury could conclude that the government's

explanation . . .  was a pretext for discrimination").   Such evidence can consist of "any

combination of (1) evidence establishing the plaintiff's prima facie case; (2) evidence the

plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any

further evidence of discrimination that may be available to the plaintiff, such as independent

evidence of discriminatory statements or attitudes on the part of the employer.  *Mastro v.*

*Potomac Elec. Power Co.*, 447 F.3d 843, 855, 371 U.S. App. D.C. 68 (D.C. Cir. 2006), citing

*Holcomb v. Powell,* 433 F.3d 889, 896, 369 U.S. App. D.C. 122 (D.C. Cir. 2006); *Aka v. Wash.*

*Hosp. Ctr.*, 156 F.3d 1284, 1289, 332 U.S. App. D.C. 256 (D.C. Cir. 1998) (*en banc*).

        Even after the defendant has articulated a legitimate, nondiscriminatory reason for its

actions, the trier of fact may still consider the proof of the *prima facie* case and inferences

properly drawn therefrom on the issue of whether the proffered reason is a pretext for

discrimination.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 147 L. Ed. 2d

105, 120 S. Ct. 2097 (2000).   The plaintiff may prove his case indirectly, by showing the

employer's proffered justification was not worthy of credence.  *U.S. Postal Serv. Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 75 L.Ed.2d 403, 103 S. Ct. 1478 (1983).

        The promotions in the present case, to borrow from *Harding*, were nothing if not "fishy."

There is no serious dispute that Mr. Hairsine possessed at least equal experience to the

successful applicants, but was more skilled in the actual functions of the department and had

experience on all three shifts.  In addition to his supervisory experience as an acting head

deskperson, Mr. Hairsine possessed real leadership experience that each of the others

lacked—leading U.S. Marines in combat and training.  This was generally known in the department, and certainly known to Mr. Hall.  Had Mr. Young or Mr. Hall even bothered to learn more about Mr. Hairsine, of whom they knew little but what was contained in his application, they would have discovered that he was the only qualified leader in the pool of qualified applicants.

Mr. Young, the selecting official, had the option of soliciting the recommendations of a Caucasian supervisor, the actual foreperson of the Digital Pre-Press unit, who had many years of experience, but instead worked exclusively with Fred Hall who had not worked in that unit for over a year at the time the selections were made.  Neither Mr. Hall nor Mr. Young did anything to inform themselves about the qualifications of the applicants.  Neither had spent any considerable time working with Mr. Hairsine, yet both asserted that they knew–somehow–Mr. Hairsine was not the more qualified applicant for the first and third shift positions, even though his application, on its face, demonstrated superior qualifications.  *Cf. Lanphear*, 703 F.2d at 1315.

Very close in time to the selections themselves, Mr. Young gave the official reasons for his selections, as selecting official.  As demonstrated above, none of the reasons holds water.  Mr. Ruffin's application for back-pay had not even happened when these selections were made, yet Mr. Young cited that as the chief reason for his selection of Mr. Ruffin.  Ironically, when Mr. Ruffin did apply for back-pay, Mr. Young himself determined at first that he was *not* entitled to it.

Mr. Young believed that Mr. Brown was a superior candidate to Mr. Hairsine largely because Mr. Hairsine used the same language in his applications for the supervisory Group Chief job as for the head deskperson job.  But Mr. Young had to concede that only Mr. Hairsine cited at least *nine* different supervisory qualifications in his application (Mr. Brown cited none), and

20

that Mr. Brown himself had submitted *identical* applications for Group Chief and for head deskperson—precisely the fact for which only Mr. Hairsine was given a demerit.

In selecting Ms. Pitt, Mr. Young and Mr. Hall scrambled to justify their actions. Ms. Pitt claimed to have been the acting head deskperson for five years, but that could not have been true (¶¶ 13-15, at 13, above). She said she was in charge of her section in the absence of the supervisor, but the supervisor (either Mr. Milans, or Mr. Hall through 2002) always worked on the same shift as Ms. Pitt. Mr. Hall averred that upon his promotion, he "left Ms. Pitt in charge" of her section and shift, but testified on deposition that she was never left in charge. Finally, it was well known that Ms. Pitt lacked the skills necessary to perform or supervise the work of the section, which Mr. Hall was all but forced to admit on deposition. (P.Ex. 13 Hood Aff. ¶ 3; P.Ex. 16 Hall Dep. 44:4-17.) In the end, Mr. Young found it necessary to add that he had gone looking for Mr. Hairsine at some point and found him not at his desk, another apparent fabrication  (¶ 17 above, at 15).

Mr. Young and Mr. Hall, the decision-makers, were unable to provide truthful or cogent explanations of their actions even when preparing affidavits in the seclusion of their respective offices, and each made unfair and unfounded assumptions about Mr. Hairsine's abilities, having not worked with him for many years, and having conducted no interviews, or any other inquiries. Such credibility problems and absence of fair procedures constitute sufficient "background circumstances" to establish a claim of discrimination, and render summary judgment inappropriate. *Cf. Mastro v. Potomac Elec. Power Co.,* 447 F.3d at 856 (claims called into question whether investigation was reasonably objective, and credibility of decision-maker). It would have been simple enough for defendant to admit to a case of unvarnished cronyism, which would violate merit promotion regulations, but not, at least, Title VII. But Mr. Young did not consider Mr. Brown or Ms. Pitt to be personal friends of his (P.Ex. 14 Young Dep. 17:2-20), and

defendant has no explanation for the favoritism exhibited by Mr. Young in making the irrational selections, or for the effort to cover the true reason for the selections with multiple falsehoods.

The Court in *Harding* was concerned specifically with "irrational" behavior, that of promoting a less qualified applicant, and held that such behavior was sufficient in and of itself to raise an inference of discriminatory intent sufficient to establish a *prima facie* case of discrimination against the majority.  In the instant case, Mr. Hairsine was passed over for the promotions in favor of two minority applicants who were less qualified by objective standards, but the behavior of the responsible officials in Mr. Hairsine's case went beyond "irrational."  It was plainly dishonest. The totality of facts is sufficient to convince a jury, within the parameters of applicable Title VII authority, that the desire to advance applicants of a given racial background over a Caucasian applicant—the only common denominator among Mr. Hall's recommendations for promotion over an eight year period—was the true reason for the selections in this case.

Respectfully submitted,

Karr & Allison, P.C.

By: _____/ s / _____
    Theodore S. Allison (D.C. Bar #441089)
    1920 N Street, N.W., Suite 300
    Washington, D.C.  20036
    Telephone (202) 331-7600
    Attorneys for Plaintiff