# ORIGINAL

1

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4    JACK R. HAIRSINE,                )

5    an individual,                   )

6              Plaintiff,             )

7         vs.                         )    Civil Action No.

8    BRUCE JAMES, Public Printer      )    05-1884 (RMC)

9    of the United States,            )

10             Defendant.             )

11                    -    -    -    -    -

12        The deposition of DANNIE E. YOUNG was

13   taken on Tuesday, October 24, 2006, commencing at

14   10:05 a.m., at the offices of Karr & Allison, P.C.,

15   1920 N Street, N.W., Suite 300, Washington, D.C.,

16   before Karen Hinnenkamp, Registered Merit Report

17   Notary Public.

18                    -    -    -    -    -

19

20

21

22

2

```
 1              A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4           THEODORE S. ALLISON, ESQ.

 5           Karr & Allison, P.C.

 6           1920 N Street, N.W.

 7           Suite 300

 8           Washington, D. C.   20036

 9           (202) 331-7600

10           tsallison@karrallison.com

11

12   ON BEHALF OF THE DEFENDANT:

13           MARINA UTGOFF BRASWELL, ESQ.

14           Assistant United States Attorney

15           U.S. Attorney's Office for D.C.

16           555 4th Street, N.W.

17           Washington, D. C.   20530

18           (202) 514-7226

19           Marina.Braswell@usdoj.gov

20

21

22
```

```
 1          A P P E A R A N C E S (Continued)

 2

 3    ON BEHALF OF THE DEFENDANT:

 4              THOMAS KELLY, ESQ.

 5              Assistant General Counsel

 6              Office of the General Counsel

 7              U.S. Government Printing Office

 8              Washington, D. C.    20401

 9              (202) 512-0033

10              tkelly@gpo.gov

11

12    ALSO PRESENT:  Jack Hairsine

13

14

15

16

17

18

19

20

21

22    (Index appears following the transcript.)
```

Young

4

1    Whereupon --
2                    DANNIE E. YOUNG
3    a witness, called for examination, having been
4    first duly sworn, was examined and testified as
5    follows:
6            EXAMINATION BY COUNSEL FOR PLAINTIFF
7                BY MR. ALLISON:
8        Q    Good morning, Mr. Young.
9        A    Good morning.
10       Q    I'm Theodore Allison.  We have met
11   before.  We are here today for your deposition in
12   the case of Jack Hairsine versus Bruce James,
13   Public Printer of the United States.
14               MR. ALLISON:  I suppose I could ask
15   Mr. Kelly if Bruce James -- I haven't checked
16   lately -- but is Bruce James still the Public
17   Printer?
18               MR. KELLY:  Yes, he is.
19               MR. ALLISON:  All right.  So that's
20   still the name of our case.
21               BY MR. ALLISON:
22       Q    Bear with me because I know that you're

Young

1       A       No.

2       Q       All right.  Excuse me.  I was trying to

3   correct an ambiguity because I said did you know

4   and we had been talking about 2004.  So you didn't

5   know it in 2004?  You didn't know he was an

6   ex-Marine?

7       A       No.

8       Q       Okay.  What about Frederick Hall?  Did

9   you know that he was an ex-Marine?

10      A       No.

11      Q       Charles Brown, did you know his military

12  service?

13      A       No.

14      Q       Okay.  In 2004, as Superintendent of

15  Pre-Press, what shift did you normally work on?

16      A       7:30 to 4:00 day side.

17      Q       Since 2004 has that been your shift?

18      A       Yes.

19      Q       When I asked you that question I realize

20  you are responsible for a large area, but I'm

21  asking your specific reporting time or your office

22  hours, it's 7:30 to 4:00 day side.

Young

15

```
 1       A     Yes.
 2       Q     Has there been a time prior to 2004 when
 3   you had a different shift?
 4       A     Yes.
 5       Q     When was that last?
 6       A     Wow.
 7       Q     Your best recollection.  Or if you can
 8   tell me which position you had when you last had a
 9   different shift?
10       A     Assistant Foreperson.
11       Q     Of Proof and Copy?
12       A     Keyboard Section.
13       Q     Okay.  So that's going back to the
14   eighties or early nineties?
15       A     Eighties.  Could I --
16       Q     I'm sorry.  Yes, go ahead.
17       A     1993.
18       Q     1993.
19       A     Yes.
20       Q     What shift were you on in 1993?
21       A     4:30 to 12:00 midnight.
22       Q     Second shift?
```

Young

16

1    A    Second shift.

2    Q    How long were you on that shift?

3    A    Probably about a year.

4    Q    Okay.  Over the years that you have

5    known Fred Hall how many times would you say you

6    have talked to him?  Can you estimate?

7    A    Last year I would say it was on a

8    constant basis, daily I would say.

9    Q    So in 2005 it was daily.

10   A    Hm-mm.

11        MS. BRASWELL:  You need to answer

12   verbally.

13        THE WITNESS:  Yes.

14        BY MR. ALLISON:

15   Q    Prior to that how often do you think you

16   would talk to him, do you recall?

17   A    Very little.  It might just be hi,

18   something like that.

