# ORIGINAL

1

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3

4    JACK R. HAIRSINE,                )

5    an individual,                   )

6            Plaintiff,               )

7            vs.                      )    Civil Action No.

8    BRUCE JAMES, Public Printer      )    05-1884 (RMC)

9    of the United States,            )

10           Defendant.               )

11              -     -     -     -     -

12        The deposition of FREDERICK GEORGE HALL,

13    SR., was taken on Thursday, November 9, 2006,

14    commencing at 10:25 a.m., at the U.S. Government

15    Printing Office, 732 North Capitol Street, N.W.,

16    Washington, D.C., before Karen Hinnenkamp,

17    Registered Merit Report Notary Public.

18              -     -     -     -     -

19

20

21

22

```
1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4            THEODORE S. ALLISON, ESQ.

5            Karr & Allison, P.C.

6            1920 N Street, N.W.

7            Suite 300

8            Washington, D. C.   20036

9            (202) 331-7600

10           tsallison@karrallison.com

11

12   ON BEHALF OF THE DEFENDANT:

13           MARINA UTGOFF BRASWELL, ESQ.

14           Assistant United States Attorney

15           U.S. Attorney's Office for D.C.

16           555 4th Street, N.W.

17           Washington, D. C.   20530

18           (202) 514-7226

19           Marina.Braswell@usdoj.gov

20

21

22
```

3

```
 1           A P P E A R A N C E S  (Continued)

 2

 3    ON BEHALF OF THE DEFENDANT:

 4           THOMAS KELLY, ESQ.

 5           Assistant General Counsel

 6           Office of the General Counsel

 7           U.S. Government Printing Office

 8           Washington, D. C.   20401

 9           (202) 512-0033

10           tkelly@gpo.gov

11

12    ALSO PRESENT:  Jack Hairsine

13

14

15

16

17

18

19

20

21

22    (Index appears following the transcript.)
```

Hall

10

1    could be commented upon in a later proceeding to

2    suggest that perhaps you weren't giving your best or

3    most truthful testimony or most accurate testimony

4    today.  Do you understand that?

5         A    Okay.  Yes.

6         Q    For that reason it's very important to do

7    your best today in answering the questions.

8              All right, let's begin at the beginning.

9    Did you work for a period of time at the Government

10   Printing Office?

11        A    Yes.

12        Q    We will call that the GPO for short.  Is

13   that okay?

14        A    Okay.

15        Q    Okay.  How long did you work at the

16   Government Printing Office?

17        A    Thirty-nine years.

18        Q    From approximately when to when?

19        A    April 19th, 1966, to November 3rd, 2004.

20        Q    Was your service uninterrupted during

21   that time?

22        A    Yes.

Hall

1      Q     Did you retire in 2004?

2      A     Yes, I did.

3      Q     What was your position when you retired?

4      A     I was Assistant to the Production Manager

5   for Pre-Press.

6      Q     Who was the Production Manager at that

7   time?

8      A     Bernazolli is his last name.  I can't

9   think of his first name.

10            I'm sorry, not Bernazolli.  What is his

11   name?  He is still the Production Manager.

12      Q     Boddi?

13      A     No.  Help me somebody.

14            MS. BRASWELL:  Would you like me to help

15   or not?

16            THE WITNESS:  I can't think of his name.

17            MR. ALLISON:  Okay, someone else can

18   suggest it.

19            MS. BRASWELL:  Would it be Mr. Schwenk or

20   Dannie Young?

21            THE WITNESS:  No.

22            MR. KELLY:  Jeff Bernazolli?

Hall

1          THE WITNESS:  Is it Bernazolli?  I'm

2     sorry.  I beg your pardon.  It is Jeff Bernazolli,

3     okay.  Excuse me.  I'm sorry about that.

4          BY MR. ALLISON:

5     Q     So Jeff was the missing piece.

6     A     Yeah.

7     Q     Okay.  So you were the Assistant to

8     Mr. Bernazolli.  How long had you been his

9     Assistant?

10    A     I'm not sure.  I think it was about a

11    year and a half maybe.

12    Q     What was your position before you became

13    his Assistant?

14    A     I was a Foreman in Digital Pre-Press.

15    Q     Is Digital Pre-Press the section that has

16    the Digital Copy Prep Unit within it?

17    A     That's the same.

18    Q     It is the same.

19    A     Yes.

20    Q     So that unit, Digital Pre-Press or

21    Digital Copy Prep, that is the unit in 2004 in which

22    Mr. Hairsine and Sarah Pitt and Charles Brown and

Hall

13

1   Fletcher Ruffin all worked?

2       A     That's correct.

3       Q     Okay.  How long were you the Foreman of

4   that unit?

5       A     I became the Foreman in 1995, January of

6   '95.  I'm not sure of the date that I left, but I

7   think it was 2002.  But I can't be sure.

8       Q     All right.  So approximately January 1995

9   to some date in 2002?

10      A     Yeah.

11      Q     Okay.  Let's work backwards from 2002 in

12  that Foreman position.  At the very end of your term

13  as Foreman what shift were you working on?

14      A     Day shift.

15      Q     That's also called shift one?

16      A     Shift one, yes.

17      Q     How long had you been working on shift

18  one as Foreman?

19      A     1995.

20      Q     Okay.  So you were always on shift one.

21      A     Hm-mm.  When I became Foreman, I came to

22  shift one.

Hall

1       Q       Okay.  That's what I was asking.  As

2   Foreman you were always on shift one?

3       A       That's correct.

4       Q       Okay.  During that period of time were

5   you the direct supervisor of Jack Hairsine?

6       A       Not the direct supervisor.  He was on

7   another shift.

8       Q       He had another direct supervision?

9       A       He had direct supervision on the shift

10  that he was on.

11      Q       Was there ever a time when you were the

12  direct supervisor of Jack Hairsine?

