# WITNESS' AFFIDAVIT

I, **WILLIAM MILANS,**

am an __X__ employee of ___ applicant to ___ former employee of the U.S. Government Printing Office:

(Agency)

(Office) Congressional Publishing Services

(Division)

(Branch)

Located in (CITY AND STATE) Washington, DC

In the capacity of (show both your organization title and the classification of your job, if different): Printing Services Specialist

Grade _12_ between _August 28, 2004_ and _Present_.
Telephone number during working hours is: 202-512-0224.

I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Government Printing Office policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Government Printing Office. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidentiality, in accordance with Equal Employment Opportunity Commission rules and regulations and Government Printing Office policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and the appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

(Initials)

000076


DEFENDANT'S EXHIBIT
05-1884 RMC

Tab F-5
Page _1_ of _3_ Pages

Having been advised of the above information about my role as a witness in the investigative process, I solemnly swear the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

I am a White male and I am currently employed at the U.S. Government Printing Office (GPO) in the Congressional Publishing Services office as the Printing Services Specialist in Washington, D.C. I have held this position since August 28, 2004. I have been employed with GPO since July 11, 1970.

My current duties are assisting GPO Production and Congressional Representatives with publishing concerns.

I had a working relationship with Mr. Hairsine because I was his supervisor in the Copy Preparation Department for about twelve years and I used to interact with him on a daily basis. Mr. Hairsine worked on the second shift and I worked as the supervisor for all three shifts at the time. The second and third shift supervisors retired.

During my tenure, I have not seen a pattern at GPO in which Black employees or Non-White employees are routinely promoted. The selections for positions in the past, I feel, have always been the best choices regardless of race and the choices made would have been my own (even the promotion that I did not get).

I believe Mr. Hairsine was qualified for the following positions: Head Deskperson, under vacancy announcement numbers 04-161 and 04-162; Group Chief, under vacancy announcement number 04-163. According to the rating factors in the announcements, he would have been qualified for all three positions. All of the journeypersons who work or had worked in Copy Preparation would have been qualified. ~~Three~~ of the individuals who applied for the positions actually worked in the positions for quite some time before the positions were advertised. Selma Dillard and Charlie Brown worked the third shift in the position of Group Chief. Fletcher Ruffin was the only one who worked in the Head Deskperson position for quite some before the position was advertised. Mr. Hairsine worked sporadically in that position ~~because he was rallying~~ the other employees not to work in the position without being paid. ~~Attempted to~~

[Handwritten margin notes: "Five wym", "Sara P.H.", "Paul Trudelt on shift", "wym", "After it became known the positions would be filled.", "wym"]

I believe the selectees were chosen because of their qualifications. The other applicants were as qualified if not better qualified than Mr. Hairsine. My decision would have been based on job performance as well. The selected

_wym_
(Initials)

individuals were excellent choices and had I been the selecting officer, the three individuals selected for these three positions would have been my own choices. I agree 100% with the decisions of the selecting officer. I do not believe that race has ever played a part in the selection of individuals in my old section or the division.

I have reviewed this statement, which consists of these __3__ pages, and hereby solemnly _X_ swear or ___ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____William James Mila_____       _____December 10, 2004_____
(Signature of Affiant)                                (Date)

_____WJM_____
(Initials)

Signed before me at (City and State) __Washington, DC__
On this __13th__ day of __December__, 2004.

_____Sharon R. Rice_____
(Signature of Investigator/Witness)

(Initials)

COPY

1

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3

4   JACK R. HAIRSINE,                )

5   an individual,                   )

6           Plaintiff,               )

7           vs.                      )   Civil Action No.

8   BRUCE JAMES, Public Printer      )   05-1884 (RMC)

9   of the United States,            )

10          Defendant.               )

11          —    —    —    —    —

12          The deposition of DANNIE E. YOUNG was

13   taken on Tuesday, October 24, 2006, commencing at

14   10:05 a.m., at the offices of Karr & Allison, P.C.,

15   1920 N Street, N.W., Suite 300, Washington, D.C.,

16   before Karen Hinnenkamp, Registered Merit Report

17   Notary Public.

18          —    —    —    —    —

19

20

21          DEFENDANT'S EXHIBIT
            05-1884RMC

22



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Young

86

1    Q    And did not receive back pay to your
2    knowledge for being an acting group chief.
3    A    True.
4    Q    Did you have some knowledge at the time
5    you made these selections that Mr. Brown had ever
6    worked as an acting group chief?
7    A    Rephrase the question?
8    Q    Okay. At the time you made these
9    selections did you have any knowledge that
10   Mr. Brown had worked at any point as an acting
11   group chief in the Copy Prep Unit?
12   A    Yes.
13   Q    What knowledge did you have of that?
14   A    Between 7:30 and 8:00 in the morning I
15   would check in Copy Prep again and Mr. Brown would
16   be there up until 8:00 and a lot of times I would
17   check back in about the status of work or whatever
18   and Mr. Brown would inform me where we're at or
19   where we're not at.
20   Q    So that indicated to you that he was the
21   acting group chief?
22   A    Indicated that he was the responsible

