# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JACK R. HAIRSINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1884 (RMC) |
| | ) | |
| BRUCE R. JAMES | ) | |
| Public Printer of the U.S. Printing Office, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Jack R. Hairsine, a Caucasian, was not selected for three positions at the Government Printing Office ("GPO") that were awarded to three African-Americans. He sues Bruce R. James, head of the GPO, in his official capacity, alleging reverse discrimination based on race and color. The government has filed a motion for summary judgment, which Mr. Hairsine opposes. The Court finds that Mr. Hairsine has presented argument but not evidence to dispute the government's motion. It will therefore grant the motion for summary judgment and dismiss this suit.

## I.  BACKGROUND

Mr. Hairsine is a Caucasian male who at all relevant times was employed as an offset stripper in the Copy Prep Unit of the Pre-Press Section of the Electronic Printing Division of GPO. Compl. ¶ 7. Three vacancy announcements were posted for the Copy Prep Unit in April 2004: (1) Vacancy Announcement 04-162 for a "Head Deskperson" for Shift 1; (2) Vacancy Announcement 04-161 for a "Head Deskperson" for Shift 2, and (3) Vacancy Announcement 04-163, for a "Group Chief" position for Shift 3. Mr. Hairsine applied for all three positions but was not selected. Def.'s Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s Facts") ¶ 2.

Dannie Young, Assistant Production Manager in the Production Department, was the selecting official for the three vacancies. *See id.* Ex. 1 (Young Aff.). He requested recommendations from Frederick Hall, one of his direct reports and the foreperson of the Section in which the Copy Prep Unit was located. *See id.* Mr. Hall had been the direct foreperson of the Copy Prep Unit until about one year before the selections, when he was promoted and William Milans became direct foreperson of the Copy Prep Unit. *See* Pl.'s Mem. Opposing Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at 3. Messrs. Hall and Young are both African-American and Mr. Milans is Caucasian. *Id.* Exs. 1 (Young Aff.) & 3 (Hall Aff.); Def.'s Reply Ex. 7 (Milans Aff.). Mr. Hall reviewed all of the applications and made recommendations to Mr. Young. Pl.'s Mem. Ex. 3. Relying in part on those recommendations, Mr. Young made his selection decisions. Def.'s Facts Ex. 2 (Young Suppl. Aff.). Mr. Hall and Mr. Hairsine are personal friends. *Id.* Ex. 3 (Hairsine Dep.) at 105-06.

Mr. Hall recommended to Mr. Young that he select Sarah Pitt, an African-American, for the Head Deskperson position for Shift 1 (the day shift). Pl.'s Mem. Exs. 3 & 4 (Hall Suppl. Aff.); Def.'s Facts Ex. 2. Ms. Pitt had been employed at the GPO for approximately 30 years and had been working as an offset stripper since 1984. Pl.'s Mem. Ex. 7 (Pitt Appl.). At the time of the vacancy in question, Ms. Pitt was working on Shift 1 and Mr. Hall believed that she was familiar with the overall operation of the office and her shift duties. Def.'s Facts Ex. 4 (Hall Dep.) at 44-46. She also had experience acting as the Head Deskperson for Shift 2 (the swing shift). *Id.* at 58-60. Mr. Young selected Ms. Pitt in part based on Mr. Hall's recommendation. *Id.* Ex. 2. He understood that certain duties performed during Shift 1 — such as dealing with the Code of Federal Regulations and Presidential Documents — were primarily performed only during Shift 1. *Id.* He concluded that Ms. Pitt was the best candidate to understand and direct the work on Shift 1. *Id.* At the time of the

selections, Mr. Hairsine was working on Shift 2 and had not worked full-time on Shift 1 for 10 years. *Id.* Ex. 3 at 33-34, 70.