19   Q    At the time that the positions were

20   being posted for the two head deskperson jobs and

21   the group chief job that are involved in this

22   case -- do you know which ones I'm talking about?

Young

17

1    A    Yes.

2    Q    Okay.  At the time that those positions

3    were being posted and the selections were being

4    made, during that time frame how often were you

5    talking to Mr. Hall?

6    A    I spoke to him daily.

7    Q    Okay.

8    A    The same.

9    Q    Over the years that you have known

10   Charles Brown how often would you say you spoke

11   with him?

12   A    Very little.

13   Q    Okay.  Over the years that you have

14   known Sarah Pitt, up through 2004 when these

15   selections were made, how often would you say you

16   had talked to her?

17   A    I would say daily.

18   Q    Would you consider Ms. Pitt a personal

19   friend of yours?

20   A    No.

21   Q    Do you have any explanation for why you

22   would talk to her on a daily basis?

Young

18

1        A     I had to go in there and check on the

2    work daily.  She was on the day side and I checked

3    on the work.

4        Q     So you went into Copy Prep on a daily

5    basis to check on the work?

6        A     Yes.

7        Q     How about Mr. Ruffin?  How often would

8    you say you spoke with him in the time that you had

9    known him up through 2004?

10       A     Not that often.

11       Q     When you would go into Copy Prep to

12   check on the work, were you checking the methods of

13   work and the quality of work that the people were

14   doing in that section?

15       A     No.

16       Q     Were you checking on the status of where

17   various jobs were in the process?

18       A     Status.

19       Q     Okay.  As of 2004, did you feel that you

20   had enough knowledge of the work of the Copy Prep

21   Section to make these selections for the two head

22   deskperson jobs and the group chief job by

Young

1    yourself?

2        A    Yes.  The job itself, yes.

3        Q    Do you recall signing two affidavits in

4    relation to Mr. Hairsine's administrative EEO claim

5    that this case relates to?

6            Let me just clarify a little bit.  Do

7    you recall dealing with an EEO investigator working

8    with the agency who worked with you to prepare and

9    have you sign two affidavits in relation to

10    Mr. Hairsine's administrative EEO complaint?

11        A    Yes.

12        Q    And it would be fair to say that in

13    making those affidavits you were attempting to be

14    truthful, correct?

15        A    Yes.

16        Q    Do you recall that a second affidavit

17    was requested by somebody in relation to

18    Mr. Hairsine's administrative EEO case?

19        A    Yes.

20        Q    Tell me what you recall about how that

21    came about.  What did you know?

22        A    They just asked me some more questions.

Young

20

1      Q      Who asked you?

2      A      The complainant.  Not the -- the person

3  representing EEO.

4      Q      So the investigator?

5      A      Yes.

6      Q      Did the investigator to your

7  recollection ask you to describe details about the

8  selection process for the head deskperson jobs and

9  the group chief job?

10     A      Yes.

11     Q      Did you provide detailed answers to the

12  best of your ability to the questions that you were

13  asked?

14     A      Yes.

15     Q      Do you recall that you said that

16  Mr. Hall had made recommendations for the

17  selections for each of these positions that you

18  had, the two head deskperson positions and the

19  group chief position?

20     A      Yes.

21     Q      And that's true, isn't it.

22     A      Yes.

Young

```
 1        Q     Do you recall who Mr. Hall recommended
 2   for each position?
 3        A     Yes.
 4        Q     And who did he recommend?
 5        A     Charlie Brown, Ruffin and Sarah Pitt.
 6        Q     And Mr. Brown was for which position?
 7        A     Group chief, third shift.
 8        Q     Mr. Ruffin was for which position?
 9        A     Head desk, second shift.
10        Q     And Ms. Pitt was for what position?
11        A     Head desk, first shift.
12        Q     Did you interview anyone for these
13   selections?
14        A     No.
15        Q     Would it normally have been your
16   practice to interview people for a job selection?
17        A     No.
18        Q     Would it normally be your practice to
19   ask another employee of the agency for their
20   recommendations for a selection?
21        A     Yes.
22        Q     Tell me why you asked Mr. Hall for his
```

1     recommendations for these selections.

2          A     He was expert in the field.

3          Q     How did you know that?

4          A     Because he is the Foreperson of that

5     section, all three shifts.

6          Q     So did you place a lot of reliance on

7     his recommendations?

8          A     I took in what he had to tell me about

9     his recommendation.

10         Q     You took it in.

11         A     Yes.

12         Q     Okay.  Describe what happened that led

13    to these three positions being posted.  How did

14    these positions come to be posted?

15         A     A lot of retirements.  Downsizing.

16         Q     Okay.  Where did the idea come from to

17    post openings for two head deskpersons and a group

18    chief in Copy Prep?

19         A     Copy Prep is still being evaluated

20    because of the downsizing.

21         Q     Are you talking in 2003-2004?

22         A     I'm talking even now.

Young

1     Q     Second shift what position?

2     A     Assistant Foreperson.

3     Q     Okay.   What is her race?

4     A     Black female.

5     Q     Did you ask either Mr. Milans or

6    Ms. Webb for their recommendations for filling

7    these three positions?