13      A       For a period of time when I was on

14  midnight, I think he was on my shift, yes.

15      Q       Midnight would be the third shift?

16      A       Midnight is the third shift, yes.

17      Q       Okay.  During the time that you were

18  Foreman were you ever directly involved in training

19  Mr. Hairsine for any duties?

20      A       No.

21      Q       Prior to the time that you were Foreman

22  were you ever involved in training Mr. Hairsine for

Hall

1    any duties?

2        A    No.   When I supervised him, there wasn't

3    any training per say going on at the time because we

4    had not yet moved into the technical aspects of

5    printing.

6        Q    All right.

7        A    High tech.

8        Q    Yes.  It's always been technical.

9        A    Right.

10       Q    But roughly when did it become high tech,

11   using computers and scanners and things like that?

12       A    That was in the late nineties.  After I

13   came to day side, or shift one.

14       Q    During the time that you were Foreman did

15   it ever come to your attention that Mr. Hairsine had

16   been trained to do the functions of the head

17   deskperson?

18       A    Let's see.  I'm trying to remember.  I

19   don't specifically recall any direct information on

20   that, but I'm sure that I was informed by the

21   supervisor on the second shift that he had been

22   trained as a head desk.

Hall

1      Q      Okay.

2      A      Of course at that time they were calling

3   it group chief.  It wasn't head desk at that period.

4      Q      Okay.  Can you tell me roughly what

5   period that would have been?

6      A      Time period?

7      Q      Yeah.

8      A      No, I couldn't.

9      Q      Can you recall, when you say you're sure

10  you were informed by his supervisor, can you recall

11  who that person was?

12     A      That would have been either Willis

13  Mitchell or Jesse King.

14     Q      If we were to refer to the time period

15  when either Mr. Mitchell or Mr. King was the

16  supervisor of Jack Hairsine, that would be roughly

17  the time period --

18     A      Yes.

19     Q      -- that you were learning that

20  Mr. Hairsine had been trained on the group chief

21  job.

22     A      That's true.

Hall

1    Q    Okay.  Apart from learning that

2    Mr. Hairsine had been trained on the group chief job

3    during the time that you were Foreman, did any other

4    particular information about Mr. Hairsine ever come

5    to your attention?  Let's say apart from the annual

6    performance appraisals that you would sign off on as

7    second line supervisor, did any other facts about

8    Mr. Hairsine come to your attention that you can

9    recall?

10    A    I'm not sure what you mean.

11    Q    Okay.  I'm asking you did you ever learn

12    of any extraordinarily good performance by

13    Mr. Hairsine or any extraordinarily bad performance

14    or any other facts that stand out in your mind that

15    you learned about Mr. Hairsine during the time that

16    you were Foreman?

17    A    I don't recall any.

18    Q    Okay.  You were in the service, right?

19    A    Yes.

20    Q    And you were a Marine?

21    A    Yes.

22    Q    And you were aware that Mr. Hairsine was

Hall

18

1    a Marine?

2        A    Yes.

3        Q    Do you recall Mr. Hairsine talking to you

4    about the Marines?

5        A    Of course.

6        Q    Okay.  Tomorrow is a significant day for

7    you and Mr. Hairsine?

8        A    Absolutely.  Yes, it is.

9        Q    What is it?

10       A    Marine Corps birthday.

11       Q    Do you recall what Mr. Hairsine's rank

12   was in the Marines?

13       A    No, I don't.

14       Q    Do you recall that he was a Sergeant?

15       A    No, I don't.

16       Q    Do you recall him ever talking about his

17   tour of duty with you?

18       A    Not specifically, no.

19       Q    Do you recall him telling you that he was

20   a grunt?

21       A    Oh, of course.

22       Q    You recall that he was actually on a

Hall

1    foreign tour of duty when he was in the Marines?

2        A    Yes, I remember that.

3        Q    You're aware that in about 2004 there

4    were three job selections in the Digital Copy Prep

5    Section for two head deskperson jobs and a group

6    chief job?

7        A    Yes.

8        Q    You recall that you had some involvement

9    in that process?

10        A    Yes.

11        Q    You recall that after that process at

12    some point you became aware that Mr. Hairsine had

13    made a complaint to the EEO office about those three

14    selections?

15        A    Yes.

16        Q    Did you provide information to an

17    investigator in the course of Mr. Hairsine's EEO

18    complaint?

19        A    An investigator?

20        Q    An investigator.  Someone who was taking

21    information relative to his complaint.

22        A    I recall something of that nature, yes.

Hall

29

1      Q     Personally acquainted with Jack Hairsine?

2      A     Yes.

3      Q     And personally acquainted with Fletcher

4  Ruffin?

5      A     Yes.

6      Q     Apart from those four people, were there

7  any other people that you were acquainted with who

8  would have been good candidates for either a group

9  chief or head desk job in 2004?

10     A     I would hesitate to say because I can't

11  even remember who was in the section at the time any

12  more.

13     Q     Okay.  So if I asked you to tell me

14  anyone you recall in the first half of 2004 who you

15  would have thought would be applying for one of

16  these positions, you can't recall any other people?

17     A     No.  If you gave some names, I might, it

18  might help me.  But like I said, I don't even

19  remember, I can't recall all the people who were in

20  the section at the time.

21     Q     Okay.  I would like to ask you about a

22  couple of people.  I think this is a little bit of a

Hall

1    shift of gears.  Who is Mo Ford?

2        A    He was an employee in the Digital

3    Pre-Press Copy Prep Unit.  He was in charge of the

4    Color Unit.

5        Q    All right.  When you say in charge, was

6    he a group chief?

7        A    He was, I believe it was a group chief,

8    yes.

9        Q    Okay.  Do you remember him being promoted

10   to group chief?