1   person and he was acting group chief, yes.
2       Q     In that could he have been acting head
3   deskperson?
4       A     Yes.
5       Q     So in determining that he had been an
6   acting group chief, you were relying on your own
7   observations, if you will, in his unit.
8       A     Yes.
9       Q     Being there personally.  Okay.  I want
10  to ask you to identify a couple of documents.  In
11  making these selections did you do the positions in
12  some order?  In other words, did you let's say
13  start with the group chief and then do the two head
14  deskperson selections?  Remember that some of the
15  same people were applying for all three positions.
16  So did you do them in some order?
17      A     I did them individually, yes.
18      Q     Individually, okay.  Do you remember
19  which one you did first?
20      A     No.
21            MR. ALLISON:  This will be Young
22  Exhibit 9.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JACK R. HAIRSINE,  )
    Complainant,  )
       ) Civil Action No. 05-1884 RMC
    v.  )
       )
BRUCE R. JAMES, Public Printer  )
    U.S. Government Printing Office,  )
    Agency.  )

### DECLARATION OF BARBARA A. WHITTINGTON

I, Barbara A. Whittington, hereby declare:

1. I am Secretary to the Superintendent of the Electronic Photocomposition Division (EPD), U.S. Government Printing Office. The current EPD Superintendent is Mr. Dannie Young. I have held this position since about August 11, 1987.

2. I have reviewed Paragraph 5 of Mr. Hairsine's February 2, 2007, declaration.

3. My given name is Barbara. At no time in the course of my life has my name ever been "Nancy."

4. I never said to Mr. Hairsine that any particular individual was going to be selected or most likely to be selected for the positions at issue in the above-captioned matter.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3-13-2007

BARBARA A. WHITTINGTON



DEFENDANT'S EXHIBIT 9
05-1884 RMC

COPY

1

```
1                  UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF COLUMBIA
3
4  - - - - - - - - - - - - - - - - -x
5  JACK R. HAIRSINE                  :
6            Plaintiff               :
7      vs.                           :   Case No: 05-1884
8  BRUCE R. JAMES, PUBLIC PRINTER    :
9  OF THE UNITED STATES GOVERNMENT   :
10 PRINTING OFFICE                   :
11           Defendant               :
12 - - - - - - - - - - - - - - - - -x
13
14                               Washington, D.C.
15                               Tuesday, November 7, 2006
16
17 Deposition of:
18                   JACK R. HAIRSINE
19 the Deponent, called for examination by counsel for the
20 Defendants, pursuant to notice and agreement as to time and
21 place, at 501 3rd Street, N.W., Washington, D.C., before
22 Jack L. Becker, a Notary Public in and for the District of
23 Columbia.
24
25
```



REPORTING, INC.
Court Reporting · Depositions
Metro Area (301) 261-1902
Balt. & Annap. (410) 974-0947

DEFENDANT'S EXHIBIT
05-1884 RMC

```
 1        Q.    What did you do after you graduated from high
 2   school?
 3        A.    Went in the Marine Corps.
 4        Q.    How long were you in the Marine Corps?
 5        A.    Two years.
 6        Q.    So 1967 to '69?
 7        A.    '68, beginning of '68 to '70.
 8        Q.    Okay.
 9        A.    Let me make a correction on that.  In '67 I
10   graduated.  I went to Brown's, started working there, and then
11   went in the Marine Corps and came back and started working
12   with Mr. Brown's again and got my journeymanship.
13        Q.    Okay.  So how long did you work with Mr. Brown's
14   before you went into the Marine Corps?
15        A.    About six months.
16        Q.    Okay.  So you think you were in the Marine Corps
17   from 1968 to 1970?
18        A.    I know I was in the Marine Corps from '68 to 1970.
19        Q.    You know you were.  Okay.  And where were you
20   stationed?
21        A.    Camp Lejeune, North Carolina.
22        Q.    The entire time?
23        A.    No.
24              REPORTER:  Can you repeat that again, where in North
25   --
```

19

```
 1              WITNESS:  Camp Lejeune, North Carolina.
 2              BY MS. BRASWELL:
 3        Q.    Was that the first place that you were stationed --
 4        A.    Paris Island.
 5        Q.    -- when you entered the Marine Corps?
 6        A.    When I went to boot camp, Paris Island, South
 7   Carolina.
 8        Q.    How long was that?
 9        A.    I was there 12 weeks.
10        Q.    And did you go to Camp Lejeune after Paris Island?
11        A.    Yes.
12        Q.    For how long?
13        A.    Approximately six -- I would say three months.
14        Q.    And where were you stationed next?
15        A.    I went on the Mediterranean cruise.
16        Q.    For how long?
17        A.    Six months.
18        Q.    Then where were you stationed?
19        A.    Then I came back to Camp Lejeune, North Carolina.
20        Q.    For how long?
21        A.    For my remainder.  I believe it was six months at
22   the time.
23        Q.    Were you ever involved in combat?
24        A.    Yes and no.
25        Q.    Okay.  You want to explain that?
```

```
 1        A.   Okay.  Yes, I was in Beirut to evacuate American
 2   citizens.
 3        Q.   When?
 4        A.   In 1969.
 5        Q.   When in 1969?
 6        A.   We left in July, '69.  I was in Beirut probably end
 7   of November.
 8        Q.   Okay.  For how long?
 9        A.   Thirty days.
10        Q.   And so is that what you were saying was combat yes
11   or no?
12        A.   Well, it was evacuating American citizens.  We were
13   -- we had arms in case of any hostile fire, but as far as
14   being shot at, no, but we were there for the protection of
15   American citizens.
16        Q.   Okay.  So you were in a situation where you could
17   have been in combat but, in fact, you never encountered --
18        A.   Right.
19        Q.   -- any hostile fire?
20        A.   Yes.
21        Q.   And then when you got out of the Marine Corps you
22   went back to work Mr. Brown's in Baltimore?
23        A.   Yes.
24        Q.   And how long did you -- so that's now -- you
25   originally said that you began with Mr. Brown's in 1972, so I
```