Mr. Hall recommended to Mr. Young that he select Fletcher Ruffin, an African-American, for the Head Deskperson position for Shift 2. Pl.'s Mem. Ex. 4. Like Ms. Pitt, Mr. Ruffin had approximately 30 years experience working for the GPO. *Id.* Ex. 6 (Ruffin Appl.). Mr. Young selected Mr. Ruffin. *Id.* Ex. 2. While Mr. Hairsine initially challenged this selection, he has withdrawn his challenge, acknowledging that he was not better qualified than Mr. Ruffin. *See* Pl.'s Mem. at 9 ("Undisputed (as to Mr. Ruffin only)" that "Plaintiff does not believe that he was better qualified than Mr. Ruffin for the Head Deskperson position for Shift 2.").

With respect to the third vacancy, for the Group Chief position for Shift 3 (the graveyard shift), Mr. Hall recommended to Mr. Young that he select Charles Brown, an African-American. Pl.'s Mem. Ex. 4 Unlike the Head Deskperson jobs, the Group Chief position is a supervisory role and higher in rank. *Id.* Ex. 2. As with the others who were selected to fill the vacancies, Mr. Brown had worked at the GPO for decades. *See id.* Ex. 12 (Brown Appl.). Mr. Hall believed that Mr. Brown had demonstrated leadership capabilities while working on Shift 3 and that Mr. Brown had shown more initiative than Mr. Hairsine. *Id.* Ex. 4. Mr. Hall found Mr. Brown to be "very personable," "knowledgeable about all the operations" done in the Copy Prep Unit, and an excellent worker. Def.'s Facts Ex. 4 at 60-61. Mr. Young selected Mr. Brown, based in part on Mr. Hall's recommendation. Pl.'s Mem. Ex. 2. In addition, Mr. Young selected Mr. Brown because he believed that Mr. Brown had been performing most of the duties of the Group Chief position on an informal basis before the vacancy announcement for the position had been posted. *See id.*

Mr. Hairsine filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") on September 3, 2004. After receiving an adverse decision from the EEOC, Mr. Hairsine filed this action on September 23, 2005. He seeks damages and injunctive relief ordering the GPO to promote him to either Head Deskperson or Group Chief. On January 4, 2007, the government moved for summary judgment. That motion has been fully briefed and is now ripe for decision.

## II.  LEGAL STANDARDS

### A.    Summary Judgment.

Under Federal Rule of Civil Procedure 56, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party that "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson*, 477 U.S. at 248. A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position.  *Id.* at 252.  To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  The nonmoving party may not rely solely on allegations or conclusory statements.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor.  *Greene*, 164 F.3d at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

**B.    Reverse Discrimination Under Title VII.**

Under Title VII, it is unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  When a plaintiff has no direct evidence of discrimination, the Court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which a plaintiff must make a prima facie showing of discrimination in order to shift the burden to the employer-defendant to establish a legitimate, non-discriminatory reason for the employment action; and, if the defendant establishes such a reason, the burden shifts back to the plaintiff to show that the defendant's reason is a pretext for discrimination.  *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

To make out a prima facie case, a plaintiff must show that: "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). In a reverse discrimination case, however, the standards are slightly different because "[i]nvidious racial discrimination against whites is relatively uncommon in our society . . . . Thus, in order to establish a prima facie case under Title VII, . . . a white plaintiff [must] show additional background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993) (internal quotation marks omitted). This additional requirement is not meant to place white plaintiffs at a disadvantage; rather, it "merely substitutes for the minority plaintiff's burden to show that he is a member of a racial minority; both are criteria for determining when the employer's conduct raises an 'inference of discrimination.'" *Id.*

There are two general categories of background circumstances that a plaintiff can rely on to raise an inference of reverse discrimination: "(1) evidence indicating that the particular employer at issue has some reason or inclination to discriminate invidiously against whites; and (2) evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Id.* (internal citations omitted). It is clear that "an allegation of superior qualifications, if supported by the facts, can constitute sufficient background circumstances to establish a prima facie case." *Id.* at 151. That is, "if a more qualified white applicant is denied promotion in favor of a minority applicant with lesser qualifications, . . . that in itself raises an inference that the defendant is that unusual employer who discriminates against the majority." *Id.* at 153 (internal quotation marks omitted). At the summary judgment stage, of course, "the plaintiff

bears the burden of showing that there is a genuine issue of material fact on the issue of superior qualifications." *Id.* at 154. The plaintiff "must support his allegations of superior qualifications with facts in the record; a mere unsubstantiated allegation of superior qualifications creates no 'genuine issue of fact' and will not withstand summary judgment." *Id.* (quoting *Celotex*, 477 U.S. at 322-23).