8     A     Mr. Milans was not there at the time.

9    Mr. Milans was not there.

10     Q     Mr. Milans was not there?

11     A     At that time, when I asked Mr. Hall for

12    his recommendation.

13     Q     He was not there meaning he was not in

14    the building or he was not employed there?

15     A     He was not in the building.   I think he

16    was on vacation or what have you.   He wasn't there.

17     Q     You recall Mr. Milans being on vacation?

18     A     Hm-mm.

19     Q     So describe for me then the process you

20    went through to ask Mr. Hall for his

21    recommendations.   What did you do?

22     A     I gave him a package to look at and he

Young

31

1    gave me his recommendation.

2        Q    So you gave him the application

3    packages?

4        A    Yes.

5        Q    How did he give you his recommendation?

6        A    Verbally.

7        Q    Meaning orally.

8        A    Orally.

9        Q    Not in writing.

10       A    Not in writing.

11       Q    Okay.

12       A    He wrote the three names down on a

13   Post-It as he told me.  He said this is the names

14   he picked.

15       Q    Okay.  So he wrote them on a Post-It

16   note.

17       A    Hm-mm.

18       Q    Now at the time that you gave Mr. Hall

19   the application packages had you gone through and

20   made your selections?

21       A    No.  Not at that time.

22       Q    Roughly when was that, if you can

Young

1    recall?  These jobs were posted generally in June

2    of 2004.  I can give you the exact dates if it

3    helps.  But would this have been after the postings

4    closed?

5        A    Rephrase it.

6        Q    I'm sorry.  Would you have asked

7    Mr. Hall for his recommendations or did you ask him

8    after the jobs closed?

9        A    Yes.

10       Q    Each job has a date that it's posted and

11   then later a date that it closes, is that correct?

12       A    Yes.

13       Q    Okay.  So after these jobs closed is

14   when you asked Mr. Hall for his recommendations.

15       A    That's when I gave him the package, yes.

16       Q    Okay.  How did those packages come to

17   you in the first place?

18       A    HR.

19       Q    Who in HR?

20       A    The person?

21       Q    If you recall.

22       A    I don't recall.

Young

33

1      Q      Tell me what you and Mr. Hall discussed

2    about these selections before he gave you his

3    recommendations.

4      A      We did not discuss them.

5      Q      You did not have a discussion.

6      A      No.

7      Q      Now tell me what happened at the time

8    that Mr. Hall gave you his recommendations.  Did

9    you meet in person with him?

10     A      He brought the packages back to me, yes.

11     Q      Okay.  He brought them in.

12     A      Yes.

13     Q      And tell me what was said.

14     A      He just gave me the package with the

15   names on it.

16     Q      What did you do then?

17     A      At that time, that's when I had to go

18   through the packages and make my decisions.

19     Q      Describe what you did.

20     A      I read each person's, what would you

21   call it, their application and all.  Then I had to

22   make my decision.

Young

```
 1      Q      So you made your decisions based in part
 2   on Mr. Hall's recommendations?
 3      A      Based in part on that and plus based on
 4   their application for the job, their resume.
 5      Q      Did you find anything false in any of
 6   the resumes that you knew to be a false statement?
 7      A      No.
 8      Q      Did you do any checking to see whether
 9   or not any of the statements in the resumes or in
10   the application packages were false?
11      A      No.
12      Q      Is there any procedure or anything that
13   you would normally do if you did find a false
14   statement in an applicant's application for a job?
15      A      No.
16      Q      Are there any rules about that?
17      A      If someone lies, that's HR.  They would
18   -- you know what I mean?
19      Q      If you caught someone lying on an
20   application, would you refer it to HR?
21      A      I wouldn't be able to catch them on
22   that.  That's -- I have to look at their
```

Young

 1    application.  I look at the substance of the

 2    application.  That's it.  But theirs is what I go

 3    by.

 4         Q    Really.

 5         A    Hm-mm.

 6         Q    Did you go through each application by

 7    each person thoroughly?

 8         A    Yes.  I have to.

 9         Q    Did you do this in the office or did you

10    let's say take some of them home and read them in

11    your spare time?

12         A    Office and at home.

13         Q    Did you talk to anybody about the

14    qualifications of the various applicants?

15         A    No.

16         Q    You didn't at any point call up or go

17    see or talk to in your office or talk to anywhere

18    Fred Hall and actually discuss with him different

19    people's backgrounds or abilities?

20         A    No.

21              MS. BRASWELL:  Objection.  Asked and

22    answered.

Young

36

1          MR. ALLISON:  We're doing this as on

2    cross.  Normally -- and I was going to say,

3    Ms. Braswell, this is the first objection, and

4    first, I appreciate that.  But everyone else in

5    your office follows the custom or rule that's been

6    in place for a few years where the reasons for the

7    objections are not given.  Are you familiar with

8    that?

9          MS. BRASWELL:  I'm familiar with how

10   you're allowed to make an objection and you're

11   allowed to state the grounds for the objection,

12   which is what I did.  It was a completely proper

13   objection.  It was not a speaking objection.  It

14   did not suggest anything to him.