11       A    Yes.

12       Q    Were you involved in that promotion?

13       A    Yes.

14       Q    What was your involvement?

15       A    I was the one, I was the recommending

16   authority.

17       Q    You were the recommending official --

18       A    Yes.

19       Q    -- and then who was the selecting

20   official?

21       A    Dannie.

22       Q    Do you know who Leon Wade is?

Hall

31

| 1 | A | Yes. |
|---|---|---|

1    A    Yes.

2    Q    Who is Mr. Wade?

3    A    He was a group chief on shift two.

4    Q    In Digital Copy Prep?

5    A    In Digital Copy Prep, yes.

6    Q    Did he retire at some point?

7    A    Yes, he did.

8    Q    Okay.  Were you involved in his promotion

9  to group chief?

10    A    Yes, I believe I was.

11    Q    Were you the recommending official?

12    A    Yes.

13    Q    Was Dannie Young the selecting official?

14    A    Dannie Young was the selecting official.

15    Q    Do you remember -- well, you have

16  mentioned Jesse King, so tell me what position Jesse

17  King had.

18    A    Jesse was a group chief in the Digital

19  Copy Prep on shift two.

20    Q    And that's a man, right?  Jesse?

21    A    Yes, uh-huh.

22    Q    Because I only go by names.  Jesse I

Hall

1    guess could be a woman's name depending on how it's

2    spelled.

3            Were you involved in Mr. King's

4    promotion?

5        A    Yes.

6        Q    Were you the recommending official?

7        A    Yes.

8        Q    And was Dannie Young the selecting

9    official?

10       A    Yes.

11       Q    Do you remember Ernest Mahoney?

12       A    Yes.

13       Q    What position did he most recently have?

14       A    The same position.  Group Chief, Copy

15   Prep Digital Pre-Press.

16       Q    Were you involved in his promotion?

17       A    Yes.

18       Q    The same involvement?

19       A    Yes.

20       Q    Okay.  Now to the best of your

21   recollection was your recommendation asked for in

22   roughly the same way for each of the four people

Hall

33

1    that I've just asked you about?  Did Dannie Young

2    just generally give you applications and ask you for

3    who you would recommend?

4        A    Yes.

5        Q    Okay.  If you can answer generally, fine.

6    If not, I will ask you for each person.  But in

7    those recommendations that you made, would you have

8    given Mr. Young just the name of the person who you

9    recommended or would you have given Mr. Young a

10   briefing let's say on that person and why they were

11   better or worse than anyone else?

12       A    If he asked for a briefing, I would, but

13   otherwise I would just give him the name.

14       Q    Okay.  Do you recall in the case of Mo

15   Ford becoming group chief, do you recall giving him

16   a briefing about Mo Ford?

17       A    No, I don't.

18       Q    In the case of Leon Wade becoming a group

19   chief do you recall giving Dannie Young a briefing?

20       A    No.

21       Q    In the case of Jesse King?

22       A    No.

Hall

1     Q     In the case of Ernest Mahoney?

2     A     No.

3     Q     Did you ultimately make recommendations

4  to Mr. Young that Sarah Pitt be put into a head desk

5  job?

6     A     Yes.

7     Q     Did you give Mr. Young a briefing on

8  Ms. Pitt?

9     A     No.

10     Q     Okay.  Did you ultimately recommend that

11  Charlie Brown -- Charles Brown -- be promoted to a

12  group chief job?

13     A     Yes.

14     Q     Did you give Mr. Young a briefing on

15  Charles Brown?

16     A     I don't recall one.

17     Q     Okay.  Did you ultimately recommend that

18  Fletcher Ruffin be promoted to a head desk job?

19     A     Yes.

20     Q     Do you recall giving Mr. Young a briefing

21  on Mr. Ruffin?

22     A     Yes.

Hall

1      Q     You did.

2      A     Oh, I'm sorry.  No.

3      Q     You gave him the name, but do you recall

4  giving him a briefing with information?

5      A     No.  No.  Might I just say something?

6      Q     Yes, absolutely.

7      A     In all of these recommendations it was

8  not just myself who -- I talked with Milans, the

9  Assistant Foreman, and it was a general agreement

10  between the two of us that these persons -- I was

11  the person who ultimately signed the recommendation,

12  but it wasn't just my view.

13      Q     Okay.  Let me ask you about that.  When

14  you say the person who ultimately signed the

15  recommendation, do you recall there being an actual

16  form that had to be signed with a recommendation?

17      A     No.

18      Q     Okay.  How do you recall communicating

19  your recommendations to Mr. Young in the case of

20  Sarah Pitt, Fletcher Ruffin and Charles Brown?

21      A     In the folder that came with the

22  applicants he put a Post-Up (sic) and I just had to

Hall

1    put the person's name on the Post-Ups (sic).

2        Q    You mean just like a sticky note?

3        A    Sticky note, yes.

4        Q    Tell me about the conversation that you

5    had with Mr. Milans concerning the selection for the

6    group chief job in 2004 on shift three.

7        A    Well, we both -- I read them over.  He

8    read them over.  We sat down and talked and then we

9    came to a conclusion of which person we thought was

10   best qualified for the job.

11       Q    Just tell me what conversation took

12   place.

13       A    I'm not sure I understand what you're

14   saying.

15       Q    Well, did you do rock/paper/scissors or

16   did you actually sit down and review all the names

17   of the candidates?  How did you go about talking

18   with him and getting his views?

19       A    Well, we just talked about the

20   individuals and the applications and we came to an

21   agreement of who we thought was best qualified.

22       Q    Was that sort of in one sitting with him?

Hall

1     A     As I recall it probably was, yes.

2     Q     Do you recall when that happened in

3   relationship to when you actually gave Dannie Young

4   the names?

5     A     No, I couldn't say.

6     Q     Do you recall if it was one day before or

7   up to one week before?