### III. ANALYSIS

The government argues that it is entitled to judgment on Mr. Hairsine's Title VII claims because there is no evidence of "background circumstances" that support an inference of reverse discrimination. Mr. Hairsine contends that the evidence points to something "fishy" about the decision to pass him over for the promotions. At its core, Mr. Hairsine's argument is that he was better qualified than the minority applicants who received the promotions. Before comparing his qualifications to the other applicants, however, Mr. Hairsine raises a melange of preliminary arguments aimed at the selection process itself.

### A.     The Selection Process.

According to Mr. Hairsine, there is an indication of racial bias in the selection process because the selecting official, Mr. Young, only discussed the promotions with Mr. Hall, an African-American who was no longer working in the Digital Pre-Press unit; he did not consult with William Milans, a Caucasian who was the foreman of the Digital Pre-Press unit. *See* Pl.'s Mem. at 3, 13. He further argues that the insidiousness of this decision is evidenced by the fact that Mr. Young provided untruthful testimony about his reasons for not consulting with Mr. Milans — he testified that he could not consult with Mr. Milans because the latter was on vacation when, in fact, Mr. Milans was not on vacation. *See id.* Mr. Hairsine also argues that Mr. Hall and Mr. Young made "unfair and unfounded assumptions" about his capabilities. Pl.'s Mem. at 21. Finally, he states that

Mr. Hall's recommendations were "the product of pre-selection." As evidence of this, he avers that since 1997 Mr. Hall had selected or recommended only African-American candidates for promotion, and that Mr. Hall did not brief Mr. Young concerning any of the successful applicants and did not interview the applicants or talk to anyone about them. *Id.* at 21-22. Thus, Mr. Hairsine argues that, at a minimum, Mr. Hall did not give fair consideration to his application. *Id.* at 4.

Contrary to Mr. Hairsine's arguments, the record reveals nothing "fishy" about the selection process. Although Mr. Hall had not worked in the Digital Pre-Press area for about a year before making the promotion recommendations, he had been foreman in that area from 1995 to 2002. Pl.'s Mem. Ex. 16 (Hall Dep.) at 12-13. Thus, Mr. Hall certainly had years of direct knowledge about the workings of the unit, and there is nothing inherently suspect in Mr. Young's decision to solicit recommendations from him. The situation does not rise to the level of something "fishy" but is, instead, entirely logical and reasonable. Mr. Hairsine correctly notes that Mr. Hall did not discuss the candidates with Mr. Young or interview them, but those facts do not raise any inference of discrimination or disparate treatment. In fact, it is undisputed that Mr. Hall and Mr. Hairsine are personal friends, so Mr. Young's decision to consult with Mr. Hall was more likely to help Mr. Hairsine than to hurt him.

Similarly, there is nothing suspicious about Mr. Young's failure to consult with Mr. Milans. In fact, Mr. Young sought out Mr. Milans when he went looking for a recommending official for these selections, but Mr. Milans "was not in the building." Pl.'s Mem. Ex. 14 (Young Dep.) at 30. Mr. Young testified that he could not remember why Mr. Milans was unavailable: "I think he was on vacation or what have you. He wasn't there." *Id.* Mr. Hairsine challenges the truth of this testimony because Mr. Milans was not on vacation at the time. *See id.* Ex. 19 (Hairsine Aff.)

¶ 2 ("During the entire two week period, Mr. Milans was out sick for a few hours, late to work one day, and took one hour of annual leave.  Otherwise, he was on duty.").  Mr. Young's uncertainty, in October 2006 at the time of his deposition, as to *why* Mr. Milans was out of the building in late June 2004, cannot be contested by Mr. Hairsine's evidence that Mr. Milans was not on vacation.  What matters is that Mr. Milans "wasn't there."  *Id.* Ex. 14 at 30.  Thus, while it is true that Messrs. Young and Hall are both African American and that Mr. Milans is Caucasian, Mr. Young's failure to speak to Mr. Milans has a totally non-discriminatory reason.  This mere scintilla of evidence does not create a genuine dispute regarding Mr. Young's reasons for not consulting with Mr. Milans.