15         MR. ALLISON:  I'm just curious.  Because

16   normally we follow the procedure where if the

17   grounds are going to be given -- I could ask you

18   for the grounds, but normally we just say objection

19   and the objection is noted as to all formal

20   objections.

21         MS. BRASWELL:  I will make objections

22   the way I think is proper, thanks.

Young

1              MR. ALLISON:  All right.

2              BY MR. ALLISON:

3        Q    So you didn't ask Mr. Hall or anyone

4    else about any of the qualifications that were

5    listed in the various applications for these three

6    jobs.

7              MS. BRASWELL:  Same objection.  You can

8    answer.

9              BY MR. ALLISON:

10       Q    You can answer.

11       A    No.

12       Q    Okay.  Describe for me how you actually

13   went about making selections in the process of

14   going through each of the applications by the job

15   applicants.

16       A    Basically I looked at each applicant and

17   looked at the contents within there.  The only

18   thing I could verify is how long they had been in

19   the section.  That was it basically.

20       Q    Did you use any sort of a rating system?

21       A    The rating -- yes.

22       Q    Okay.  You did use a rating system.

Young

38

1       A      Yes.

2       Q      Okay.  Did you make notes?

3       A      Yes.

4       Q      Describe how that system worked in this

5    process of selecting these applicants.

6       A      I looked at the contents of the

7    application, what they put down on paper.

8       Q      When I asked about a rating system, tell

9    me what your system consisted of.

10      A      How thorough they are in giving me -- in

11   how they explain their job and themselves or what

12   have you.  Yeah, I look at all that.

13      Q      So in your thorough review of

14   Mr. Hairsine's applications did you see that he had

15   military experience?

16      A      I don't recall at that time.  I really

17   don't.

18      Q      Okay.  Did you see that Mr. Hairsine had

19   experience as an acting head deskperson?

20      A      Yes.  That's what he said.

21      Q      Did you give him credit for having that

22   experience?

Young

39

1    A    When I read it and what he put in for
2    it, yes.  But I gave Ruffin more since Mr. Ruffin
3    got paid for it.
4    Q    Explain what you mean by you gave Ruffin
5    more because Mr. Ruffin got paid for it.
6    A    Mr. Ruffin put in for back pay for the
7    position and he actually got paid for it, for the
8    position itself.  And Mr. Ruffin and Mr. Hairsine
9    worked the same shift.
10    Q    Who granted Mr. Ruffin's application for
11    back pay, do you know?
12    A    I would say HR again.
13    Q    Were you involved?
14    A    I had to sign off on it I believe after
15    the fact, but it was mostly HR.
16    Q    You had to sign off on Ruffin's
17    application for back pay.  When you say after the
18    fact, after what fact?
19    A    After he presented it to HR.  Then they
20    go ahead and process it.  And I have to -- I think
21    I signed off on it.  I'm not certain.  I think I
22    have to sign off just to verify, you know, that he

Young

40

1    was doing the work.

2        Q        How did you determine that he was doing

3    the work?

4        A        Because he was over there on the second

5    shift and he actually was doing the work.

6        Q        How did you determine that?

7        A        He wrote everything down.  I have to

8    look at his application on that.  But he did get

9    back pay on it for that part.  He did put in for

10   it.  And didn't nobody say he was not doing the job

11   as far as I know.

12       Q        Did you talk to Mr. Ruffin about his

13   application for back pay?

14       A        Maybe one occasion only.

15       Q        Did you talk to anyone else to verify

16   that he had actually done the work?

17       A        Not that I recall.

18                MR. ALLISON:  Let's mark this as

19   Exhibit 2.

20                        (The document referred to was

21                        marked Young Exhibit No. 2

22                        for identification.)

Young

1            MR. ALLISON:  Exhibit 2 is a collection

2    of pages that came to us from GPO in the document

3    production.  They appear to be an application for a

4    head deskperson job by Fletcher Ruffin.  I will

5    hand it to counsel.

6            BY MR. ALLISON:

7        Q    Mr. Young, please take a look at

8    Exhibit 2.  Tell me if you recognize that as

9    Mr. Ruffin's application for the head deskperson

10   job.

11       A    The first sheet I would not see.

12       Q    Okay.  The first sheet is the

13   qualifications sheet?

14       A    Yes.

15       Q    Just so we're clear, the first sheet

16   which bears the heading Internal Qualifications

17   Guide is not something that you would see and not

18   something that you did see in making these

19   selections?

20       A    Yes.

21       Q    That's correct, okay.  We will put that

22   aside.  And beginning with the second sheet called

Young

42

1    Optional Application for Federal Employment, OF

2    612, is that where the application begins?

3         A    Yes.

4         Q    Now I'm just going to ask you if in this

5    application Mr. Ruffin says he was an acting head

6    deskperson.

7         A    No.

8         Q    Okay.  Does he say anything in that

9    application about having applied for and received

10   back pay?