8     A     Oh, it probably all took place -- once we

9   decided, I put the name on the slip and gave it to

10  Dannie the same day.

11    Q     Okay.

12    A     There was a time limit.

13    Q     For the selection?

14    A     Yes.

15    Q     Okay.  How long did you have the

16  application packets?

17    A     I can't recall.

18    Q     But do you recall getting them from

19  Dannie Young?

20    A     Yes.

21    Q     Apart from talking to Mr. Milans, did you

22  talk to anyone else about the selections as you were

**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

Hall

1    making up your mind about who to recommend?

2        A    If it was on the other shifts, of course

3    I talked to the supervisors that were on the other

4    shifts, yes.

5        Q    You say of course.  Do you recall who you

6    talked to?

7        A    Well, if it was shift two, I talked to

8    either Mitchell or Jesse King.

9        Q    Okay.

10       A    If it was shift three, I don't recall who

11   the supervisor was at the time.

12       Q    When you say at the time, you are talking

13   about the time from the closing of these

14   announcements until you made your recommendations?

15       A    Yes.

16       Q    Okay.

17       A    Wait.  I'm sorry.  I think we are in the

18   wrong time frame here.

19       Q    Okay, we're in the wrong time frame.

20       A    At least I am.

21       Q    Let me back up.  Okay.  What I'm asking

22   you about are the 2004 selections for group chief

Hall

1    and two head deskperson jobs where Charlie Brown was

2    selected as group chief and Sarah Pitt and Fletcher

3    Ruffin were selected as head deskpersons.  I've been

4    asking you did you talk to Mr. Milans about those

5    selections?

6         A    Okay.  We're talking about the ones in

7    2004.

8         Q    Yeah.

9         A    That I was asked to recommend.

10        Q    Right.

11        A    I'm sorry.  Then I have to recant

12   something I said --

13        Q    Please.

14        A    -- because that's not correct.

15        Q    Please.

16        A    No, I did not talk with Mr. Milans about

17   that.

18        Q    Okay.

19        A    I was in the Production Office at the

20   time.  Dannie dropped those off to me.  I perused

21   them and I gave him a recommendation.

22        Q    So Mr. Young brought them physically to

Hall

1    your office?

2        A    Yes.

3        Q    How long did you have them before you

4    made your recommendation?

5        A    I don't recall.

6        Q    So now we know Mr. Milans wasn't

7    involved, but did you talk to anyone else?

8        A    No.

9        Q    Did you interview any of the candidates?

10       A    No.

11       Q    Okay.  Let me just say for a general

12   reference, had you within the six months prior to

13   making these recommendations, had you had any

14   extensive discussions with anyone about the relative

15   qualifications of the applicants for these jobs?

16       A    No.

17       Q    Okay.  Do you remember having a

18   conversation, and conversation may be too big a

19   word, but exchanging any words with Mr. Hairsine in

20   a hallway after these selections had been announced

21   and Mr. Hairsine was concerned that he had not

22   gotten one of the jobs?

Hall

44

1    was any controversy about whether he should get back

2    pay?

3         A    Yes.

4         Q    Tell me what you know about Sarah Pitt's

5    training on the computer and scanning functions in

6    the Copy Prep Unit.

7         A    She had a limited amount of training.

8    But she had other duties.  She wasn't trained as

9    extensively as some, but she had training.

10        Q    Do you know who trained her?

11        A    Bill Milans, and there was another guy,

12   Bill Knecht I think on day side, and there was a

13   couple other fellows in the back.  I don't recall

14   their names.  They have since retired.

15        Q    Was there a man named Dexter Hood who was

16   a trainer on computers?

17        A    Dexter was there, but Dexter came later.

18        Q    Okay.  When you say Sarah Pitt had other

19   duties, tell me what you mean by that.

20        A    Sarah would be on the incoming desk so

21   she took care of all the jobs that were coming into

22   the section.  She made out the control cards.  She

Hall

45

1    had the PPW make the xeroxes of the jackets.  She

2    scheduled them.  She placed them up on the counter

3    to be worked.

4        Q      During what period of time was she doing

5    these jobs?

6        A      Period of time?

7        Q      Yeah.  Like what year to what year, do

8    you know?

9        A      She took over that position after Mo was

10   promoted to the group chief in the Color Unit.

11       Q      After Mo Ford was --

12       A      So it was probably sometime in '96 or

13   '97, up until she was promoted into the head

14   deskperson job.

15       Q      Okay.

16       A      Which in fact was the same duties.

17       Q      Head desk was the same duties as incoming

18   desk?

19       A      Yes.

20       Q      The Mo that you're talking about is Mo

21   Ford?

22       A      That's correct.

Hall

46

1     Q    So is it your belief that from the time

2    that Mo Ford got his promotion to group chief until

3    sometime in 2004 that Sarah Pitt was the acting head

4    deskperson during all that time?

5    A    Well, she wasn't acting because there

6    were two supervisors there so there was no position

7    there.  When we lost, when the group chief retired,

8    she assumed the responsibilities of the person that

9    was performing those duties.  And she was working

10   the incoming desk, she was handling queries, she was

11   okaying press sheets, she was doing all the things

12   that the group chief did.

13   Q    You say she wasn't acting in that

14   position because there were two supervisors there?

15   A    Yeah, it was myself and Milans on the

16   other side, so....

17   Q    Then after you left there was still

18   Milans?

19   A    Yes.

20   Q    So was she in charge of the section after

21   you left?

22   A    In charge?

Hall

47

1       Q       Yeah, did you leave Sarah in charge of

2    the section?

3       A       No, I didn't leave her in charge.

4       Q       Okay.

5       A       Sarah was promoted before I left.

6       Q       Before you left the GPO.

7       A       No, before I left the section.

8       Q       I understood you to say that you left the

9    section in 2002.  You left your Foreman position in

10   2002.