Finally, there is no support for Mr. Hairsine's argument that Mr. Hall's recommendations were preordained.  No conclusions can be drawn from the sliver of information provided by Mr. Hairsine concerning Mr. Hall's prior recommendations: with no information on the make-up of the qualified applicant pool for each of the past selections and recommendations, it cannot be said that he was biased in favor of minority applicants.  The only thing that is clear is that Mr. Hall has promoted at least five Caucasian employees during his tenure at GPO.  Pl.'s Mem. Ex. 3 at 3; Pl.'s Mem. Ex. 4 at 6.  Similarly, the fact that Mr. Hall did not brief Mr. Young on his recommendations or interview the applicants is not evidence of racial discrimination.  Despite Mr. Hairsine's opinion that he should have been interviewed, it is undisputed that Mr. Hall did not interview any of the candidates, nor did he discuss any of the candidates with Mr. Young beyond writing his recommendations down on a Post-It Note.  Mr. Hairsine's contention that "Mr. Hall did not give fair consideration to [his] application," Pl.'s Mem. at 4, does not logically follow from these facts and finds no support in the record.  And although he argues that Messrs. Hall and Young made

"unfair and unfounded assumptions" about his capabilities, *id.* at 21, Mr. Hairsine never identifies what those alleged assumptions were.

In essence, Mr. Hairsine's objection to the selection process is that Mr. Hall and Mr. Young should have been more thorough in their review of the applications and, if they had taken the time to "learn more about Mr. Hairsine . . . [than] what was contained in his application," *id.* at 20, they would have recognized him as the most qualified applicant.  Mr. Hairsine does not appreciate that the scope of review in employment discrimination cases is more narrow than he wishes because federal courts are not review boards for local employment decisions.  "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (*quoting Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. (1986)).  To the contrary, a court "may not 'second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive.'" *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (*quoting Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).  A personnel decision can be silly, it can be unfair, and it can be short-sighted without being illegal; Title VII protects against discriminatory decisions, not wrong ones.  There is nothing "fishy" about the selection process that establishes "background circumstances" to support a prima facie case of discrimination.

**B.    Selection of Sarah Pitt as Head Deskperson for Shift 1.**

Putting aside his scatter-shot challenges to the selection process, Mr. Hairsine argues that he was objectively better qualified for the Shift 1 Head Deserkperson position, which was ultimately awarded to Sarah Pitt.  It is undisputed that Mr. Hall recommended to Mr. Young that he select Ms. Pitt for the Head Deskperson position for Shift 1 and that, based in part on that

recommendation, Mr. Young chose her for the position.  *See* Def.'s Facts Ex. 1.  Beyond that, Mr. Hairsine contends that "Ms. Pitt's application was plainly false and contained obvious plagiarism. Ms. Pitt had limited training in the automated aspects of the job, which were significant, and she was not competent in those areas and, her application revealed that she did not comprehend one of the critical aspects of the job — timely completion of work."  Pl.'s Mem. at 4-5 (record citations omitted).  He contends that he was "more skilled in the actual functions of the department" than Ms. Pitt, *id.* at 19, and that he possessed superior leadership skills based on his service in the Marine Corps from 1968-1970, *id.* at 19-20.  These are points of argument, not fact, and do not persuade.

Mr. Hairsine does not specify in what regard he believes Ms. Pitt's application to be "false," but it appears that he challenges the statement in her application that she served as Acting Head Deskperson on Shift 1.  *See* Pl.'s Mem. at 14, 21.  The evidence in the record establishes that Ms. Pitt's claim is accurate.  According to the testimony of Mr. Hall, from January 1995 to sometime in 2002 he was the Foreman in the Digital Pre-Press section, of which the Digital Copy Prep Unit is a part (in 2002 he became Assistant to the Production Manager, Jeff Bernazolli).  Pl.'s Mem. Ex. 16 at 12-13.  Mr. Hall explained that Mo Ford was promoted to Group Chief in the color unit in 1996 or 1997 and his duties at the incoming desk on Shift 1 were taken over by Ms. Pitt.  *Id.* at 44-48.  The "[h]ead desk was the same duties as incoming desk."  *Id.* at 45.  Ms. Pitts was not officially "acting" in the job because there were two supervisors — Messrs. Hall and Milans — "so there was no position there."  *Id.* at 46.  Nonetheless, once Mr. Ford left, Ms. Pitts "was working the incoming desk, she was handling queries, she was okaying press sheets, she was doing all the things that the [head deskperson] did."  *Id.*  Thus, Ms. Pitts served functionally as the "acting head deskperson" on