11        A    No.

12        Q    Do you recall that you had some question

13   about Mr. Hairsine not changing his application

14   between the head deskperson application and the

15   group chief application?  Do you have a

16   recollection --

17        A    Yes.

18        Q    -- that it was your view that

19   Mr. Hairsine had used essentially the same

20   application for both jobs?

21        A    Yes.

22        Q    In your selection system did you

Young

1    downgrade him for doing that?

2        A    Yes.

3        Q    That was because it didn't show any

4    extra effort?

5        A    For the group chief job, yes.

6        Q    I'm going to hand you another document.

7    Just to streamline this labeling process, I'm going

8    to first hand you the document and let your counsel

9    look at it and I'm going to ask you if the first

10   page belongs or it's a different first page.  This

11   is what I understood to be the application of Sarah

12   Pitt for the head deskperson job.  But let me just

13   show this to you and your counsel.  This is going

14   to be Young Exhibit 3.

15            MS. BRASWELL:  Counsel, it's your

16   understanding that she had the vacancy announcement

17   on her application?

18            MR. ALLISON:  That's the way it

19   appeared, although I'm going to ask Mr. Young just

20   a preliminary question.

21            BY MR. ALLISON:

22        Q    Do you recall Ms. Pitt's application for

Young

44

1    a head deskperson job having the vacancy

2    announcement as its first page?

3         A     No.

4         Q     Okay.  Since this is your deposition,

5    let's remove that and start with what you

6    recognize.

7              MR. ALLISON:  Let's mark this as

8    Exhibit 3, because I think we can safely do that.

9                   (The document referred to was

10                   marked Young Exhibit No. 3

11                   for identification.)

12             BY MR. ALLISON:

13        Q     I've removed the first page and

14   everything is the same as what I handed you a

15   moment ago.  I will ask you if you recognize that

16   document.

17        A     Yes.

18        Q     Okay.  And that is what?

19        A     Sarah Pitt's Form 612.

20        Q     So is this as we have been discussing

21   it, is this Sarah Pitt's application for a head

22   deskperson position?  Is this her application for

Young

45

1    one of the head deskperson positions?

2        A    Yes.

3             MS. BRASWELL:  Can I look through it for

4    one second?

5             THE WITNESS:  Yes.

6             BY MR. ALLISON:

7        Q    I'm going to point out that the last

8    three pages again may be pages that did not come to

9    you in the application process.  If that's the

10   case, we will remove them.  Possibly even the last

11   four pages.

12            MS. BRASWELL:  You need to look through

13   this, please.

14            BY MR. ALLISON:

15       Q    Yeah, please flip through that and tell

16   me if anything else should be removed in order to

17   be the application that you reviewed.

18            You have identified some pages at the

19   back that were not part of what you reviewed?

20       A    Yes.

21       Q    And those have been removed and given to

22   counsel?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Young

46

1    A    Yes.

2    Q    All right, thank you.

3         MS. BRASWELL:  Did you see that?

4         I mean do you want this to be accurate

5    or not?

6         MR. ALLISON:  I do.  Absolutely I do.

7         MS. BRASWELL:  Okay.  Was that part of

8    the application or not?

9         THE WITNESS:  No.

10        MR. ALLISON:  I want nothing but

11   accuracy here.  And of course for everyone to be

12   enjoying themselves.

13        BY MR. ALLISON:

14   Q    Okay.  You recognize this as one of the

15   applications that you reviewed for a head

16   deskperson opening?

17   A    Yes.

18   Q    This is the one by Ms. Pitt?

19   A    Yes.

20   Q    Sarah Pitt.  Okay.  Now do you recall

21   reviewing her responses to the ranking factors for

22   that head deskperson job?

Young

47

1       A     Yes.

2       Q     Did you check to see whether Ms. Pitt

3   had claimed back pay for acting as an acting head

4   deskperson?

5       A     No.

6       Q     Can you take a look at page 6 of

7   Ms. Pitt's typewritten or computer written

8   application and look at what she says -- Ms. Pitt

9   got one of the jobs, didn't she?  She did.

10      A     Yes.

11      Q     And you felt that she made adequate

12  effort in making her application for the job?  She

13  showed sufficient effort?

14      A     Yes.

15      Q     Can you look at what she wrote under

16  ability to communicate effectively both orally and

17  in writing?  Do you see that?

18      A     Yes.

19      Q     Would you please look back at Young

20  Exhibit 2 and look at what Mr. Ruffin said in

21  response to that same factor.  Do you see that?

22      A     Hm-mm.

Young

48

1      Q      They said the same thing, didn't they.

2             MS. BRASWELL:  Objection.  The documents

3      speak for themselves.  You can answer.

4             BY MR. ALLISON:

5      Q      All right.  You see that they say the

6      same thing.

7      A      Yes.

8      Q      Do you have an explanation for why it is

9      that Ms. Pitt's application and Mr. Ruffin's

10     application say exactly the same thing under one of

11     the qualifications for this job?

12     A      No.

13     Q      It would appear to be either an amazing

14     coincidence or that somebody copied someone else,

15     is that correct?

16            MS. BRASWELL:  You are misstating these

17     documents.  They are not verbatim the same.  You

18     are misrepresenting the documents.