11      A       Yeah.

12      Q       And that was the last time that you were

13   a supervisor of Copy Prep, right?

14      A       That's correct.

15      Q       Okay.  Sarah was not promoted by that

16   time, was she.

17      A       I thought she was promoted already before

18   -- I don't absolutely recall, but I thought she was

19   already the head deskperson in the day shift before

20   I left there.

21      Q       Okay.

22      A       Maybe I'm confused about the time frame.

Hall

48

1    Q    Okay.  You were promoted to Assistant to

2    the Production Manager in about 2002 do you recall?

3    A    I think.  I'm not sure about the dates.

4    Q    Okay.  You recall that the promotion when

5    Sarah Pitt became a head deskperson was in the

6    middle of 2004.

7    A    Is that correct?

8    Q    That is correct.

9    A    Okay.  Then my recollection of it is

10   wrong then.

11   Q    Okay.

12   A    So she was acting.

13   Q    She was acting.

14   A    Yes.

15   Q    Okay.  Was she the supervisor in charge?

16   A    No, Milans was in charge.

17   Q    All right.  Do you belong to any

18   organizations whose membership is predominantly

19   black or African American?

20   A    Prince Hall Masons.

21   Q    Do you hold an office in the Masons?  Do

22   you have a title?

Hall

49

```
 1      A      Well, I was Worshipful Master.  I'm a
 2   Past Master now.
 3             By the way, Prince Hall Masons are not
 4   segregated.  We open the doors to everyone.
 5      Q      I understand.
 6             MR. ALLISON:  If you will give me a
 7   minute, we can take a five-minute break.  Or give me
 8   five minutes and I should be able to decide if I can
 9   finish up quickly.
10             MS. BRASWELL:  Sure.
11             (Brief recess.)
12             MR. ALLISON:  Back on the record.
13             BY MR. ALLISON:
14      Q      Were you ever involved in promoting or
15   recommending a person named Harold Needleman for a
16   promotion?
17      A      Yes.
18      Q      Were you actually the selecting or
19   recommending official?
20      A      I was the recommending official.
21      Q      Do you recall what position that was?
22      A      He was group chief.
```

Hall

50

```
 1      Q    Do you recall when that was?

 2      A    Oh.  That was back in the eighties.

 3      Q    Okay.  Were you involved in either

 4  recommending or selecting someone named Tom Gillis?

 5      A    Yes.

 6      Q    For what position was that?

 7      A    Assistant -- group chief also.

 8      Q    Okay.  Were you the recommending or

 9  selecting official?

10      A    I was the recommending.

11      Q    When was that if you can recall?

12      A    Around the same time period.  It was in

13  the early eighties.

14      Q    Okay.

15      A    See, I was an Assistant Foreman then and

16  the Foreman was the selecting official at that

17  point.

18      Q    I see.  Then were you ever involved in

19  either recommending or selecting Karen Kuntz for a

20  position?

21      A    Yes.

22      Q    What position was that?
```

Hall

51

1       A       She was a PPW.

2       Q       What is that?

3       A       It's called a printing plant worker.  She

4    was a copy distributor.  In other words, she took

5    the packages that we, the copy that we made up to be

6    taken to the neg room.  She went from the seventh

7    floor down to the second floor to the neg room.

8       Q       So that's more or less a courier type

9    job?

10      A       Yes.

11      Q       Okay.  When were you involved in

12   recommending her?

13      A       I believe that was the first promotion

14   that I did when I came to day side in '95.

15      Q       So were you selecting or recommending in

16   her case?

17      A       I selected her.

18      Q       Okay.  Now let us mark a couple of

19   documents.

20              MR. ALLISON:  These will be Exhibits 2

21   and 3.

22                      (The documents referred to were

**U.S. GOVERNMENT**
**PRINTING OFFICE**
KEEPING AMERICA INFORMED

MERIT PROMOTION

# Vacancy Announcement

| | |
|---|---|
| **ANNOUNCEMENT NUMBER:** | 04-000 |
| **POSITION:** | Group Chief |
| **SERIES/GRADE:** | KA-4416-00 |
| **SALARY RANGE:** | $33.95 PH  Plus 10% Night Rate |
| **ISSUE DATE:** | 05/00/04 |
| **CLOSING DATE:** | 05/00/04 |
| **NUMBER OF VACANCIES:** | One |
| **ORGANIZATION:** | Production Department
Electronic Photocomposition Division
Digital Prepress Section
Copy Preparation Unit |
| **GEOGRAPHIC LOCATION:** | Washington, DC |
| **PROMOTION POTENTIAL:** | None |
| **DURATION OF APPOINTMENT:** | Permanent |
| **TOUR OF DUTY:** | Shift 3 |
| **OPM NOTICE OF RESULTS REQUIRED:** | No |
| **CIVIL SERVICE STATUS REQUIRED:** | Yes |
| **AREA OF CONSIDERATION:** | Permanent GPO Employees |

**SUMMARY OF DUTIES/RESPONSIBILITIES:**
Under the immediate supervision of the Foreperson and/or Assistant Foreperson the incumbent assigns and supervises employees of the Digital Prepress Section, Copy Preparation Unit. Plans and assigns work in accordance with standard practices or special instructions in the unit. Specifically, the work involves the following duties: Maintains work assignment rosters and other appropriate work lists to show location of work disposition, and elapsed time. Coordinates work with other units as necessary; and reports on workload and status of ████████████████████████, and congressional work. Reviews work procedures and techniques of individual employees as it relates to timeliness and economical methods of processing. Assists in training by providing technical assistance and recommendations when applicable. Schedules leave requests for approval by superior. Evaluates employees and makes formal appraisals of their work performance. Determines training requirements and recommends training needed to superior. Counsels employees, and attempts to resolve complaints and grievances through discussions at the informal level. Nominates employees for awards and initiates disciplinary action as needed. Enforces regulations and rules on housekeeping, conduct, and safety. Maintains production reports and records (i.e., spoilage, production variance, and safety). Performs other related duties as assigned.