Shift 1 from sometime in 1996 or 1997 until 2004, even though she did not get the benefit of an "acting" assignment or more money for serving in a higher-graded position. Mr. Hairsine contends that he was "more skilled in the actual functions of the department," Pl.'s Mem. at 19, but does not explain what functions he means or how to compare his skills at the unidentified functions to Ms. Pitt.

Mr. Hairsine also challenges the selection of Ms. Pitt because she had limited training and allegedly was not competent in the automated aspects of the job. For the former point, he relies on Mr. Hall's deposition testimony that Ms. Pitt "had a limited amount of training [on the computer and scanning functions]. She wasn't trained as extensively as some, but she had training." *Id.* Ex. 16 at 44. For the latter, he relies on the affidavit of Dexter Hood, who worked as a trainer in the areas of computers and scanning from 2000 until his retirement from the GPO. *See id.* Ex. 13 (Hood Aff.). Mr. Hood opines, "To the extent that a Head Deskperson should be competent in the various skills that are used in the Copy Prep Unit, Ms. Pitt did not have that competency in the area of computers and scanning and was not qualified for that position." *Id.* ¶ 3.

The problem with this "evidence" is that it merely demonstrates that Mr. Hood differently values Ms. Pitt's prior experiences than did Mr. Hall or Mr. Young. According to Mr. Hall, Ms. Pitt took over the job of running the intake desk when Mr. Ford was promoted to Group Chief in the color unit. Pl.'s Mem. Ex. 16 at 44-48. She ran the intake desk for years before the opportunity for the promotion to Head Deskperson came about. *See id.* Mr. Hall did not find her limited training on computer and scanning functions to be detrimental because she "had other duties" in running the incoming desk: "she took care of all the jobs that were coming into the section. She made out the control cards. She had the PPW [printing plant worker] make the xeroxes of the

-12-

jackets. She scheduled them. She placed them upon the counter to be worked." *Id.* at 44-45. These were the same duties as a head deskperson. *Id.* at 45. In addition, Mr. Young thought that one of the advantages Ms. Pitt offered was that she was familiar with the work that was done on Shift 1. Pl.'s Mem. Ex. 14 at 51. Mr. Young had first-hand knowledge of how Ms. Pitt ran the intake desk because they both worked on Shift 1 and he went into Copy Prep on a daily basis to check on the status of the work. *Id.* at 17-18. That Messrs. Hall and Young discounted Ms. Pitt's lack of computer training in light of her significant experience working at the incoming desk is not so "irrational" as to support an inference of racism.

       Mr. Hairsine does not take issue with these facts; he only argues that he too was familiar with the work on Shift 1 because he occasionally worked overtime or was assigned to Shift 1 when Congress was out of session. Pl.'s Mem. Ex. 19 ¶ 3. But again, there is nothing suspect about Mr. Young's decision to give Ms. Pitt's application more value because she had been working on Shift 1 for many years, as opposed to Mr. Hairsine, who only had limited experience on Shift 1 during the last decade. The kinds of flaws that Mr. Hairsine perceives in Ms. Pitt's credentials do not make his case because they merely reflect his difference of opinion with Mr. Hall and Mr. Young.

       Mr. Hairsine's argument that Ms. Pitt did not appreciate the critical nature of timely completion of work is similarly infirm. Ms. Pitt wrote on her application that she was responsible for making sure that jobs were "not delayed within the section for long periods of time." Pl.'s Ex. 10 at 5 ¶ 2. Mr. Hairsine decries this statement as evidencing a willingness to let work be untimely. Pl.'s Mem. at 4-5. The argument relies upon stretching a statement beyond its meaning — intended to convey attention to deadlines — and transposing it into an admission that deadlines do not matter.