19            MR. ALLISON:  They are the same.  The

20     witness said they say the same thing.

21            MS. BRASWELL:  The documents speak for

22     themselves.  You are misrepresenting them.

Young

49

1          MR. ALLISON:  This is a speaking

2    objection.  I object to the objection.

3          BY MR. ALLISON:

4     Q    Now on the first page of Exhibit 3 you

5    see where it says "I have been serving as acting

6    head deskperson for approximately 5 years"?

7     A    Yes.

8     Q    Just once again, did you check to

9    determine whether Ms. Pitt obtained back pay for

10   any of that service?

11    A    No.

12    Q    To your knowledge did she?

13    A    No.

14    Q    One of the duties of a head deskperson

15   is to make sure that the work is done on schedule,

16   is that a fair statement?  That jobs are not

17   delayed.

18    A    Yes.

19    Q    Look on page 5 of Exhibit 3.  There is a

20   page with a number 5 at the bottom?

21    A    Hm-mm.

22    Q    Do you have that?

Young

1       A      Yes.

2       Q      Okay.  Do you see that Ms. Pitt said "In

3   this position," this is the last sentence on page

4   5, "In this position, my ongoing responsibility is

5   to make assignments and manpower adjustments

6   necessary whereby various jobs are not delayed

7   within the section for long periods of time."  Do

8   you see that?

9       A      Yes.

10      Q      So what she was saying here is that the

11  way she did her job, a job could be delayed but

12  simply not for a long period of time.  Is that the

13  way you read that?

14             MS. BRASWELL:  Objection.  You can

15  answer.

16             THE WITNESS:  Yes.

17             BY MR. ALLISON:

18      Q      Okay.  How important is being a realtor

19  to being head deskperson in the Copy Prep Section?

20      A      None, or no.

21      Q      All right.  Mr. Brown was the successful

22  candidate for the group chief job, correct?

Young

51

1    A    Yes.

2    Q    Let me ask you, you were of the view

3  that Ms. Pitt being familiar with the work that was

4  done on shift one gave her the advantage in this

5  application of the head deskperson?

6    A    One of the advantages.

7    Q    That was one of the things that made her

8  a better candidate?

9    A    Yes.

10    Q    Did you know that Mr. Hairsine also was

11  or was not familiar with the work on shift one?

12    A    Restate that again, I'm sorry?

13    Q    Okay.  What was your knowledge of

14  Mr. Hairsine's knowledge of the work on shift one?

15    A    Very little.

16    Q    You had very little knowledge?

17    A    Very little, yes.

18    Q    Okay.  Did you do anything to check on

19  whether Mr. Hairsine had knowledge of the work of

20  shift one?

21    A    No.

22    Q    So back to Mr. Brown.  Mr. Brown became

Young

52

1   the group chief in this application process, and

2   you said yes.  I would like to show you what will

3   be marked as Young Exhibit 4.  This time I'm going

4   to preemptively remove an Internal Qualifications

5   Guide and I'm just going to show it to you so I get

6   your answer to whether this was not part of

7   Mr. Brown's application.  Is that right?  This was

8   not part of Mr. Brown's application that you saw.

9        A     Right.  Yes.

10       Q     Okay.

11             MR. KELLY:  Could I take a look at that?

12             MR. ALLISON:  Oh, absolutely.

13             MR. KELLY:  Thank you.

14             MR. ALLISON:  Sure.

15             BY MR. ALLISON:

16       Q     So is it accurate -- I just want to be

17  sure that I understand these Internal

18  Qualifications Guides -- is it accurate, Mr. Young,

19  that when you're making a selection for jobs like

20  these you don't look at the point values that HR

21  gives these candidates on this Internal

22  Qualifications Guide?

Young

53

```
 1        A     True.

 2        Q     True, okay.

 3              MR. ALLISON:  So let's mark this Young

 4     Exhibit 4.

 5                       (The document referred to was

 6                       marked Young Exhibit No. 4

 7                       for identification.)

 8              MR. ALLISON:  I will show it to counsel.

 9              BY MR. ALLISON:

10        Q     My first question of course is going to

11     be, Mr. Young, to look through with your counsel

12     and see if there are any pages in this exhibit that

13     weren't part of what you reviewed for Mr. Brown's

14     application.

15        A     Yes.

16        Q     As best you recall is that the

17     application you looked at for Mr. Brown?

18        A     Yes.

19        Q     For group chief.  Okay.  Now in any

20     place here did Mr. Brown say that he had been

21     acting head deskperson?  Did Mr. Brown ever say

22     that he was an acting head deskperson?
```

Young

54

1    A    No.

2    Q    Did he ever say that he was an acting

3    group chief?

4    A    No.

5    Q    All right.

6          MR. ALLISON:  Let's mark this Young

7    Exhibit 5.

8                    (The document referred to was

9                    marked Young Exhibit No. 5

10                   for identification.)

11         MR. ALLISON:  I will show it to counsel

12   and the witness.

13         MS. BRASWELL:  Can I see Exhibit 4,

14   please?

15                 (Document handed to counsel.)