**QUALIFICATIONS:** Applicants must have completed a formal, recognized apprenticeship or Government Printing Office journeyperson training program, or possess substantially equivalent practical experience in the trade of the vacancy. In addition, applicants must have at least two years of subsequent journeyperson experience and have served at least one year in the Government Printing Office under a career or career-conditional appointment.

**NOTE 1:** Selectee may also be subject to serving a one year probationary period as prescribed by GPO Instruction 610.9A, "Probationary Period for Newly Appointed Managers and Supervisors."

**NOTE 2:** This position requires a security clearance. If the selectee does not currently possess a security clearance, he/she will be promoted on a temporary basis not to exceed one year pending the completion of a full field investigation and clearance.

**RANKING FACTORS:** *(Applicants who meet the above qualification requirements will be rated on the basis of relevant experience, education, training, supervisory appraisal, job-related awards, and the factors listed below. Applicants should be specific in documenting these areas in their application materials.)*

**CONTINUED ON REVERSE SIDE**

Trademarks/Notices,

EXHIBIT
Hall 1
KH 11-9-06

1. Ability to supervise and direct work.
2. Ability to plan, direct work activities in a manner which promotes coordinated effort and the prompt completion of individual assignments.
3. Ability to deal with others in a tactful manner, and maintain harmony in working relationships and among workers.
4. Ability to communicate effectively both orally and in writing.
5. Ability to understand technical data in order to solve problems, meet deadlines, and keep abreast of all new developments in the industry.

## ALL APPLICANTS MUST INCLUDE THE FOLLOWING:

**Applicants may submit an Optional Form 612, "Optional Application for Federal Employment" (or SF-171), or a resume. If a resume is submitted, it must contain all pertinent data in the OF-612.**

Current and former Federal employees must submit copies of their latest annual performance rating and SF-50 as proof of status or reinstatement eligibility. Veterans who are preference eligibles or who have been separated from the armed forces under honorable conditions after 3 years or more of continuous active service may apply. When one application is received, it will be considered under the federal merit promotion procedures. Applicants eligible under the **Veterans Readjustment Act (VRA)** will also be considered, if this position is being announced at the grade PG-11 level and below. Veterans must submit a copy of their DD-214, "Certificate of Release or Discharge from Active Duty"; if claiming 10-point veterans' preference, submit a SF-15, "Application for 10-Point Veterans' Preference," plus the proof required by that form.

Applicants seeking Excepted Appointments based on disabilities must provide certification from a State or District of Columbia rehabilitation counselor indicating that they meet the requirements for and are eligible for an Excepted Appointment based on a physical or mental disability.

## GPO WILL NOT PAY RELOCATION COSTS.

## OTHER ESSENTIAL INFORMATION:

Applicants must:
- include the vacancy announcement number and position title on their application.
- describe their duties and responsibilities in their own words; position descriptions may  not be submitted.
- meet time-in-grade and qualification requirements by the closing date of this announcement.
- submit a GPO Form 2566, "Report of Merit Promotion Action," if they wish to obtain a report on the status of their application.
- submit applications and required forms postmarked no later than the closing date of this announcement.
- provide the title and length of related courses. For college classes include the number of credit hours (not required if a degree has been earned)
- be a United States citizen or national (e.g. resident of American Samoa)
- include their Social Security Number on their application

**SUBMIT APPLICATION(S) TO:**                      **FOR ADDITIONAL INFORMATION CALL:**

**Team 3**                                                                  (202) 512-1308
U.S. Government Printing Office                      TDD (202) 512-1519
Employment Branch, Room C106, Stop: PSE
732 North Capitol Streets NW
Washington, DC 20401
FAX (202) 512-1292

*\*THIS AGENCY PROVIDES REASONABLE ACCOMMODATIONS TO APPLICANTS WITH DISABILITIES\**
*\*THE GOVERNMENT PRINTING OFFICE IS AN EQUAL OPPORTUNITY EMPLOYER\**

# WITNESS' AFFIDAVIT

## I, **FREDERICK G. HALL,**

am an _____ employee of ___ applicant to __x__ former employee of the U.S. Government Printing Office:

(Agency)

(Office)  Production Department

(Division)  Electronic Photocomposition Division

(Branch)  Digital Press Section

Located in (CITY AND STATE)  Washington, DC

In the capacity of (show both your organization title and the classification of your job, if different):  Supervisor of Printing

Grade __14__ between __2003__ and __November 10, 2004__. Telephone number during working hours is:  Retired.

I HAVE BEEN ADVISED OF THE FOLLOWING:

     I am required by Federal regulations and Government Printing Office policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Government Printing Office. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Government Printing Office policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed

000064



EXHIBIT
Hall 2
KH 11-9-06

Tab F-2
Page 1 of 10 Pages

statement.

_____
(Initials)

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

I am an African American male and I retired from the U.S. Government Printing Office (GPO) on November 10, 2004. The last position I served in was Supervisor of Printing in the Production Department in Washington, D.C. I held this position for about a year and a half before I retired. I was employed with GPO for thirty eight years. I served in a supervisory capacity since 1976.

My duties were supervising the delivery of production and I also oversaw the production of Congressional Agency job requests. In addition, I was responsible for tracking jobs and ensuring jobs were delivered on time.