-13-

The argument also overlooks and ignores the statement later in Ms. Pitt's application that "[i]t is my ongoing responsibility to ensure that the schedules and deadlines are met within a timely fashion." Pl.'s Ex. 10 at 6 ¶ 5. In fact, Ms. Pitt's applications demonstrates her knowledge that schedules had to be timely met.

Mr. Hairsine further claims that Ms. Pitt's application contains "obvious plagiarism." Pl.'s Mem. at 4. He asserts that Ms. Pitt "blatantly copied Mr. Ruffin's application in several respects." *Id.* at 14. He compares Mr. Ruffin's application at page 6 with Ms. Pitt's. Mr. Ruffin wrote:

> I have the ability to communicate effectively, both orally and in writing when assisting in the preparation of special job assignments. This responsibility requires attentiveness to specific details, and the ability to communicate effectively, both orally and in writing and the ability to use these skills in applying rules and regulations to day-to-day operational procedures in the Copy Preparation Section.

Pl.'s Mem. Ex. 6 at 6. Ms. Pitt wrote:

> I have the ability to communicate effectively, both orally and in writing when assisting in the preparation of special job assignments. This responsibility requires attentiveness to specific details, ability to communicate effectively, both orally and in writing with the skills to apply rules and regulations to day-to-day operational procedures in the Copy Preparation Unit.

Pl.'s Mem. Ex. 7 at 6. While not exact duplicates, these answers to the question concerning a candidate's ability to communicate effectively certainly closely mimic each other. At his deposition, Mr. Ruffin testified that Ms. Pitt did her application on her own and did not ask to see his application. Pl.'s Mem. Ex. 15 at 63. Mr. Ruffin was not asked why the two paragraphs were virtually identical. At his deposition, Mr. Young simply stated that he could not explain why they

-14-

are similar.  Pl.'s Mem. Ex. 14 at 47-48.  Since Ms. Pitt was not deposed, there is no record information on any explanation from her.

Mr. Hairsine insists that Ms. Pitt plagiarized from Mr. Ruffin's application.  Of course, it is possible it was the other way around.  Or that both candidates looked on the Internet for suggested ways to answer such questions.  Or that GPO employees maintain a collection of successful past applications from which a candidate might "borrow" when the occasion presents.  There is simply no way to know how this happened.  But more importantly, there is no indication that Mr. Young noticed it when he was reviewing the applications.  He was asked at his deposition if he could explain the similarity, but he was not asked whether he remembered taking note of it when he reviewed the applications.  Pl.'s Mem. Ex. 14 at 47-48.  Whatever the meaning of the virtually identical responses, there is no evidence that they had any impact of any kind on the selection here.

Finally, Mr. Hairsine contends that he was more qualified based on "real leadership experience" that he gained while serving in the Marine Corps from 1968 to 1970.  Pl.'s Mem. at 19-20.  Although Mr. Harisine's service is commendable, the Court cannot find that an experience 34 years before the instant selections were made has the weight or bearing that Mr. Hairsine attributes to it.

There is no question that Mr. Hairsine was qualified for the Head Deskperson position.  At issue is whether his qualifications are so superior to Ms. Pitt's that the difference supports an inference of discrimination.  At the time she applied, Ms. Pitt had been working at the GPO for over 30 years and had been essentially performing the head deskperson job for Shift 1 since at least 1997.  *See* Pl.'s Mem. Ex. 7 at 1-2 & Ex. 16 at 44-48.  The record does not reflect any

meaningful disparity in qualifications between Ms. Pitt and Mr. Hairsine. The attacks on Ms. Pitt's qualifications advanced by Mr. Hairsine are trivial and do not indicate that Mr. Young acted in a discriminatory manner by choosing her over Mr. Hairsine. A court "may not 'second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive.'" *Fischbach*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)). There is nothing in the background circumstances to the selection of Ms. Pitt that "support[s] the suspicion that the defendant is that unusual employer who discriminates against the majority." *Harding*, 9 F.3d at 153.