16         MS. BRASWELL:  What did you represent

17   Exhibit 4 to be?

18         MR. ALLISON:  Exhibit 4 was Mr. Brown's

19   application for group chief.

20         MS. BRASWELL:  Okay.

21         BY MR. ALLISON:

22   Q    And I'm showing you Exhibit 5.  If you

Young

55

1    could tell me what Exhibit 5 is, Mr. Young.

2        A    Head desk job application.

3        Q    Of?

4        A    Mr. Brown's.

5        Q    All right.  Do you see on the first page

6    of Exhibit 5 that under 8, work experience, number

7    1, job title, and then right in the middle of the

8    page it says "Describe your duties and

9    accomplishments" and below that it says "See

10   Attachment A."  Is that right?

11       A    Yes.

12       Q    Okay.  So in looking at this

13   application, Attachment A you would expect would be

14   a description of the applicant's current duties and

15   responsibilities in their current job as of the

16   time of the application?

17       A    Yes.

18       Q    Okay.  Now do you see anywhere in this

19   application where Mr. Brown describes his

20   qualifications with reference to the job

21   qualification factors for the head desk job?  Does

22   he go through the factors?

Young

56

1    A    I would have to look at the factors.

2    Q    No, please take a look at the

3 application and tell me if he goes through any

4 factors in any of what he wrote about his

5 qualifications for this head desk job.

6    A    I still need to see the factors.

7    Q    Oh, I see.  Okay.  So if you look at the

8 factors, you can tell what he was saying that was

9 responsive to the factors.  Do you know what some

10 of them are?

11    A    I would have to see them, sir.

12    Q    You would have to see them, okay.  I

13 realize the document says what it says, but is it

14 fair to say that he does not have a listing of the

15 factors and his qualifications set forth under each

16 one?  Is that a fair characterization?

17        MS. BRASWELL:  Objection.  The document

18 speaks for itself.  You can answer.

19        BY MR. ALLISON:

20    Q    You can answer.

21    A    Say the question again.

22    Q    Yeah.  Does he list the various factors,

Young

57

1   for example the way Ms. Pitt did, and then give his

2   qualifications under each one?

3        A     No.

4        Q     For example, the way Ms. Pitt did.

5        A     No.

6        Q     No, okay.  Now if you would, please, put

7   the head desk application of Mr. Brown, which is

8   Exhibit 5, next to the group chief application of

9   Mr. Brown, which is Exhibit 4.  My first question

10  is do you know where in his application Mr. Brown

11  said why he was qualified for the specific

12  qualification factors of either job?  What part of

13  his application talks about his qualifications?

14       A     When he explains his duties and what he

15  was doing.

16       Q     Attachment A?

17       A     Yes.

18       Q     Okay.  He has got an Attachment B to

19  these applications, doesn't he?

20       A     Yes.

21       Q     Do you know what the purpose of

22  Attachment B was?

Young

1    A    Explaining his job duties.

2    Q    Still explaining his job duties?

3    A    Yes.

4    Q    Is there any place in here where he says

5    why he is qualified for a promotion to a higher

6    level job?  In either of these applications.

7    A    No.

8    Q    Okay.  Now I would like you to look at

9    Attachment B on both applications.  Just open each

10   one to Attachment B.  Are they the same?

11   A    Yes.

12   Q    Okay.  Flip back to Attachment A for

13   each of the applications.  It is a little harder

14   because Attachment A consists of two pages.  Are

15   they the same?

16   A    Yes.

17   Q    Did you ever indicate that you were

18   going to deny Mr. Ruffin's application for back pay

19   for being acting head deskperson?

20        MS. BRASWELL:  Objection.  Lacks

21   foundation.  You can answer.

22        BY MR. ALLISON:

Young

1    and ask for Mr. Hairsine?

2        A    No.

3        Q    Did you ever go to the Copy Prep Unit

4    and talk to Mr. Ruffin about where Mr. Hairsine

5    was?

6        A    Not that I recall.

7        Q    Do you know how long it takes for a

8    person to train to become a head deskperson?

9        A    There is not a training program for a

10   head desk.

11       Q    So it's not like there are these

12   apprentice programs and training programs.   There

13   isn't one for head desk, right?

14       A    Right.

15       Q    Okay.  So how do people learn the head

16   desk job?  Let's focus on Copy Prep since that's

17   what this case is about.

18       A    Mostly doing the work as a -- just doing

19   the work.

20       Q    Okay.  Should a head deskperson be

21   knowledgeable about all the different kinds of work

22   that are being done by people in a given unit like

Young

67

1    Copy Prep?

2        A    Yes.

3        Q    Are you aware whether Sarah Pitt is

4    currently receiving instruction in the use of

5    computers that are used in the Copy Prep Section?

6        A    No.

7        Q    You're not aware of that.

8        A    No.

9        Q    Okay.  Exhibit 6 I'm going to mark and I

10   want to make sure that there are no extra pages.

11           MR. ALLISON:  We are going to mark

12   Exhibit 6, which is an application for head

13   deskperson by Jack Hairsine.