I was not the Selecting Official for the following positions: Head Deskperson, under vacancy announcement numbers 04-161 and 04-162; Group Chief, under vacancy announcement number 04-163. Danny Young was the Selecting Official. Mr. Young consulted me and asked me to make a recommendation from the applicant pool. I was asked to make the recommendation because I had been a part of the unit since 1971 and served as a supervisor since 1976. I was not a supervisor of the Production Department at the time the applications were presented to me. I believe I was also asked to make a recommendation because I was familiar with the capabilities of the applicants and I had a grasp of who could perform the required tasks. All of the selectees and some of the applicants performed some if not all of the duties prior to the position being advertised.

Mr. Young provided a copy of all of the applications including Mr. Hairsine's. After I reviewed the applications, I chose who I believed to be the Best Qualified out of those candidates and Mr. Hairsine was not one of them. All of the applications that I reviewed, I believe the candidates

were qualified. The selectees (three) were all African-American. Race was not used as a factor when I made the recommendations to Mr. Young.

I supervised Mr. Hairsine for a few years while he and I were on the midnight or third shift. We used to interact on a daily basis.

Over the course of my tenure with GPO, I have served on numerous panels which was either a Selection or Promotion Panel. I was asked to serve after I initially volunteered in 1976. I was only asked to serve on a panel in which

*(Initials)*

I was familiar with the functions of the office such as EPD and Pre Press. I was never asked to serve on a panel concerning the functions of the Binding department because I was not familiar with that unit.

I vaguely remember a conversation with Mr. Hairsine concerning his nonselection for the advertised positions. I also do not recall if I have ever seen Mr. Hairsine's application for advertised positions in the Production Department until the recent positions he applied for.

I have promoted approximately five White employees during my tenure. All but one of the employees are still working for GPO. The others have retired.

I have reviewed this statement, which consists of these _____ pages, and hereby solemnly ____ swear or ____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____
(Signature of Affiant)

12/15/04
(Date)

Signed before me at (City and State)

*Washington, D.C.*

On this *15th* day of *December*, 2004.

*Sharon R. Rice*
_____

**(Signature of Investigator/Witness)**

_____
**(Initials)**

Tab *F-2*
Page *4* of *10* Pages

# Sharon R. Rice

*Attorney at Law*

1201 Pennsylvania Avenue, NW
Suite 300
Washington, DC 20004
Office: 202-661-4769
Fax: 301-809-0527

email: sricelaw@verizon.net

Admitted in the District of Columbia
and South Carolina

## MEMORANDUM

TO:       Draughn & Associates, Brenda Smith, Project Manager

FROM:     Sharon R. Rice, Contract EEO Investigator *SRR*

RE:       Hairsine GPO – 04-32, Supplemental Affidavit

DATE:     April 5, 2005

On March 22, 2005, I contacted Mr. Frederick Hall in order to elicit a more detailed explanation as to why he recommended the three African American applicants to Mr. Young for the positions of Head Deskperson and Group Chief. I conducted an interview with Mr. Hall on that same day. On March 25, 2005, I drafted the affidavit and sent it to him via express mail. The package was scheduled to arrive on March 28, 2005.

I have attached a copy of the shipping receipt, the tracking information, and the documents I sent to him on March 25, 2005. The tracking information demonstrates that Mr. Hall did receive the package on March 28, 2005 at 11:52 a.m.

Mr. Hall was instructed to fax the executed affidavit to my office after he reviewed it. I asked that he send the affidavit to me by no later than Wednesday, March 30, 2005.

On April 1, 2005, I called Mr. Hall's home and spoke to his wife. She confirmed that her husband received the package because she saw my name on the documents. I asked her to have her husband fax the executed affidavit to me by the end of the day.

To date, I have not received Mr. Hall's supplemental affidavit.



EXHIBIT
Hall 3
KH 11-9-06

000067A

APR-05-2005 23:0: From:SHARON R RICE ESQ    3018090527    To:1 320 341 3843    P.6/10

iShip Track It - Track Packages    Page 1 of 1

## Your Tracking Information

| | |
|---|---|
| Status: | DELIVERED |
| Last Scan: | 3/28/2005 11:52:00 AM DELIVERED TAKOMA PARK, MD US |
| | TAKOMA PARK, MD US |
| Delivered To: | TAKOMA PARK, MD US |
| Delivery Date: | Monday, March 28, 2005 |
| Delivery Time: | 11:52:00 AM |
| Delivery Location: | FRONT DOOR |
| Carrier: | UPS |
| Service: | GROUND |
| UPS Tracking Number: | 1Z7R7W600331306050 |

Scan History:

3/28/2005 11:52:00 AM DELIVERED TAKOMA PARK, MD US
3/25/2005 10:20:00 PM DESTINATION SCAN LAUREL, MD US
3/25/2005 8:49:00 PM DESTINATION SCAN LAUREL, MD US
3/25/2005 8:48:00 PM ORIGIN SCAN LAUREL, MD US
3/25/2005 6:36:00 PM BILLING INFORMATION RECEIVED  US

**NOTE:** The times listed in the scan details are local time.

Done

*Status as of Tuesday, April 5, 2005 7:38:40 PM Pacific Standard Time*

Learn More

## Track Another Package

Enter tracking number: [          ]    Submit

Having trouble? Click here for help. ● iShip, Inc. Privacy Policy
Copyright (c) 1998-2005 iShip, Inc. All rights reserved. All other trademarks are properties of their owners.

http://www.iship.com/trackit/track.asp

4/5/2005
TAB F-2
Page 6 of 10 Pages

APR-05-2005 23:03 From:SHARON R RICE ESQ    3018090527    To:1 320 341 3843    P.5/10

# Shipment Receipt:  Page #1 of 1
THIS IS NOT A SHIPPING LABEL  PLEASE SAVE FOR YOUR RECORDS.

**SHIP DATE:**
Fri, Mar 25, 2005

**EXPECTED DELIVERY DATE:**
MON, MAR 28, 2005 EOD

**SHIP FROM:**
SHARON RICE
16426 ELLIPSE TER
BOWIE MD 20716-3262
(301) 809-0246

**SHIP TO:**
FREDERICK G HALL

Business

**SHIPPED THROUGH:**
The UPS Store #2888
BOWIE,MD 20716
(301) 352-8095

**SHIPMENT INFORMATION:**
UPS Ground Commercial
0.04lbs/1lbs Billed
Customer Packed: 11"X8"X1"

Tracking Number: 1Z7R7W50031130605B
Shipment ID: MMS6XK2JZQSA9
Or/Item#: -  -
Ref#: -  -