    **C.    Selection of Charles Brown as Group Chief for Shift 3.**

        Mr. Hairsine also contends that he was passed over for the Group Chief for Shift 3 position based on his race and color. Unlike the Head Deskperson job, which is a non-supervisory "lead" position, a Group Chief is a supervisory position. It is undisputed that Mr. Hall recommended to Mr. Young that he select Charles Brown to be Group Chief for Shift 3 and, based in part on that recommendation, Mr. Young chose Mr. Brown. *See* Def.'s Facts Ex. 1. Mr. Hairsine disputes the bases on which Mr. Hall made his recommendation because "Mr. Hall had not worked on the same shift as Mr. Brown or Mr. Hairsine and made no effort to determine whether Mr. Hairsine's skills were equivalent or superior to Mr. Brown's." Pl.'s Mem. at 9. Mr. Hairsine asserts that Mr. Brown was not well qualified and that Mr. Hairsine presented substantially better qualifications. *Id.* at 13. He claims that "Mr. Young identified nine different aspects of Mr. Hairsine's applications for the positions that demonstrated supervisor ability. Mr. Brown's application does not appear to demonstrate any." *Id.*

First, Mr. Hairsine is incorrect that Messrs. Hall and Young were not sufficiently familiar with Mr. Brown's work to make their selection of him legitimate.  In fact, both Mr. Hall and Mr. Young had direct experience observing Mr. Brown at work.  Mr. Hall usually arrived for his morning shift forty-five minutes before Mr. Brown's night shift ended; Mr. Hall would receive an update from Mr. Brown on the work that Shift 3 had completed, what work still needed to be done, and which work was likely to be on the "hot list" to do.  Def.'s Facts Ex. 4 at 61-62.  Mr. Hall found Mr. Brown's updates to be "very good."  *Id.* at 62.  Similarly, Mr. Young would check into the Copy Prep Unit between 7:30 and 8:00 in the morning and he periodically received reports on the status of the work from Mr. Brown.  Def.'s Reply, Ex. 8 at 86-87.  Mr. Young personally observed Mr. Brown serving as the acting Group Chief for his shift.  *Id.*  Thus, even if it could be said that Mr. Hairsine's application identified more specific supervisory duties that he had performed when working as Acting Head Deskperson, the record shows that Mr. Hall and Mr. Young had personal knowledge of Mr. Brown's supervisory experience in addition to his detailed description of the scope of actual work that he performed.

Second, contrary to Mr. Hairsine's arguments, the record shows that Mr. Brown was well qualified for the Group Chief position.  Mr. Young testified that a supervisor would (1) use the Production Estimating Planning System ("PEPS"), Pl.'s Mem. Ex. 14 at 75; (2) direct the workflow and the offset strippers, *id.*; (3) plan and organize the work activities of the Copy Preparation Unit to meet deadlines, *id.*; (4) make sure that manpower shortages would not cause a conflict within work assignments, *id.* at 75-76; (5) receive work and schedules from other sections within the division, *id.* at 76; (6) assign work to employees, *id.*; (7) maintain a line of communications with other supervisors, *id.*; (8) tell on-coming shift supervisors about work in the unit, *id.*; and (9) work

-17-

with offices in Congress, like House Appropriations and the Federal Register. *Id.* at 77. Mr. Hairsine's application noted that he had experience in each and all of these areas from the occasions when he served as Acting Head Deskperson. *See* Pl.'s Mem. Ex. 11, at 4-5.