14                    (The document referred to was

15                    marked Young Exhibit No. 6

16                    for identification.)

17           BY MR. ALLISON:

18       Q    I will show it to you and your counsel.

19   I will point out that the last page appears to be

20   the same kinds of pages that we have removed from

21   some of these applications so please let me know if

22   that should not be there based on the application

Young

1    that you reviewed.

2            MS. BRASWELL:  Should that not be there?

3            THE WITNESS:  No.

4            BY MR. ALLISON:

5        Q    So we have one page that should not be

6    included.  Now please look at the rest of the

7    application and tell me if that is Mr. Hairsine's

8    application for the head deskperson job number

9    04-162.  Is that Mr. Hairsine's application?

10       A    Yes.

11       Q    Okay.  Take a look at page 3, numbered

12   at the bottom.  Look under other qualifications.

13   Do you see where it says "I have worked all three

14   shifts"?

15       A    Yes.

16       Q    And you see below that where it says

17   under awards, Outstanding Performance Award 1978,

18   1979 and 1980.

19       A    Yes.

20       Q    And you see where below that it says

21   that one of his organization affiliations is

22   Veterans of Foreign War.

Young

75

1        A       Some of the things, yes, sir.

2        Q       Okay.  For example, using the Production

3   Estimating Planning System, would that be a thing

4   that a supervisor would do?

5                Are you taking your cues -- you're not

6   taking your cues from your lawyer, are you,

7   Mr. Kelly?

8        A       No.

9        Q       Would that be something a supervisor

10  would do?

11       A       Repeat it?

12       Q       Would using the PEPS, the Production

13  Estimating Planning System, be something that a

14  supervisor would do?

15       A       Yes.

16       Q       Okay.  Would directing the work flow and

17  directing the offset strippers to accomplish

18  pressing deadlines be something a supervisor would

19  do?

20       A       Yes.

21       Q       Would planning and organizing the work

22  activities of the Copy Preparation Unit to ensure

Young

76

1    that schedules and deadlines are met be something

2    that a supervisor would do?

3         A    Yes.

4         Q    Making sure the manpower shortage would

5    cause a conflict within the work assignments of the

6    other employees.  I'm not sure that I read that

7    exactly right.  But is that a supervisory function?

8         A    Yes.

9         Q    Does receiving work and schedules from

10   other sections within the division qualify as

11   something that a supervisor would do?

12        A    Yes.

13        Q    Would assigning work to employees be

14   something that a supervisor would do?

15        A    Yes.

16        Q    Maintaining a line of communications

17   with other supervisors to ensure the work is being

18   processed in a timely fashion.  Is that something a

19   supervisor would do?

20        A    Yes.

21        Q    Would telling the oncoming shift

22   supervisors about the jobs in the section so they

Young

77

1    will have a greater understanding of what is

2    expected of them be something that a supervisor

3    would do?

4         A    Yes.

5         Q    How about working with offices in

6    Congress and other places, like House

7    Appropriations and Federal Register?  Would that be

8    something a supervisor would do?

9         A    Yes.

10         Q    Do you have any knowledge of

11    Mr. Hairsine's experience or training in the

12    process of scanning documents?

13         A    No.

14         Q    Did you as of 2004?

15         A    No.

16         Q    Is scanning something that the Copy Prep

17    Unit does?

18         A    Yes.

19         Q    Is that one of its regular functions?

20         A    Yes.

21         Q    So if someone were applying for a head

22    deskperson position, scanning would be something

Young

81

1       Q       What about number 2, down in the ranking

2    factors, "Ability to understand technical data in

3    order to solve problems, meet deadlines and keep

4    abreast of all new developments in the industry"?

5    Doesn't that include knowing how all the things are

6    done in the unit?

7       A       Yes.

8       Q       In doing these selections, did you

9    identify something in every application that you

10   looked at that made that person and their

11   application less good, less qualified than the

12   person who was selected for the jobs?

13      A       Yes.

14      Q       You did.  You have said Mr. Ruffin was

15   acting head deskperson for some period of time.  Do

16   you know who appointed him to do that?

17      A       No.

18      Q       If you accepted that Sarah Pitt was

19   acting head deskperson like she said in her

20   application, do you know who appointed her to do

21   that?

22      A       No.

Young

1        Q      Can we go back to Exhibit 3, please.

2    I'm just going to see if I can find it.

3        A      I've got it.

4        Q      What I'm going to ask you about is on

5    page 5 of her application.  Under number 2, you see

6    where it says "In the absence of the section head,

7    I am required to work with the production

8    workload," et cetera?

9        A      Hm-mm.

10       Q      Do you know what she was referring to

11   when she said in the absence of the section head?

12       A      No, I do not.

13       Q      Did you have any understanding at the

14   time you were making these selections of who the

15   section head was for the Copy Prep Unit shift one?

16       A      Probably Billy Milans.

17              MR. ALLISON:  I'm going to suggest that

18   we take a short break.  I want to see if I can wrap

19   up as quickly as I think I can.

20              MS. BRASWELL:  Okay.

21              (Brief recess.)

22              MR. ALLISON:  Let's go back on the