DESCRIPTION OF GOODS:
-  -

**SHIPMENT CHARGES:**
| | |
|---|---|
| Ground Commercial | $5.40 |
| Service Options | $0.00 |
| Fuel Surcharge | $0.09 |
| **Total** | **$5.49** |

COMPLETE ONLINE SHIPMENT TRACKING INFORMATION:
Enter any of the following addresses in your web browser to view tracking
information:
http://theupsstore.com (select Tracking, then enter Tracking #)
or http://ship.com/track/trk and/or MMS6XK2JZQSA9 Tracking #)

QUESTIONS ABOUT YOUR SHIPMENT?
Contact the SHIPPED THROUGH facility listed above.

ShipmentID: MMS6XK2JZQSA9

Powered by iShip(tm)
03/26/2005 03:16 PM Pacific Time

**Draughn & Associates**
*Law Office of Sharon R. Rice*
**1201 Pennsylvania Avenue, N.W., Suite 300**
**Washington, DC 20004**

March 25, 2005

<u>EXPRESS MAIL</u>

Mr. Frederick G. Hall



Re: <u>**Supplemental Affidavit – Hairsine GPO 04-32**</u>

Dear Mr. Hall:

As we discussed earlier this week, the agency needed further clarification on the specific reasons why you recommended the three African American applicants for the positions of Head Deskperson and Group Chief.

Based upon the telephone interview I conducted with you on March 22, 2005, I drafted your supplemental affidavit and I have enclosed it for your review. Please review the affidavit carefully and make any necessary corrections directly on the document and place your initials next to any corrections you make. In addition, please initial the bottom of each page and indicate the number of pages of your affidavit in the appropriate spaces.

Please fax the signed affidavit to me at the number listed below by no later than Wednesday, March 30, 2005.

If you have any questions or concerns, please feel free to contact me on my cell phone. I am in court all of next week but will call you back as soon as I get a break. Thank you for your patience and cooperation in this matter.

Sincerely,

*Sharon R. Rice*

Sharon R. Rice
Cell: 240-472-4494
Fax: 301-809-0527

Enclosures

TAB F-2
Page 6 of 10 Pages

APR-05-2005 23:03 From:SHARON R RICE ESQ    3018090527          To:1 320 341 3843      P.8/10

## WITNESS' SUPPLEMENTAL AFFIDAVIT

I, **FREDERICK G. HALL,**

am an ____ employee of ___ applicant to  _x_  former employee of the U.S.
Government Printing Office:

(Agency)

(Office)  Production Department

(Division)  Electronic Photocomposition Division

(Branch)  Digital Press Section

Located in (CITY AND STATE) _Washington, DC_

In the capacity of (show both your organization title and the classification of your
job, if different):  Supervisor of Printing

Grade _14_ between _2003_ and _November 10, 2004_.
Telephone number during working hours is:  _Retired._

I HAVE BEEN ADVISED OF THE FOLLOWING:

     I am required by Federal regulations and Government Printing Office
policy to cooperate fully and promptly with the investigator who has been
assigned to conduct a thorough and impartial investigation into a complaint of
discrimination against the Government Printing Office. I must provide a
statement for the investigative report which is true and complete to the best of
my knowledge and which discloses all of my firsthand knowledge having a
bearing on the merits of the complaint. My statement is provided under oath (or
affirmation), without a pledge of confidentiality, in accordance with Equal
Employment Opportunity Commission rules and regulations and Government
Printing Office policy. This means that any employee(s) whom I accuse of
discrimination or other acts of impropriety may be shown relevant portions of my
affidavit and be provided an opportunity to respond for the record. In addition,
the complainant and the appropriate Departmental officials involved in the EEO
complaint process will receive the entire investigative file. I have the right to
review my statement prior to signing it and may make initialized corrections if it is
incomplete or inaccurate. I have the right to receive a copy of the signed
statement.

_____
*(Initials)*

TAB  F-2
Page _9_ of _10_ Pages

000067E

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

I recommended Fletcher Ruffin to Mr. Young for the Head Deskperson position because he had more experience in the overall operation of the office. In addition, he ran the whole ship, stepped up and took charge when the supervisor was absent. Mr. Ruffin demonstrated that he knew everything he needed to know pertaining to the skills necessary for the position. I felt confident that he would be able to perform the tasks required of the position.

I recommended an African American female to Mr. Young for the day shift, Head Deskperson position because she was familiar with the overall operation of the office. In addition, she operated the section since I left. I had confidence in her ability to perform the duties of the position.

I recommended an African American male to Mr. Young for the midnight shift, Group Chief position because he stepped up and took charge and showed more initiative than Mr. Hairsine. I also had confidence in his ability to successfully perform the duties of the position.

I believe that all the selectees names above were better qualified than Mr. Hairsine because he did not show as much initiative as the others.

Since I have been employed with GPO for thirty eight years, I cannot specifically recall the total number of employees I promoted. If I provide a number, I would probably be incorrect. I do recall that I promoted five White employees during my tenure and I can only recall the names of three: Tom Gilles, Harold Needleman, and Karen Kuntz.

I have reviewed this statement, which consists of these _____ pages, and hereby solemnly ___ swear or ___ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____
*Initials*

2

TAB F-2
Page 10 of 10 Pages

000067F