According to Mr. Brown's application, which was organized differently from Mr. Hairsine's, Mr. Brown had extensive experience in these areas as well. He worked with PEPS. Pl.'s Mem. Ex. 12, Att. A. He placed all incoming jobs in order and responded to all inquiries about locations and conditions of jobs. *Id.* He knew all the systems and equipment in the Digital Prepress Section, where he was working as Head Scanner. *Id.* He covered many of the activities of a Group Chief:

> I assemble all types of printing media: (art-transparencies, mechanical, repros-reprint copy-print-plates progressive proofs-film negatives-manuscript or other) to make a satisfactory finished book, brochure, pamphlet or form as ordered by department. I inspect-size evaluate-prepare camera copy to meet Quality Assurance Standards. I examine Departments O.K. proofs for corrections. I advance work to the next production areas on schedule. I consult with supervisors on doubts as to the customers request. I demonstrate a full working knowledge of all job-handling procedures. The jobs I handle must meet the schedule time no less than 90%. I follow jacket instructions, department req., spec. sheets, print orders, A.J.I.S. and memo. I verify trim size, type of binding and punching, form numbers. I determine correct margins. I am also responsible for keying in illustration to text, mount proofs, provide bleed, cropping , color breaks, tone overlay and registration controls. I determine whether jobs need doc line, prices and other printing identifications. I prepare data sheets of ally [sic] types as required. I inspect negatives for reprint quality standards. I order films, prints, proofs, type of correct fac [sic] fonts. I create or supply missing elements of art or copy. I also make accurate records of all work or movement of materials on a section control card.

*Id.* In addition, Mr. Brown performed duties for the Security Room of the Copy Preparation Section, as detailed on his application. *See id.* Like Mr. Hairsine, Mr. Brown had served in the military. *See*

-18-

*id.* From this description, Mr. Young concluded that Mr. Brown "had performed most of the duties of the Group Chief on an informal basis before the job had been posted." Pl.'s Mem. Ex. 2.

Mr. Hairsine also claims that Mr. Brown was "less qualified by objective standards." Pl.'s Mem. at 22. But Mr. Brown, like Ms. Pitt, had been working at the GPO for over 30 years at the time he was selected by Mr. Young. *See* Pl.'s Mem. Ex. 12. Also like Ms. Pitt, Mr. Brown had effectively been performing many of the duties of a Group Chief prior to his promotion into the job. *See id.* Mr. Hairsine had, at unknown times and for unknown durations, served as Acting Head Deskperson on Shift 2. *See* Pl.'s Mem. Ex. 11 (Hairsine Appl.). Since Mr. Brown had immediate on-going experience with the Group Chief's duties, and Mr. Hairsine had prior experience of unknown immediacy or duration serving in a different job, it is impossible to make a true comparison and certainly impossible to find that Mr. Hairsine's experience was equal — much less superior — to Mr. Brown's. As the Court of Appeals instructed in *Harding*, the "mere unsubstantiated allegation of superior qualifications creates no 'genuine issue of material fact' and will not withstand summary judgment." *Harding*, 9 F.3d at 154 (*quoting Celotex*, 477 U.S. at 322-23).

There is no question that the record demonstrates that Mr. Hairsine was qualified for the Head Deskperson and Group Chief positions. Indeed, the government does not dispute that point. But the record is also clear that Ms. Pitt and Mr. Brown were at least as well qualified as Mr. Hairsine. Thus, Mr. Hairsine cannot demonstrate background circumstances raising an inference that Mr. Young or Mr. Hall discriminated against him based on his race. *See, e.g.*, *Fischbach*, 86 F.3d at 1183 ("[T]he court must respect the employer's unfettered discretion to choose among qualified candidates."); *Jones v. Bernanke*, No. 04-1696, 2007 WL 1662330, at *7-*8 (D.D.C. June 11, 2007)

(finding that plaintiff in a reverse discrimination case failed to show background circumstances because the record revealed only that he and the chosen candidate were "equally qualified"); *see also Chock v. Northwest Airlines, Inc.*, 113 F.3d 861, 864 (8th Cir. 1997) ("[A] comparison that reveals that the plaintiff was only similarly qualified . . . as the selected candidate would not raise an inference of racial discrimination.").

## IV.  CONCLUSION

Mr. Hairsine cannot show that he was better qualified than Sarah Pitt or Charles Brown for the positions to which they were promoted.  The record simply does not reflect a discriminatory decision to promote two minority applicants over a white applicant with clearly superior qualifications.  The government's motion for summary judgment will be granted.  A memorializing order accompanies this Memorandum Opinion.


DATE:  June 19, 2007                    _____/s/_____
                                        ROSEMARY M. COLLYER
                                        United States District Judge